UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:

SWIFTSHIPS, LLC                                             CASE NO. 26-50237
    Debtor                                             CHAPTER 11

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTOR'S**
**REQUEST TO WAIVE DEPOSITARY REQUIREMENTS OF § 345(b)**

COMES NOW David W. Asbach, Acting United States Trustee for Region 5 (the "U.S. Trustee"), and objects to Debtor Swiftships, LLC's Cash Management Motion, filed at ECF No. 80, to the extent it seeks to waive the depository requirements of § 345(b) of the Bankruptcy Code.

## I.       Preliminary Statement

1.      The Debtor's Cash Management Motion (the "Motion") fails to meet the core statutory transparency requirements needed to justify a waiver under 11 U.S.C. § 345(b). A debtor seeking to maintain an uncollateralized, non-uniform banking architecture bears the burden of presenting a cohesive, transparent narrative to the Court and its creditors. Instead, the Debtor's Motion contains serious errors and omissions.

2.      While the Motion exclusively requests authority to continue using amounts maintained at Patterson State Bank ("PSB"), the Debtor completely omits its active account relationship with the National Bank of Egypt, which holds $21,473.63 in uncollateralized estate cash[1]. Neither bank has signed a uniform authorized depository agreement ("UDA") obligating

---

[1]Exhibit 1 of the Schedules establishes that the Debtor maintains an active account relationship with the National Bank of Egypt (Account xxxx-xxxxx5-010) (ECF No. 52 at 29). It also lists a $1,500,000.00 short-term investment letter of credit tied to its "DCS Egypt" customer (ECF No. 52 at 3, 29). The Cash Management Motion seeks relief, and a § 345(b) waiver exclusively for accounts held at Patterson State Bank. The Motion remains entirely silent on why the National Bank of Egypt accounts are left out of the cash management structure completely.

1

them to collateralize these funds, and indeed as a foreign institution that cannot be an FDIC member, the National Bank of Egypt is not eligible to be an authorized depository. The bank statements revealed that these two institutions held $1,131,814.09 at the end of April 2026. Of this amount, only $250,000.00 is covered by FDIC insurance.

3. Furthermore, while the Motion describes four distinct military and commercial shipbuilding programs to justify its banking structure, it completely fails to map or explain how these projects link to its requested PSB accounts. In addition, a forensic review of Monthly Operating Reports reveals the Debtor sweeps hundreds of thousands of dollars out of restricted naval project accounts into a general, uncollateralized corporate account plagued by chronic overdrafts and NSF penalties.

4. The Debtor repeatedly asserts that multiple global defense contracts are operationally active and critical to its cash system; yet, its sworn bankruptcy Schedule G is virtually empty, identifying zero active shipbuilding agreements or commercial sales pacts. The U.S. Trustee cannot discern which of Debtor's conflicting statements to rely upon at this juncture.

5. Debtor does not state it has attempted to get Patterson State Bank to execute a UDA or attempted to collateralize the accounts themselves via bond. Because the Debtor's actual banking practices reveal a volatile, unmonitored commingling network rather than a sophisticated financial architecture that cannot be disturbed, a § 345(b) waiver is legally unwarranted.

## BACKGROUND

**The Debtor's Depository Accounts Claimed as Property of the Estate.**

6. The Debtor's Schedule A/B lists the following depository accounts holding the following balances as of the Petition Date:

2



**EXHIBIT 1**

| Swiftships LLC | |
|---|---|
| **Cash and Cash Equivalents as of January 31, 2026** | |
| | Cash at Bank |
| Swiftships NBoE xxxx-xxxxx5-010 | - |
| Patterson State Bank - 28m CDA | - |
| Swiftships PNC xxxxxx8759 | - |
| Prepay Credit Card - PEX card | - |
| Swiftships Patterson State - xxxxx6401 | - |
| Swiftships PATTERSON - XXXXX0401 | - |
| Sub Total $ | - |

(ECF No. 52 at 29). Among these accounts was the Debtor's designated DIP account at PNC Bank, an authorized depository. (ECF No. 96 at 21-22; ECF No. 97 at 22-23). The U.S. Trustee is aware of the following bank accounts, with the following balances:

| Depositary Institutions | Purpose | Balances as of March 31, 2026 | Balances as of April 30, 2026 |
|---|---|---|---|
| PNC Bank Account No. 8759 DIP Account | DIP Account | $8,286.78 | $16,806.80 |
| **PSB Account No 6401** | NAVSEA PMS 377 LCU 170 Special Account [2] | $100.99 | $100.99 |
| **PSB Account No. 0901** | 28M Control Acct, Naval Sea System Command and Special Account | $2,010.77 | $2,010.77 |
| **PSB Account No. 0401** | Free Business/Operating Account | -$7,843.31 | $1,091,421.90 |
| **National Bank of Egypt** | 28m DCS[3] | $16,599.05[4] | $21,473.63 |
| Total Deposits | | $19,154.28 | $1,131,814.09 |
| Total Deposits at Patterson State Bank | | -$5,731.55 | $1,093,533.66 |
| Percent Made Up by Patterson State Bank | | -29.9% | 96.6% |

*(See generally,* ECF No. 96 at 19-20, 21-22, 24, 26, 31 34, ECF No. 97 at 20-21, 22, 24, 26, 31,

---

[2] The balance sheet notes to March 2026 Monthly Operating Report ("MOR") clarify that this is tied to the Debtor's "LCU 1700 program" with the military. (ECF No. 96 at 16).

[3] The balance sheet and accounts receivable schedules to March 2026 MOR explicitly tie Swiftships' primary foreign business to the "Egypt Navy DCS Project." (ECF No. 96 at 15, 18, 20).

[4] Pursuant to National Bank of Egypt account statements, this deposit is not insured by FDIC. (ECF No. 96 at 19; ECF No. 97 at 20).

3

34) (bold indicates the accounts at issue).

7. The FDIC insures up to $250,000 per depositor (not per account) per institution, meaning deposits below this threshold at Patterson State Bank (PSB) do not raise § 345(b) concerns but deposits above that amount are uninsured and unprotected. Deposits at the National Bank of Egypt, a foreign institution, are uninsured and unprotected in any amount. Conversely, PNC Bank is a fully compliant, authorized depository bound by a Uniform Depository Agreement (UDA) to collateralize its accounts in any amount.

8. By weight of deposit, the § 345(b) risk rests principally on PSB, an unauthorized depository. In April 2026, the Debtor held 96.6% of its total depository assets at PSB, exposing a substantial portion of the estate's liquid cash to collateralization defaults.

9. The U.S. Trustee objects to any § 345(b) waiver for these funds. To protect creditors, the Debtor must either compel PSB to execute a UDA and become an authorized depository, or immediately transfer all excess estate funds to its compliant DIP account at PNC Bank

**ANALYSIS**

10. Section 345(a) empowers a debtor-in-possession to deposit or invest estate money to maximize the estate's return while "taking into account the safety of the deposit or investment." 11 U.S.C. § 345(a). Section 345(b), on the other hand, restricts that power to deposit estate money by requiring that either: (1) the deposit is insured or otherwise backed by the full faith and credit of the federal government, or (2) the debtor-in-possession "require" the depository to obtain a bond in favor of the United States or to pledge certain specified securities. 11 U.S.C. § 345(b). "While section 345(a) vests a debtor with some discretion in investing money of the estate, as a practical matter, section 345(b) of the Bankruptcy Code limits that discretion." In re Ditech

4

Holding Corp., 605 B.R. 10, 16-17 (Bankr. S.D.N.Y. 2019).  The purpose of § 345(b) is to ensure the depository's ability to repay the deposit obligation owed to the debtor-in-possession.  In other words, the purpose is "to safeguard the money for the benefit of the debtor's creditors."  Id.

11.     "To ensure that those parties meet their obligations under section 345, the U.S. Trustee monitors fiduciaries and depositories, and requires that chapter 11 estate assets be held in debtor-in-possession accounts at 'Authorized Depositories'—i.e., those [depositories] that have entered into a Uniform Depository Agreement ('UDA') with the U.S. Trustee."[5]  Ditech, 605 B.R. at 15.  "The UDA requires the Authorized Depository to maintain collateral in an amount of no less than 115 percent of the aggregate bankruptcy funds on deposit [for] each bankruptcy estate that exceeds the FDIC insurance limit, unless otherwise provided for by an order of the bankruptcy court."  Id. (bracketing added).

12.     Section 345(b) does provide that the Court may waive the requirements of § 345(b) "for cause."  11 U.S.C. § 345(b) ("unless the court for cause orders otherwise").  This additional language was "intended to afford courts with flexibility in addressing the challenges of strict compliance with the deposit and investment requirements of section 345."  Ditech, 605 B.R. at 17. "The statute does not define the term 'cause,'" which means that Congress left it to the courts to decide what may or may not constitute cause in any particular case.  Id.  In determining "cause," courts have used a totality of the circumstances test, referencing factors listed in the Service Merchandise opinion:  (1) the sophistication of the debtor's business; (2) the size of the debtor's business operations; (3) the amount of investments involved; (4) the bank ratings of the financial institutions where debtor-in-possession funds are held; (5) the complexity of the case; (6) the safeguards in place within the debtor's own business of insuring the safety of the funds; (7) the

---

[5] Region 5 authorized depositories are listed here:  https://www.justice.gov/ust/media/1397436/dl?inline.  Further, a copy of the Uniform Depository Agreement is available here:  https://www.justice.gov/ust/media/1356651/dl?inline.

debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (8) the benefit to the debtor; (9) the harm, if any, to the estate; and (10) the reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case. In re Serv. Merch. Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

13. However, in applying this totality of the circumstances analysis, courts have kept in mind the overriding importance of protecting estate assets. In particular, mere inconvenience or cost in complying with § 345(b) does not constitute "cause" for waiver of this Congressional mandate imposed for the protection of the bankruptcy estate. See, e.g., In re Lodging Enters. LLC, 2024 WL 4252773, *3 (Bankr. D. Kan. Sept. 18, 2024) (holding that debtor failed to establish "cause" for waiver of §345(b) despite showing that compliance with § 345 would burden accounting personnel, disrupt operations, and potentially result in a loss of business).

14. Turning back to the Ditech case, the court found that that, even though the cash management system involved was large and complex, the "financial burden" the debtor would face to ensure the collateralization of its accounts was not sufficient cause to waive § 345(b), particularly without evidence such costs were "unreasonable." Ditech, 605 B.R. at 22. The court reiterated Congress's intent, saying:

> The legislative purpose behind the enactment of section 345(b) was to ensure "that the funds of a bankrupt that are obligated to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate," while also giving bankruptcy courts the flexibility to modify such requirement for "just cause" where strict compliance might "work to needlessly handcuff larger, more sophisticated debtors."

Id. (citing H.R. Rep. 103-835, 103rd Cong., 2d Sess. 210 (Oct. 4, 1994)). The court then said that requiring collateralization "clearly ensures the safety of the funds on deposit in those accounts and, under the facts of this case, the payment of a monthly fee to do so, does not 'handcuff' the

6

Debtors." Id. at 22. The court denied the waiver.

**The Debtor's Failure to Map Stated Operational Programs to Requested Bank Accounts.**

15. The Debtor's Cash Collateral Motion, in most conclusory fashion, outlines four specific operational programs but fails to map or explain how they associate with Patterson State Bank. (ECF No. 80 at 3-6). While the Motion details the functional intent of these programs, it offers no narrative linking them to the specific bank accounts requested. Id. This lack of transparency falls short of the comprehensive disclosure required to justify cash management relief.

**The U.S. Trustee's Forensic Reconstruction of the Unmapped PSB Accounts (0901 and 6401).**

16. Despite the Debtor's omission, the U.S. Trustee attempted to independently decipher the purpose of these accounts and their operational connections by auditing the bank statements submitted with the Monthly Operating Reports (MORs). (ECF No. 96, 97). However, because the Debtor failed to provide an explicit accounting framework, this forensic review could only yield inferences rather than a definitive cash management map.

17. Based on the March and April 2026 MORs bank statements and reconciliations, the U.S. Trustee can deduce that the requested Patterson State Bank (PSB) accounts Nos. 0901 and 6401 are connected to the following specific operational programs:

- PSB Account No. **0901**: The legal account title is "28M Control Acct, Naval Sea System Command and Special Account." The account showed a single, large $148,734.84 cash transfer out to another account. (ECF No. 96 at 31). The U.S. Trustee believes this sum was deposited into the Debtor's main operating account (PSB Account No. 0401) on March 4, 2026. However, due to overdraft volatility and NSF fees in that account, the reflecting deposit was for a much lower amount. Alternatively, if the Debtor transferred these funds through an intermediate account, the bank statements for that specific account were omitted from the Monthly Operating Report. Following the large cash sweep, it sat completely dormant throughout April 2026, holding a static balance of $2,010.77 with zero deposits or withdrawals. (ECF No. 97 at 31).

7

- PSB Account No. **6401**: The legal account title is "NAVSEA PMS 377 LCU 1700 Special Account. (ECF No. 96 at 34). This account belongs to the LCU 1700 boat-building program (ECF No. 96 at 16 n.2, 34). Throughout March and April 2026, it featured no active operational transactions and sat dormant with a nominal holding balance of $100.99 (ECF No. 96 at 34; ECF No. 97 at 34).

Thus, two of the three PSB accounts appear to be currently dormant and not part of an ongoing financial management system.

**Undisclosed and Unauthorized Cash Pooling and Shielding Arrangement between the Debtor and its Affiliate ICS Nett Inc. in the PBS Account No. 0401.**

18. The third and active PSB Account No. 0401 is also not part of any complex system and appears to be an ordinary operating account of the Debtor, the deposits of which can and should be transferred to the protected DIP Account. According to the official Patterson State Bank statements, the PSB Account No. 0401 title is simply listed as "Free Business" under the account owner name "Swiftships LLC." (ECF No. 96 at 24).

19. More troubling, however, is that analysis of the March and April 2026 bank statement for PSB Account No. 0401 demonstrates financial patterns heavily consistent with an unmonitored cash pooling and shielding arrangement with the Debtor's affiliate, ICS NETT INC-1101 (ECF No. 96 at 24-28 and 97 at 24-28). The ICS Nett Inc. is a Virginia based corporation and the two companies operate under overlapping executive control. [6] The transaction architecture reveals that the Debtor does not maintain an independent, self-sustaining cash flow using its own accounts. Id. Instead, the affiliate's account acts as an external treasury vault, through a recurring pattern of back and forth transfers of estate funds that has continued post-petition. Id.

20. Particularly, on April 17, 2026, a month after the Debtor's petition date, the U.S.

---

[6] Pursuant to Viriginia State records ICS Nett Inc., key principal is Shehraze Shah and Sadia Iqbal. (Ex. 1 at 2). Mr. Shah signed the petition Schedules and Statement of Financial Affairs for the Debtor. (ECF No. 1, 52, 53). Both Mr. Shah and Ms. Iqbal appeared as representatives to testify at the 11 U.S.C § 341 Meeting of Creditors.

8

Department of Defense deposited $1,499,998.00 into the PSB Account No. 0401. That exact same day (April 17), the Debtor moved -$1,480,000.00 (98.6% of the incoming funds) completely out of the estate via an online transfer to what appears to be the affiliate account. (INTERNET TRANSFER TO CHECKING -1101)[7].

21.  Once the core capital was shielded inside the non-debtor affiliate's account, the affiliate funneled back exact, precise quantities of cash into Account 0401, apparently to cover immediate operational emergencies. For instance, on April 21, 2026, the affiliate transferred back $26,000.00 (ECF No.  96 at 24). This was immediately consumed by a $29,573.12 corporate health insurance collection—Cigna Ede Trans) (ECF No. 96 at 26). On April 22, 2026, the affiliate transferred back two separate tranches of $16,500.00 and $900,000.00. (ECF No. 96 at 24). The first tranche directly covered a $16,038.00 rent payment. (ECF No. 96 at 26).

22.  The April sweep was not an "extraordinary, one-time occurrence" related to a large Department of Defense check. The March statement proves the Debtor has systematically used its estate accounts into a mere pass-through conduit, moving 99% of all major cash influxes directly into a non-debtor affiliate's control within 24 hours. On March 4, 2026 a single massive withdrawal of $96,175.36 was swept into the PSB Account No. 0401 from another PSB Account No. 0901.  (ECF No. 96 at 24). That exact same day (March 4), without using these funds to satisfy its outstanding creditors, the Debtor immediately moved $96,000.00 (99.8% of the incoming sweep) out of the estate via an internet transfer to the CHECKING-1101 affiliate account. (ECF No. 96 at 26). Once the bulk of the liquid cash was securely held inside the

---

[7] By pairing the bank statement destination (CHECKING-1101)) with the Debtor's itemized Cash Receipt and Disbursement Report filed with the April 2026 MOR (ICS NETT INC-1101), the records confirm that the $1.48 million outflow went directly to the affiliate account designated for ICS Nett Inc. (ECF No. 97 at 13, 26).

Pursuant to Cash Receipt and Disbursement Report, there is a line item date 4/17/2026

9

affiliate's account, the affiliate fed nominal, exact quantities back into PSB Account 0401 strictly to pay select administrative expenses. (ECF No. 96 at 26).

23.    Finally, following these unauthorized sweeps, the affiliate made post-petition disbursements purportedly "for the benefit of the [sic] state" to insiders and unemployed professionals:

e. Disburstments made by third party for the benefit of the state

| Date | Party Name | Reason for Payment | Paid by | Amount |
|---|---|---|---|---|
| 4/30/2026 | King and jurgen | Legal | ICS Nett (Affiliate) | 10,000.00 |
| 4/30/2026 | Capt Hashim | Overseas Consultant (Program Management) | ICS Nett (Affiliate) | 3,750.00 |
| 4/30/2026 | Khurram shehzad | Overseas Consultant (Program Management) | ICS Nett (Affiliate) | 2,500.00 |
| | | | $ | 16,250 |

(ECF No. 97 at 14). These payments were issued without court authorization, in direct violation of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the U.S. Trustee Operating Guidelines and this Court's explicit orders.

24.    As such, the Debtor is not using its own cash management system to manage estate cash. Instead, it is using a non-debtor affiliate's bank account as an unmonitored third-party vault. The U.S. Trustee is unaware of any justification under Title 11 that permits a debtor-in-possession to surrender control of estate funds to an unauthorized affiliate in this manner. This practice is particularly alarming given that, pursuant to the Monthly Operating Reports, the Debtor already owes millions of dollars to its unidentified affiliates. (ECF No. 96 at 16; ECF No. 97 at 17). The U.S. Trustee anticipates pursuing discovery and potentially seeking further relief from the court on this issue in the coming weeks.

**The Defunct LCU 1700 Program Does Not Justify a § 345(b) Waiver.**

25.    The Debtor asserts it must maintain an uncollateralized "CDA account"[8] at

---

[8] A Controlled Disbursement Account (CDA) is a specialized business checking account that provides early morning notification of the exact dollar amount of checks that will clear against the account that day. At the end of the business day, the CDA typically carries a zero balance, as any unused funds remain safely in your interest-bearing accounts.

Patterson State Bank to service the "LCU 1700 Program." (ECF No. 80 at 3). However, by the Debtor's own admission, NAVSEA[9] terminated this contract in 2024 for delivery failures; it is a defunct program, not an active, income-generating project.

26. To challenge the termination, the Debtor filed a $150 million Tucker Act action against the United States (*Swiftships, LLC v. USA*, Case No. 1:24-cv-00361, ECF No. 1 (Fed. Cl. 2024). The United States moved to dismiss for failure to exhaust administrative remedies under the Contract Disputes Act, arguing the premature lawsuit stripped the contracting officer of authority to issue a final decision (*Swiftships, LLC v. USA*, Case No. 1:24-cv-00361, ECF No. 6 at 4–8 (Fed. Cl. 2024). Rather than responding, the Debtor voluntarily dismissed the action without prejudice (*Swiftships, LLC v. USA*, Case No. 1:24-cv-00361, ECF No. 8 (Fed. Cl. 2024). The status and ultimate disposition of this substantial claim **remain entirely undisclosed** in this bankruptcy case.

27. A cash depository account is a tool for live operations, not residual wind-downs or vendor disputes. The Debtor can reconcile historical obligations electronically while holding estate cash in a UDA-compliant depository. Preserving an uncollateralized account at the expense of creditor safety requires denial of the § 345(b) waiver. Furthermore, PSB Account No. 6401 remained completely dormant in April 2026, holding a static $100.99 balance. While the Debtor claims this account must remain open to reconcile "unresolved matters," it failed to disclose the underlying $150 million claim on its bankruptcy schedules. If these claims and assets require an open account, they must legally be scheduled.

28. The request for a § 345(b) waiver based on the LCU 1700 program must be denied.

---

[9] NAVSEA stands for Naval Sea Systems Command, the largest systems command of the U.S. Navy responsible for engineering, building, buying, and maintaining the Navy's ships, submarines, and combat systems. See generally, www.navsea.navy.mil/who-we-are/headquarters.

**Sworn Schedules Directly Contradict the Cash Management System Narrative, Rendering the Record Unreliable.**

29. The Debtor's filings reveal fundamental contradictions between the contract representations in its official Schedules and the operational narrative presented to secure cash management relief.

30. Specifically, the Debtor's motion describes an active shipyard managing multiple global military programs with unalterable vendor pipelines. (See generally ECF No. 80). In stark contrast, Schedule G is virtually empty (ECF No. 52 at 27). The Debtor discloses only one executory contract: a shipyard facility lease with its affiliate, BOT LLC. Id. It fails to list any active shipbuilding contracts, international military supply agreements, or manufacturing pacts. Id.

31. Schedule A/B lists $4,806,993.92 in unbilled accounts receivable from the Bahrain Navy, Egyptian Navy, and a DIU project (ECF No. 52 at 38). If these programs are active enough to carry millions in unbilled balances and generate post-petition cash, they must legally be listed on Schedule G. The Debtor cannot argue a program is operationally critical to secure cash management relief while simultaneously telling creditors under penalty of perjury on Schedule G that no such contract exists. Consequently, the U.S. Trustee does not know which official records to rely upon at this point, as the Debtor's sworn Schedules directly impeach the integrity of its Cash Collateral Motion.

**The Debtor's Inter-account Sweeps and Commingling of Restricted Project Funds.**

32. The Debtor claims that one of the accounts—without specifying which one—is "integral to tracking project-specific receipts, vendor payments, and procurement costs." (ECF No. 80 ¶11). However, the Debtor's actual cash practices undermine its argument. As shown by the March and April 2026 MORs, any funds deposited to PSB Account No. 0901 are swept

immediately to another account while PSB Account No. 6401 remained completely dormant during the reporting period at issue.

33. PSB Account 0401, on the other hand, does not isolate project-specific data. Instead, it is used as a general corporate account into which funds from all sources are deposited. As mentioned above, the U.S. Trustee believes the Debtor has swept all funds from its specialized PSB Account No. 0901 into its general operating PSB Account No. 0401 without offering any operational necessity for keeping the operating account open. (ECF No. 80, 96, 97). A general "Free Business" account that suffers from chronic overdrafts and commingled funds is not a specialized tracking tool. By commingling restricted project funds—such as the $150,000 sweep and a $1.49 million DOD receipt—with separate corporate overhead, and then immediately sweeping those funds into an undisclosed affiliate account, the Debtor undercuts its own argument for maintaining this legacy architecture. If the Debtor's actual cash management practice relies on sweeping funds into a centralized account for corporate disbursements, it can—and legally must—sweep those funds directly into a fully collateralized, UDA-compliant PNC Bank DIP account to ensure creditor safety.

**The Debtor's Complete Omission of the National Bank of Egypt Account Leaves Its Operational Rationale Unexplained.**

34. A debtor seeking a § 345(b) waiver bears the burden of presenting a transparent, comprehensive cash management narrative. The Debtor's motion fails this standard by completely ignoring its active account relationship with the National Bank of Egypt. As of April 2026, this account held $21,473.63, yet the record is entirely devoid of any operational justification for leaving these funds there (ECF No. 96 at 19; ECF No. 97 at 20).

35. To decipher this account's purpose, the U.S. Trustee analyzed the MORs and

believes it collateralizes a $1,500,000 international letter of credit.[10] The March 2026 MOR balance sheet matches this account to a $1,500,000 "Cash Margin (Restricted)" asset linked to the "DCS Egypt customer." (ECF No. 52 at 29; ECF No. 96 at 15). Furthermore, a March 24, 2026, bank statement reveals a $1,965.00 debit for "LC Charges" under reference CAIRONLP (ECF No. 96 at 13, 19). The Debtor is under a Court order prohibiting unauthorized pre-petition liability payments yet has sought no authority for these charges. (ECF No. 15 at 2). Omitting this account and its unauthorized debits from the motion demonstrates a lack of comprehensive oversight required for cash management approval.

36.    By failing to even mention the National Bank of Egypt account, the Debtor has failed to demonstrate any legitimate necessity for keeping it open. Because the operational rationale for this account remains entirely unexplained, the request for a § 345(b) waiver must be denied, and the Debtor must be ordered to immediately transfer these uncollateralized funds into a compliant institution.

**The Debtor's Underutilized DIP Account Obviates the Need for Non-Compliant Accounts.**

37.    The Debtor's request to maintain uncollateralized, non-UDA accounts is further undermined by the fact that the Debtor has already opened a fully authorized, compliant Debtor-in-Possession (DIP) account. Despite establishing this compliant account structure, the Debtor's motion fails to explain why it remains underutilized while millions of dollars in estate cash are left exposed in non-compliant institutions and flow through an uncollateralized non-UDA account of an affiliate.

38.    Alternatively, even if the PSB accounts needed to remain open to receive certain

---

[10] On Schedule A/B Ex. 1, the Debtor disclosed an asset described as follows: "Investments- Short Term $1,500,000.00 LC with the DCS Egypt customer." (ECF No. 52 at 29).

deposits, the estate funds can be swept daily into the DIP account to ensure full § 345(b) protection, rather than sitting uncollateralized and at risk at Patterson State Bank. The Debtor cannot justify exposing up to $1.5 million in estate funds to ongoing uninsured risk under the guise of "operational continuity" when a compliant, court-authorized DIP depository is already open and sitting idle. Just as with the Egyptian holdings, there is no logistical or legal impediment preventing the immediate transfer of the funds from Patterson State Bank into the Debtor's compliant DIP account.

**The Debtor's Operations and Account Structure Are Not Complex.**

39.     The totality-of-the-circumstances factors weigh heavily against a § 345(b) waiver. Neither the Debtor's ongoing business operations nor its deposit accounts are especially large, sophisticated, or complex.

40.     Unlike mega-corporate operations managing hundreds of accounts—such as the debtor in *In re Ditech Holding Corp.*, 605 B.R. 14, 14 (Bankr. S.D.N.Y. 2019)—the Debtor maintains a highly concentrated, straightforward depository footprint. The PSB Account No. 0401 currently operates as the central account for estate funds, and there is no reason the authorized DIP account could not serve the same functions. Compliance with § 345(b) is entirely manageable, yet the Debtor is improperly utilizing its old PSB accounts to hold massive, uncollateralized structural funds.

**The Debtor's Concentrated Account Structure Fails to Mitigate Depository Risk.**

41.     Pursuant to March and April 2026 MORs, the Debtor's deposit accounts are highly concentrated in one free Business Checking PSB Account No. 0401 and an affiliate PSB Account No. 1011, which has not executed a UDA obligating it to collateralize this account.

42.     There is no diversification or mitigation of risk when approximately 96.6% of the

15

funds across these non-UDA institutions—specifically $1,093,533.66 of the $1,131,814.09 held at the end of April 2026. Compounding this risk, the aggregate balances fluctuate wildly—reaching $1.5 million in a single month—before it is swept into a non-UDA affiliate account without any oversight by the Court, the U.S. Trustee, creditors.[11] As a result, on certain days $1,250,000 million in estate cash sits entirely uninsured and uncollateralized each month. There is no risk mitigation in leaving millions of dollars of estate funds at the mercy of depositories that are unable or unwilling to fully protect them.

**The Debtor Has Failed to Provide Any Evidence of Efforts to Comply with the Statutory Safety Requirements.**

43.     Finally, it remains entirely unclear from the record what actions, if any, the Debtor has taken to actively comply with the security mandates of the Bankruptcy Code before seeking an extraordinary waiver from this Court. Aside from asserting that it chose a banking institution that is uncollateralized, the Debtor's cash management motion is completely devoid of any showing that it made a good-faith attempt to protect estate funds. The Debtor does not state whether it requested that Patterson State Bank execute a UDA, nor does it outline any operational hurdles that would prevent these institutions from doing so. By rushing to request a blanket waiver without demonstrating a prior, failed effort to secure compliant collateralization or corporate surety bonds for the deposits, the Debtor treats standard statutory protections as an inconvenience rather than a mandatory fiduciary duty. Because the Debtor has failed to show that compliance is an impossibility rather than a mere preference, it cannot satisfy its burden to establish "cause" for a waiver.

WHEREFORE, the U.S. Trustee asks the Court to deny a § 345(b) waiver as applied to all

---

[11] The bank account statements for the ICS Nett Inc.'s PSB Account No. 1101 are not attached to the MORs (ECF No. 96, 97).

depository accounts held at depositories who have not signed a UDA.

David W. Asbach

Acting United States Trustee
Region 5, Judicial Districts
of Louisiana and Mississippi

By:    /s/ *Anna Haugen*
      Anna Haugen

Anna Haugen, FL Bar No. 89555
Trial Attorney, Office of the U.S. Trustee
300 Fannin Street, Suite 3196
Shreveport, LA 71101
Anna.Haugen@usdoj.gov
Telephone No. (318) 676-3456
Direct Telephone No. (318) 676-3554

17

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:

SWIFTSHIPS, LLC                                         CASE NO. 26-50237
    Debtor                                              CHAPTER 11

## CERTIFICATE OF SERVICE

    I certify that a copy of the above and foregoing **UNITED STATES TRUSTEE'S OBJECTION TO DEBTOR'S REQUEST TO WAIVE DEPOSITARY REQUIREMENTS OF § 345(b)** has been either mailed by first class mail, postage prepaid, or transmitted by CM/ECF to the following:

Swiftships, LLC
1105 Levee Road
Morgan City, LA 70380-1001

Ryan James Richmond
Sternberg, Naccari & White, LLC
450 Laurel Street,Suite 1450
Baton Rouge, LA 70801

Emile Joseph, Jr.
Allen & Gooch, A Law Corporation
P.O. Box 81129
Lafayette, Louisiana 70598

Benjamin W. Janke
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170

Carli M. Worsham
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170

Duris L. Holmes
DEUTSCH KERRIGAN, L.L.P.
755 Magazine Street
New Orleans, Louisiana  70130

18

Ryan W. Lamb
U.S. Department of Justice
P.O. Box 875-Ben Franklin Station
Washington, DC 20044

Joseph E. "Josh" Lee III (Bar #26968)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

Claire A. Campbell (Bar #41181)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

PATRICK K. RESO
HENRI S. THERIOT
CHEHARDY, SHERMAN, WILLIAMS,
RECILE & HAYES, L.L.P.
111 North Oak Street, Suite 200
Hammond, Louisiana 70401

Seth B. Shapiro
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875

Rick M. Shelby
KELLY HART PITRE
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Amelia L. Hurt
KELLY HART PITRE
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Louis M. Phillips
KELLY HART PITRE
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

19

KREBS FARLEY, PLLC
Laura F. Ashley
400 Poydras Street, Suite 2500
New Orleans, LA 70130

KREBS FARLEY, PLLC
Elliot Scharfenberg
400 Poydras Street, Suite 2500
New Orleans, LA 70130

Charels M. Rush, APLC
202 Magnate Drive
Lafayette, LA 70508

Date:   June 17, 2026                    By:   /s/ Samantha A. Woodruff
                                              Samantha A. Woodruff
                                              Bankruptcy Analyst *(Detail)*
                                              Office of the United States Trustee
                                              300 Fannin Street, Suite 3196
                                              Shreveport, LA 71101
                                              Telephone No. (318) 676-3456
                                              Direct Telephone No. (318) 676-3139