**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **SWIFTSHIPS, LLC** | § | **Case No. 26-50237** |
| | § | |
| **Debtor.** | § | |

# RESPONSE TO DEBTOR'S MOTION FOR FINAL ORDER (1) AUTHORIZING USE OF CASH COLLATERAL; (2) GRANTING ADEQUATE PROTECTION; AND (3) GRANTING RELATED RELIEF

---

The Official Committee of Unsecured Creditors of Swiftships, LLC (the "***Committee***") appointed in the above-captioned case (the "***Chapter 11 Case***"), files this response (the "***Response***") to *Debtor's Expedited Motion for Interim and Final Orders Authorizing the Debtor to Obtain Postpetition Financing and Granting Related Relief* [Dkt. No. 117] (the "***DIP Motion***"). In support of the Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Committee understands the need for access to liquidity; however, the Committee files this Response because there have been significant developments in this case that have not been addressed by any party.

2. First, although the United States has participated in this case, throughout the spring and summer, including in examinations under Fed. R. Bankr. P. 2004, the United States did not object to the DIP Motion or even mention it planned to assert a very large claim. Despite this, on the last day before the bar date, the United States filed a $104.6 million claim on a terminated Navy contract (the "***Navy Claim***"). The Navy Claim is obviously a dramatic, unforeseen change to the trajectory of this case.

3. How that claim is treated will determine whether this estate can provide any meaningful recovery to the Committee's constituents who are real trade creditors who supplied

goods and services. If the Navy Claim is treated as filed, there is a real possibility for recovery for those creditors, as all but $107,550 of the Navy Claim is secured. But if the Navy Claim is amended and the Navy obtains a large unsecured deficiency claim, the prospects of meaningful recovery are doubtful and the case could very well be administratively insolvent—a very important consideration for the approval of DIP financing.

4. The Committee strongly opposes any suggestion that the case should be dismissed because this would permit the United States to leverage 31 U.S.C. § 3713(a)(1) to obtain a priority over all other unsecured creditors (31 U.S.C. § 3713(a)(1) is expressly inapplicable to cases under the Bankruptcy Code).

5. The Committee therefore asks the Court to deny final approval without prejudice, leave the Interim Order in place pending further order, require the Debtor to report on the matters identified below, and set a status conference so that this case can proceed toward a plan for its non-insider creditors.

## BACKGROUND

### A. Bankruptcy Case

6. On March 18, 2026 (the "***Petition Date***"), Swiftships, LLC (the "***Debtor***") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Louisiana, Lafayette Division (the "***Court***").

7. The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8. On April 13, 2026, the Office of the United States Trustee filed that certain *Notice of Appointment of Unsecured Creditors' Committee* [Dkt.. No. 71], appointing a Committee pursuant to section 1102 of the Bankruptcy Code. The Committee consists of the following Committee members: (i) Consolidated Electrical Distributors and (ii) AIT Machine, LLC.

### B. Post-Petition Financing and Reporting

9. On September 14, 2026, the Court entered an interim order authorizing the Debtor to borrow up to $600,000 from ICS Nett Inc. (the "***DIP Lend***er") under section 364(b), applying to funds borrowed on or after July 21, 2026. Dkt. No. No. 141 (the "***Interim Order***"). The Interim Order extends the protections of § 364(e) to the DIP Lender pending the final hearing, which is set for October 15, 2026. *Id.*

10. The DIP Lender is an affiliate of the Debtor. The DIP budget describes its advances as "Affiliates Support/Loan." Interim Order, Ex. A (the "***DIP Budget***").

11. Even with the full $600,000 from the DIP Lender, the DIP Budget projects negative closing cash balances in five of its thirteen weeks. It reaches a positive ending balance only because of a single $750,000 program receipt in its final week. *Id.*

12. The Debtor has reported a net loss in every month of this case, totaling $2,853,714 through July 31, 2026. Dkt. No. 145 at 2.

13. As of July 31, 2026, the Debtor's balance sheet carries inventory of $27,236,517 and a "vessel held for sale" of $12,608,164. *Id*. at 2, 16. While there were previous representations of a sale of the vessel on the horizon, the Committee has not received any updates on the sale process.

14. The amounts the Debtor reports owing to affiliates ("loan payable, affiliate" and "due to affiliates") rose from $34,642,137 at May 31, 2026 to $35,029,985 at July 31, 2026, an increase of $387,848. Compare ECF No. 107 at 17, with Dkt. No. 145 at 17. For the same period, the Debtor reported no postpetition borrowing and no postpetition payables. Dkt. No. 145 at 2, 8. Every operating report answers "no" when asked whether there was any postpetition borrowing other than trade credit. Dkt. No. 107 at 8; Dkt. No. 144 at 8; Dkt. No. 145 at 8. Yet the bank statements attached to those reports show payroll-processing fees bearing the DIP Lender's name,

Dkt. No. 107 at 30; Dkt. No. 145 at 28; the reports disclose $81,075 in disbursements made by a third party for the benefit of the estate, Dkt. No. 145 at 2; and the Interim Order itself reaches back to advances made on or after July 21, 2026.

15. The June report records a $168,167.25 receipt from The American Longshore Mutual Association, a third-party insurer, as an "inter bank transfer." Dkt. No. 144 at 13. In the same month, the amount reported as due to the Debtor from affiliates fell by $167,657. *Compare* Dkt. No. 107 at 16, *with* Dkt. No. 144 at 16. The reports do not explain what the insurer paid for, why the receipt was recorded as an internal transfer, or whether it was applied to an affiliate's obligation.

**C. The United States' Participation and Claim No. 45-1**

16. The Committee conducted extensive examinations of the Debtor under Fed. R. Bankr. P. 2004 in which the United States participated, examining the Debtor itself.

17. The United States did not object to the DIP Motion nor to entry of the Interim Order.

18. On September 11, 2026, three days before the governmental bar date under section 502(b)(9), the United States filed Claim No. 45-1 for $104,643,489.98. The claim arises under Navy contract N00024-18-C-2401, which the Navy terminated for default on February 20, 2024, more than two years before the Petition Date. Navy Claim, Ex. A ¶ 23.

19. The Navy Claim asserts that $104,535,939.98 is secured by "work in progress and acquired property." It values that property at exactly the same amount and asserts an unsecured claim of only $107,550. Navy Claim, Part 2, ¶ 9. Yet the Navy's declarant states that the Navy has never completed an inventory of that property or assessed its condition. *Id.*, Ex. A ¶ 47.

20. The Navy Claim attaches none of the 27 enclosures on which it relies. It states instead that they are available on request, subject to the Government's review and approval. *Id.*, Attach. 1 at 3; Ex. A ¶ 50. It acknowledges that no demand for repayment was made before the

Petition Date, id., Ex. A ¶ 44 n.5, and it describes itself as unliquidated and subject to reduction, *id*., Attach. 1 at 1; Ex. A ¶ 4.

21. The Navy Claim cannot be reconciled with the Debtor's books. Those books carry the Navy program as approximately $35.7 million of deferred revenue, presented net of vendor prepayments. Dkt. No. 145 at 17 & n.2.

22. The United States has indicated that dismissal could be appropriate here, but as described below, dismissal would serve to solely benefit the United States at the expense of trade creditors.

## OBJECTIONS

23. The uncertainty in this case should preclude final approval of the DIP financing.

### A. The Debtor Has Not Shown That Final Approval of Insider Financing Serves the Estate.

24. Section 364(b) permits a debtor to obtain unsecured credit outside the ordinary course only after notice and a hearing. Courts approve postpetition financing when its terms are fair, reasonable, and adequate, and when it is in the best interests of the estate and its creditors. When the lender is an insider, the transaction is subject to rigorous scrutiny. *Pepper v. Litton*, 308 U.S. 295, 306 (1939)

25. The record does not support final approval. Financing in chapter 11 should serve a purpose: a sale, a plan, a path out of the case. Here there is no plan. Indeed, exclusivity expired on September 14, 2026, only two business days after the hearing granting the Interim Order. At that hearing, Debtor's counsel announced his intention to file a plan. No plan was filed presumably in large part because of the Navy Claim. Additionally, there is no report on the vessel sale, and no explanation of how continued operating losses will produce value for creditors. The DIP Budget itself projects negative cash in five of thirteen weeks and depends on a single receipt in its final

week.

26. Final approval would also extend the protections of section 364(e) to an insider's advances without an adequate record. The Interim Order reaches back to advances made on or after July 21, 2026. Yet the Debtor's July report states that there was no postpetition borrowing, while its balance sheet shows amounts owed to affiliates growing by $387,848 between May and July. The Committee cannot reconcile those figures, the operating reports' statement in every month that there was no postpetition borrowing (¶ 9), nor the June report's treatment of an insurer's payment as an internal transfer (¶ 10). These are serious questions, and the Debtor should answer them before any final order is entered. The Court should not make a final good-faith finding in favor of an insider until the Debtor substantiates such a finding.

### B. The Navy Claim Has Changed This Case, and Its Effect Must Be Addressed Before Any Final Financing Order.

27. Whether this estate can deliver value to non-insider creditors now depends largely on how the Navy Claim is treated. The United States waited until the eve of the bar date to assert a nine-figure claim on a contract terminated more than two years before the case. It did so after months of participation, after participating in the Committee's examination, and never objecting to the incurrence of post-petition financing. It has not supported the claim with documents. It has not inventoried the property it says secures the claim. And its position on that property's value cannot be squared with the Debtor's books.

28. The United States did, however, make a choice. It filed a claim, under penalty of perjury, asserting that it is secured in full except for $107,550. Having taken that position, the United States should look to its asserted collateral for its recovery. Additionally, it remains to be determined whether the government's actions are intended for its sole benefit, especially if dismissal were to occur as discussed in more detail below. In other words, it appears that the

completion of certain projects to access additional funds, which serves as the Debtor's basis for needing DIP financing, could be subject to the Navy Claim; meaning the DIP financing was only necessary to benefit one creditor: the United States.

29. The Committee intends to propose a plan on that basis, so that the estate's remaining assets, including its claims against insiders, benefit the creditors who supplied the Debtor with goods and services.

30. None of this can be resolved on the current record, and a final financing order should not be entered while it remains unresolved.

**C. Dismissal Is Not an Appropriate Alternative; This Case Should Proceed Toward a Plan.**

31. Dismissal would not give creditors a fresh start; it would reorder their recoveries. Outside bankruptcy, the federal priority statute gives claims of the United States priority over other creditors of an insolvent debtor. 31 U.S.C. § 3713(a)(1). Congress expressly made that statute inapplicable in cases under title 11. *Id.* § 3713(a)(2). Dismissal would also extinguish the estate's avoidance actions and leave the estate's claims against insiders, including the receivables on the Debtor's own books, to whoever reaches them first.

32. The Bankruptcy Code does not permit the end of a case to be used to distribute value in a way that departs from its priority scheme without the consent of the affected creditors. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017). A creditor should not obtain through dismissal a priority it could not obtain under a plan.

33. Exclusivity has expired, and the Committee is prepared to propose a liquidating plan that pursues the estate's claims against insiders for the benefit of non-insider creditors. *See* 11 U.S.C. § 1121(c)(2). This case should proceed toward that plan, not toward dismissal.

34. But the Committee does need a carve out for its fees in the DIP Order, particularly

given the Navy Claim. The Committee believes that there is a viable route to recovery for trade creditors here; however, their counsel should not be forced to fund the case. The Committee requests that the DIP Budget and DIP Order reflect a modest carve out commensurate with the fees for Debtor counsel.

***Reservation of Rights***

35. The Committee has not seen a proposed final order. It reserves all rights to object to any proposed final order, including any provision that (a) grants liens or priority beyond sections 364(b); (b) waives rights under section 506(c) or section 552(b); (c) contains stipulations, findings, or releases concerning the DIP Lender or any other insider; (d) limits the Committee's investigation or the estate's claims; or (e) treats conversion, dismissal, or the filing of a Committee plan as a default. The Committee also reserves all rights concerning the Navy Claim, including to object to it, to seek valuation under section 506(a), to seek surcharge under section 506(c),[1] and to assert recoupment and setoff.

**RELIEF REQUESTED**

The Committee respectfully requests that the Court: (i) deny entry of a final order on the DIP Motion, without prejudice; (ii) order that the Interim Order remain in effect according to its terms pending further order of the Court; (iii) direct the Debtor, fourteen days before the reset of

[1] Section 506(c) permits recovery from property securing an allowed secured claim of the reasonable, necessary costs of preserving or disposing of that property, to the extent of the benefit to the claimholder, and section 106(a) waives sovereign immunity for section 506. In October 2024 the Navy directed the Debtor to protect and preserve the property while it remained in the Debtor's possession. Navy Claim, Ex. A ¶ 36. The Navy acknowledges that the property remains in the Debtor's possession, id. ¶ 47, and has not sought access to the Debtor's Morgan City facility to assess it, *id*. ¶¶ 40, 42. Since the Petition Date, the estate has borne the cost of keeping that facility insured, secured, powered, and leased. A secured creditor that consents to preservation of its collateral acknowledges in advance that the cost benefits it. *In re Senior-G & A Operating Co*., 957 F.2d 1290, 1299–1300 (5th Cir. 1992). And expenses incurred primarily to preserve collateral are surchargeable even if the estate also hoped to benefit. *In re Domistyle, Inc*., 811 F.3d 691, 698 (5th Cir. 2015). Having valued the property at $104,535,939.98, the United States can hardly contend that preserving it conferred no benefit. The Committee reserves the estate's right to seek a surcharge of the United States' asserted collateral.

the DIP Motion, to file: (a) a report on the status of the sale of the vessel and any other sale efforts, and (b) an accounting of all advances by the DIP Lender or any other affiliate since the Petition Date, and their uses, reconciled to the Debtor's monthly operating reports, including any payroll funded through the DIP Lender and the June 2026 receipt from The American Longshore Mutual Association; (iv) conditional approval of DIP financing on the final DIP Order containing a commensurate carve out for Committee professional fees, and (v) reset the final hearing on the DIP Motion.

Dated: October 8, 2026.

Respectfully submitted,

**KELLY HART PITRE**


*/s/ Rick M. Shelby*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Rick M. Shelby (LA #31963)
Amelia L. Hurt (LA #36817)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: rick.shelby@kellyhart.com
amelia.hurt@kellyhart.com

***Counsel for the Official Committee of Unsecured Creditors of Swiftships, LLC***

**CERTIFICATE OF SERVICE**

I do hereby certify that a true and correct copy of the above and foregoing document has, on this October 8, 2026, been served on all counsel of record via e-service.

*/s/ Rick M. Shelby*
Rick M. Shelby