UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:
SWIFTSHIPS, LLC — CASE NO. 26-50237
Debtor — CHAPTER 11

**UNITED STATES TRUSTEE'S MOTION TO**
**DISMISS CASE, OR, IN THE ALTERNATIVE, CONVERT TO CHAPTER 7**

COMES NOW Kevin M. Epstein, United States Trustee for Region 5 (hereinafter "UST"), by and through undersigned counsel, and moves the Court to dismiss the case, or, in the alternative, to convert to a case under chapter 7 of the Bankruptcy Code, for cause pursuant to 11 U.S.C. §§1112(b)(4)(A)(B)(E)(H)(F) and (J), and in support thereof represents as follows:

**Preliminary Statement**

1. The U.S. Trustee moves to dismiss or convert this Chapter 11 case because Swiftships, LLC, (the "Debtor") has failed to fulfill its fiduciary duties as a debtor-in-possession. The Debtor's Schedules failed to disclose: a $100 million debt to the U.S. Navy, systematic transfers to insiders, insider co-debtors, claims against insiders, and executory management contracts with insiders, as well as omitting a large claim against the government it purports to possess. After filing for bankruptcy, the Debtor continued, without court authorization, its admitted pre-petition practice of commingling and routing millions of dollars through undisclosed affiliate bank accounts, a practice specifically instituted to shield corporate assets from legitimate creditor collection and garnishment. The Debtor has also bypassed judicial vetting to pay unapproved professional fees and failed to comply timely with this Court's mandate to file Monthly Operating Reports ("MORs"), impeding creditor review of its ongoing depletion of estate resources. Compounding its failure to satisfy basic debtor-in-possession duties, the Debtor

has not furnished valid proof of mandatory workers' compensation insurance coverage, the absence of which could expose the estate to serious uninsured tort liability.

2. Furthermore, the Debtor lacks any independent or viable business plan to achieve rehabilitation, rendering its continued presence in Chapter 11 a continuous drain on estate assets. The Debtor is completely stagnant operationally, does not bid on new commercial contracts and rests its entire reorganization on hope of a financial bailout from the U.S. Navy—a fantasy that has been completely foreclosed by the Navy's formal refusal to engage. The Debtor's main marketable asset, the *M/V Risen Sun* vessel, is hopelessly deadlocked in a transaction with foreign entities that the Debtor's own majority principal characterized under oath as "scam artists." The Debtor has implicitly conceded its lack of reorganization options by failing either to file a plan within the Court's deadline or to seek an extension of that deadline. Because the Debtor has flagrantly violated its debtor-in-possession duties and has no path forward in chapter 11, immediate conversion or dismissal is required to protect the remaining integrity of the bankruptcy estate and prevent further prejudice to creditors.

## Factual Background

3. On March 18, 2026, the Debtor filed a voluntary Chapter 11 petition on March 18, 2026. (ECF No. 1). On the same date, the Court entered an Order to Debtor- in-Possession. (ECF No. 15), which strictly regulated the Debtor's operations. The DIP Order mandated that the Debtor close all pre-petition bank accounts and transfer all balances to a U.S. Trustee-approved DIP account. *Id.* at 1. The Order explicitly required court approval for: i) out-of-ordinary-course transactions; insider compensation (to corporate officers, directors, or stockholders per Local Bankruptcy Rule 4002-1(1)). *Id.* at 2. Additionally, the Debtor was ordered to maintain estate property insurance and timely file MORs. *Id.*

### A. Material Omissions and Misrepresentations in Debtor's Bankruptcy Filings

4. **Liabilities Understated by Over $100 Million.** The Debtor's April 15, 2026 Schedules reported only $44,083,285.49 in total liabilities (ECF No. 52 at 2). However, on September 14, 2026, the U.S. Department of Defense filed a $104,643,489.98 proof of claim (Claim No. 46-1). This claim stems from $121,399,307.77 in Navy progress payments disbursed to the Debtor under Contract N00024-18-C-2401 to construct Landing Craft Utility 1700 vessels (Claim No. 47-1 at 9, 16; Ex. A, Ksanznak Decl.). Consequently, the Debtor severely understated its liabilities in its financial disclosures.

5. **Omission and Subsequent Mischaracterization $150 million Claim.** Pre-petition, the Debtor filed two contract damage actions against the United States seeking $150 million, both of which were dismissed without prejudice. *See Swiftships, LLC v. United States*, No. 24-00316, ECF No. 7 (Fed. Cl. May 30, 2024) (dismissing complaint via voluntary dismissal); *Swiftships, LLC v. United States*, No. 24-01661, ECF No. 15 (Fed. Cl. July 8, 2025) (dismissing complaint for failure to state a claim); *see generally* Ex. 4). Because these dismissals were without prejudice, the claims remained potential assets. Yet, the Debtor failed to disclose this $150 million claim on Schedule A/B, Part 11, violating mandatory disclosure requirements for legal, unliquidated, and setoff claims. (Questions 74 and 75; ECF No. 52 at 8).

6. Instead of disclosing this litigation asset, the Debtor's Schedule A/B listed the Navy as a standard customer with nominal unbilled accounts receivable balance of $68,985.42. (ECF No. 52 at 8, 38). However, during the Rule 2004 Examination on July 10, 2026, the Debtor's representatives reversed course and testified that the Debtor is actively asserting the claim. (Ex. 2 at 143-49, 201-03). Specifically, Mr. Shah testified that the total demand is significantly higher than the scheduled amount, detailing $11 million in post-"stop work" labor costs, as well as

substantial unpaid material and equipment costs tied to six physical ship hulls sitting in the Morgan City shipyard (Ex. 2 at 172, 198, 201). This ongoing demand was also documented in a pre-petition letter from the Debtor dated January 23, 2026 (Ex. 3).

7. In the letter, the Debtor requested that the Naval Sea System Command ("NAVSEA"): (i) directly disburse approximately $4.1 million in outstanding payments to financially strained suppliers; (ii) authorize the Debtor to actively pursue recovery of $23 million previously prepaid to non-compliant vendors for undelivered materials; and (iii) approve the liquidation of $18.3 million of on-hand inventory to clear remaining vendor liabilities. *See generally* Ex. 3 at 3-4. As such while the Debtor's schedules filed under penalty of perjury claim the Navy just owes a minor baseline receivable of $68,985.42, the leadership was seeking millions for specialized labor, material overhead, and advance equipment connected to the stalled hulls. (Ex. 3 at 15-16).

8. **False Representations Regarding $3.8 Million Insider Claim.** The Debtor falsely denied the existence of any claims or receivables against insider Shehraze Shah on its Schedules, and treasurer Saadia Iqbal echoed this denial at the Section 341 Meeting of Creditors. However, internal balance sheets attached to the Debtor's post-petition MORs consistently reflect an asset of $3,834,212.00 to $3,849,437.00 [1] classified as "Due from partner/stockholder" (ECF Nos. 96 at 16, 97 at 17, 107 at 17, 144 at 17, 145 at 17).

9. During the Rule 2004 Examination, CFO Omer Saeed confirmed that this balance is a valid, actively tracked debt owed to the Debtor by Mr. Shah. (Ex. 2 at 137). Mr. Saeed testified that the receivable originated from a 2023 intercompany restructuring with affiliate ICS Nett, where Mr. Shah personally assumed "$2.4 million or $2.7 million" of the Debtor's liability to

[1] As of July 2026, the amount due from partners and stockholders increased to $3,849,437.00. (ECF No. 145 at 17).

artificially enhance its creditworthiness. (Ex. 2 at 138, 140). Despite Mr. Saeed's attempt to dismiss the entry "as an audit adjustment" to be offset by future dividends, it remains an unliquidated claim that the Debtor completely omitted from its formal bankruptcy schedules (Ex. 2 at 139, 140-41).

10. **Undisclosed Management Structure and Secret Master Services Agreement.** The Debtor's sworn filings (Corporate Resolution and Statement of Financial Affairs "SOFA") consistently represented that Shehraze Shah exercised exclusive control as "sole manager," listing no other officers, directors, or managing members on its SOFA.[2] (ECF No. 18 at 1; ECF No. 53 at 6). Despite these sworn representations, Mr. Shah failed to appear on behalf of the Debtor at the initial meeting of creditors. (Ex. 1 at 1-5).

11. Instead, counsel introduced three previously undisclosed executives: Omer Saeed (CFO), Mike Poel (CEO), and Saadia Iqbal (VP of HR) (Ex. 1 at 1-3). Because, the sudden introduction of these executive officers directly contradicted the Debtor's prior sworn disclosures framing Mr. Shah as the sole manager, the U.S. Trustee continued the meeting to May 21, 2026, to allow for further investigation. (ECF No. 53 at 6). When questioned at a continued meeting, Mr. Shah reversed course and claimed the Debtor had no officers, a statement directly contradicted by the executives who testified that they manage the Debtor's day-to-day operations.

12. Subsequent Rule 2004 Examinations showed that these executives are actually direct employees of an affiliate, Sunrays International, LLC ("Sunrays"). (Ex. 2 at 9, 25, 221, 235-36). Sunrays completely operates the bankruptcy estate's core administrative functions—including finance, IT, procurement, and HR—under an undisclosed Master Services Agreement (MSA). (Ex. 2 at 9, 25-26). Despite updating its Schedule G out of an "abundance of caution" to

[2] Question 28 of the Debtor's SOFA mandates disclosure of all officers, directors, managing members, or individuals in control at the time of the bankruptcy filing.

add various naval programs, the Debtor completely omitted the MSA and its management relationship with Sunrays from both its original and amended schedules (ECF No. 52 at 27; ECF No. 108 at 9).

13. This hidden arrangement leaves the estate's management completely shrouded. Sunrays functions as a centralized administrative hub and shared ledger network for a web of intertwined affiliates, including ICS Nett, Inc., BOT, LLC**,** and OCR Global, Inc. (controlled by Mr. Shah's brother, Khurram Shah). (Ex. 2 at 25-26, 93). Sunrays issues monthly invoices across these affiliates based on its own cost allocations, letting intercompany liabilities accumulate in the books depending entirely on affiliate cash flow (Ex. 2 at 25-26). Meanwhile, Sunrays asserts a $4,374,816.35 unsecured claim against the estate. (ECF No. 52 at 23).

14. **Concealment of $7.3 Million Pre-Petition Transfers.** In response to SOFA Question 4, the Debtor falsely stated that no insider transfers occurred within one year of the petition date except for $7,550.00 in routine life insurance premiums. (ECF No. 53 at 2). In reality, bank records reveal $7,279,000.00 in undisclosed pre-petition transfers to entities owned or controlled by majority shareholder Shehraze Shah and his brother Khurram Shah:

- ICS Nett, Inc. (100% owned by Shehraze Shah): $4,545,350.00 total, comprising $1,330,350.00 from Patterson State Bank records and $3,215,000.00 from PNC Bank statements (Ex. 11 at 2; Ex. 14 at 2).

- BOT, LLC (owned by Shehraze Shah): $7,200.00 from Patterson State Bank records (Ex. 7 at 2).

- OCR Global, Inc. (owned by Khurram Shah): $2,678,600.00 total, comprising $858,100.00 from Patterson State Bank records and $1,820,500.00 from PNC Bank statements (Ex. 12 at 2; Ex. 15 at 2).

- Sunrays International, LLC (owned by Khurram Shah): $47,850.00 from Patterson State Bank (Ex. 6 at 4, 16, 21, 21, 22, 26, 44, 48).

15. During the Debtor's Rule 2004 Examination, CFO Omer Saeed confirmed these insider relationships under oath, explicitly identifying BOT and ICS Nett as affiliates owned by Shehraze Shah, and OCR Global and Sunrays as affiliates owned by Khurram Shah.[3] (Ex. 2 at




73, 89, 92, 101–02). The corporate chart above details the exact legal relationships among the Debtor, its statutory affiliates, and its non-statutory affiliates (Ex. 9[4] at 2).

---

[3] Sunrays is 100% owned and controlled by Khurram Shah, who is the brother of the Debtor's managing principal, Shehraze Shah. Under 11 U.S.C. § 101(31)(B)(vi), any relative of a person in control of a debtor corporation is automatically a statutory insider. Because Sunrays is own by a statutory relative, and because the two companies share closely intertwined management, Sunrays is a non-statutory insider. Matter of Holloway, 955 F.2d 1008, 1011 (5th Cir. 1992) (whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. Collier on Bankruptcy states that "[a]n 'insider' generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny." 2 Collier on Bankruptcy ¶ 101.31 at 101-87 (15th ed. 1991). The legislative history of § 101(31) defines an insider as a person or entity with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." S.Rep. No. 95-989, 95th Cong. 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5810.

[4] In response to the Rule 2004 Order, the Debtor produced a corporate affiliate ownership chart titled "LEGAL STRUCTURE – Affiliates," attached as Exhibit 9. This chart maps out the corporate entities, ownership percentages,

16. During the Rule 2004 Examination, Mr. Saeed admitted that the Debtor systemically routed its funds were through the bank account of either ICS Nett, Inc.'s or OCR Global' s to shield the money from active legal collections. (Ex. 2 at 101). He testified:

> The practice was in the last two, three years since we are been hitting with all this garnishment into Swiftships, so any money that we are receiving, we just need to secure it from these garnishment. We are pulling it into either ICS Nett or either OCR. . . . So that was the practice, just to secure these funds -- the project funds, to avoid any unnecessary hassle that . . . we were facing in the last two, three years. That was the only genuine reason. (Ex. 2 at 95, 96, 101).

17. When questioned about rapid, back-and-forth transfers between the Debtor and its affiliates, Mr. Saeed claimed funds were returned ad-hoc to cover operational expenses and judgment creditors. (Ex. 2 at 97, 99). However, bank statements expose a net deficit, revealing that more money exited the Debtor to these insider accounts than ever returned. When pressed about these un-reconciled, off-book balances, Mr. Saeed admitted that a significant volume of transactions was kept entirely off the formal record.

> Q: In looking at those bank statements, a significant amount of more money is going out to those entities than coming back in.
>
> A: Uh-hun . . . Not every single transaction is recorded on the bank statement. In case -- if ICS is paying their payroll or so directly, it's been routed through our payment on behalf. So if we go into our ledger for this specific account, we will see every single transaction. And that has a counter effect into its liability on the payroll.
>
> Q: You -- you didn't answer my question. There are certain amounts being paid directly by OCR or ICS Nett, in addition to amounts being returned to the debtors. And that's what
>
> A: Yeah. Our best practice is to move the funds, but sometimes when it's come to the payroll deadlines and the -- the risk of the garnishment onto a PSP or PNC with the Swift, payroll is is -- sometimes it's a – it's a sensitive issue. (Ex. 2 at 100-101).

---

and organizational relationships controlled by three key individuals: Shehraze Shah, his brother Khurram Shah, and Jeff Leleux.

18. Underscoring the deceptiveness of these omissions, the Debtor concealed $7.3 in pre-petition insider transfers despite being fully aware of the entities' insider status. On its Schedule E/F, the Debtor listed ICS Nett as an unsecured creditor with a $4,007,952.50 claim, OCR Global, Inc. with a $5,676,915.89 claim, and Sunrays with a $4,374,816.35 claim. (ECF No. 52 at 19, 22, 23). Yet, the Debtor properly excluded all three from its List of 20 Largest Unsecured Creditors, which explicitly commands the exclusion of insiders under 11 U.S.C. § 101(31). (ECF No. 4).

19. As detailed in the U.S. Trustee's Section 345(b) Waiver Objection[5], the Debtor continued its unauthorized practice of pooling financial resources with affiliates post-petition (ECF No. 99 at 8–23). Particularly, on April 17, 2026—one month after filing for bankruptcy—the U.S. Department of Defense deposited $1,499,998.00 into the Debtor's Patterson State Bank account. That same day, without court approval, the Debtor transferred $1,480,000.00 to ICS Nett. (ECF No. 97 at 24, 26).

20. **Misrepresentations Regarding Keeping Funds Separate.** At the Section 341 Meeting of Creditors, treasurer Saadia Iqbal testified under oath that the Debtor maintained separate funds from its owners and affiliates without any commingling. This statement was demonstrably false. The U.S. Trustee's investigation and the Debtor's Rule 2004 Examination conclusively exposed this statement as a misrepresentation, revealing a systemic practice of shifting and commingling cash to shield assets from creditors that seamlessly crossed over into the post-petition period.

[5] For brevity the U.S. Trustee realleges its allegations from Objection to the Debtor's Request to Waive Depositary Requirements of 11 U.S.C. § 345(b) by reference. (ECF No. 99).

21. **Misrepresentations Regarding $2 million ("SBA") Loan.** In its initial Cash Collateral Motion, the Debtor appeared to be asserting that the SBA held a lien on its vessel, the *M/V Risen Sun*, but completely omitted the existence of any personal insider guarantees. (ECF No. 12 at 8). Under penalty of perjury, the Debtor then filed Schedule H claiming it had no codebtors. (ECF No. 52 at 28). It later amended Schedule H to swear that Treasurer Saadia Iqbal was the sole personal guarantor of the $2 million SBA debt. (ECF No. 108 at 11). The actual loan documents in Proof of Claim 47-2 directly contradict this narrative. Shehraze Shah executed the personal guarantee for the loan, while Ms. Iqbal is never named, mentioned, or signed anywhere on the SBA debt instruments (Claim No. 47-2 at 8).

22. During Rule 2004 Examinations, management's testimony collapsed into further contradictions:

- Mr. Shah admitted that he personally guaranteed the SBA loan, directly contradicting the Debtor's amended Schedule H. (Ex. 2 at 217).
- Ms. Iqbal flatly denied being a guarantor and claimed her primary residential home and not MV Risen Sun was encumbered as the primary collateral for the debt. (Ex. 2 at 236-37).

23. This is not a clerical oversight, but a calculated failure to provide truthful disclosures. The Debtor's management either cannot or will not disclose which corporate insiders are personally liable for its debts or which assets are actually encumbered.

**B. Post-Petition Failures to Comply with the Law and the Court's Orders**

24. **Unauthorized Post-Petition Transfers to Insider—Sunrays International, LLC.** In addition to failing to disclose its operational agreement with Sunrays and failing to utilize proper statutory channels[6] to validate it post-petition, the Debtor also made an unauthorized

[6] To validate an operational agreement in bankruptcy, a debtor must utilize specific statutory vehicles depending on the contract's timing and role: i) 11 U.S.C. § 363(b) (requires an out-of-the-ordinary-course business motion proving a sound business justification and intrinsic fairness under heightened insider scrutiny.) 3 Collier on Bankruptcy ¶

$210,844.00 transfer to Sunrays on May 6, 2026, purportedly “for the month of April.” (Ex. 2 at 127-28). This transfer was made even though no MORs disclosed any post-petition payables due to Sunrays.

25. During the Rule 2004 Examination, Mr. Saeed attempted to minimize the violation, claiming the payment matched historical ranges (Ex. 2 at 128). However, the record directly refutes this: the U.S. Trustee’s review of bank account statements shows the Debtor paid Sunrays only $47,850.00 for all of 2025 and nothing in 2026 until this May transfer. Furthermore, historical practices do not excuse the complete failure to obtain court authorization before transferring estate property to an insider.

26. **Refusal to Obey Lawful Order of the Court: Failure to File MORs Timely.** Under the March 18, 2026 DIP Order, the Debtor was required to file MORs by the 15th of each month (ECF No. 15 at 2). Currently, the August 2026 MOR (due on September 15, 2026) remains unfilled and is now 24 days overdue. The March 2026 MOR (due April 15) was filed 61 days late, the April 2026 MOR (due May 15) was filed 31 days late, the May 2026 MOR (due June 15) was filed 11 days late, the June 2026 MOR (due July 15) was filed 76 days late, and the July 2026 MOR (due August 15) was filed 45 days late. This chronic reporting failure violates direct court mandates and leaves the U.S. Trustee and creditors entirely blind to the Debtor’s ongoing financial condition and asset movements.

---

363.02 (“Section 363(b) has been applied to . . . entering into transactions out of the ordinary course of business . . . because nearly any kind of transaction will involve use, sale or lease of property of the estate, even if only cash.”). ; ii) 11 U.S.C. § 365(a) (requires a formal motion to assume pre-existing, ongoing contracts, demanding that the debtor cure all pre-petition defaults and prove the deal benefits the estate.); iii) 11 U.S.C. § 327(a) (requires a formal professional retention application and Rule 2014 affidavit, mandating that the counterparty pass strict "disinterestedness" standards.); iv) 11 U.S.C. § 363(c) (allows routine, pre-existing operations to continue without prior court approval, provided they pass industry and creditor ordinary-course tests.).

27. **Failure to Maintain Insurance.** In its Emergency Wage Motion, the Debtor represented under oath that it maintained a workforce of 26 individuals (16 salaried, 10 hourly) across critical operational roles. (ECF No. 10 at 3). Despite these representations, the Debtor has repeatedly failed to demonstrate compliance with La. R.S. § 23:1035(A), which strictly mandates workers' compensation coverage for "every person performing services arising out of and incidental to his employment."

28. At the Section 341 Meeting of Creditors, Ms. Iqbal testified that the Debtor's policy had been canceled for non-payment but claimed it was subsequently reinstated; however, the Debtor failed to comply with the U.S. Trustee's demand for physical proof of reinstatement. Regardless, the policy expired on June 28, 2026. (Ex. 13 at 63). Despite four months of formal written demands from the U.S. Trustee. (Ex. 10), the Debtor continues to operate without providing proof of coverage. This ongoing statutory violation leaves the estate exposed to catastrophic tort liability.

29. **Unauthorized Post-Petition Professional Fee Payments.** The Debtor has bypassed the mandatory professional retention and compensation rules of 11 U.S.C. §§ 327 and 330 by failing to obtain court approval for the employment or compensation of two law firms:

- **King & Jurgens, LLC**: the Debtor's April 2026 MOR reveals that its non-debtor affiliate, ICS Nett disbursed $10,000.00 directly to King & Jurgens for post-petition[7] "Legal" services. (ECF No. 97 at 2, 14). King & Jurgens is a pre-petition unsecured creditor holding a $114,936.66 claim (Claim No. 40-1 at 2), having historically received pre-petition payments between $11,200 and $50,000 (Ex. 6 at 36, 53). Funneling unapproved fees through an affiliate framework evades mandatory judicial scrutiny for conflicts of interest and creditor vetting.

[7] In Part 7(a) of the MOR questionnaire, the Debtor checked "No" to indicate there were *no* unapproved payments made on pre-petition debt (ECF No. 97 at 8). This Monthly Operating Report covers only transactions that occurred "From April 01 through April 30th." (ECF No. 97 at 13).

- **Murthy Law Firm**: the June 2026 MOR shows the Debtor paid $1,850.00 directly to the Murthy Law Firm out of its restricted Patterson State Bank account (ECF No. 144 at 30). The Debtor masked this payment by deceptively categorizing it under "Fringe Benefits/401K/Others." *Id.* at 13. However, public records confirm the firm practices U.S. immigration law[8]; under federal regulations, employment-based immigration costs are non-reimbursable employer business expenses, not employee fringe benefits. [9] The Debtor cannot manipulate reporting categories to hide un-vetted law firm payoffs.

30. **Unauthorized Pattern of Post-Petition Insider Financing.** The Debtor's March, and April MORs reveal a systematic pattern of unauthorized post-petition borrowing, consisting of at least ten separate cash infusions from its non-debtor affiliate, ICS Nett without prior Court approval under 11 U.S.C. § 364:

| Date | Destination Account | Amount |
|---|---|---|
| **03/20/2026** | Patterson Operating Account (-0401) | $4,500.00 |
| **03/24/2026** | Patterson Operating Account (-0401) | $765.00 |
| **04/03/2026** | Patterson Operating Account (-0401) | $2,500.00 |
| **04/07/2026** | Patterson Operating Account (-0401) | $25.00 |
| **04/07/2026** | Patterson Operating Account (-0401) | $8,000.00 |
| **04/16/2026** | Patterson Operating Account (-0401) | $32,000.00 |
| **04/16/2026** | Patterson Operating Account (-0401) | $60,000.00 |
| **04/16/2026** | Patterson Operating Account (-0401) | $70,000.00 |

(ECF No. 96 at 24, 97 at 24).

31. The Debtor failed to disclose or seek approval for this financing until the U.S. Trustee exposed the practice at the June 30, 2026 hearing. Only then did the Debtor belatedly file a Motion for Post-Petition Financing on July 14, 2026, to obtain permission to borrow funds from

---

[8] *See generally*, Practice Areas - Murthy Law Firm | U.S Immigration Law (Last visited Sept. 30, 2026).

[9] Under federal Department of Labor and USCIS regulations, employment-based immigration actions (such as H-1B filings, labor certifications, or PERM green card steps) are classified as necessary employer business expenses. 20 C.F.R. § 655.731(c)(9)(iii)(C) (barring passing the cost for H-1B visa petitions & associated attorney fees to employees; 20 C.F.R. § 656.12(b) (barring passing the cost for labor certificates and green card to employees); *see e.g.*, *Kutty v. U.S. Dep't of Labor*, 764 F.3d 540, 548 (6th Cir. 2014) (concluding that "the costs—including attorneys' fees—of obtaining 11–113 visas are business expenses within the meaning of 20 C.F.R. § 655.731(c)(9)(iii)(C).").

its insider in the future. (ECF No. 117). To date, the Debtor has failed to legitimize any of the March and April 2026 cash infusions through a proper motion and court order.

32. **Defiance of Deadlines and Failure to Propose a Plan of Reorganization.** The Court's March 18, 2026 DIP Order required the Debtor to file a plan of reorganization and disclosure statement within 120 days. (ECF No. 15 at 3). The Court subsequently granted an extension of the Debtor's exclusive filing period to September 14, 2026. (ECF No. 133). The extended deadline has passed, and the Debtor has failed to file a plan or disclosure statement or request any further extension.

## C. Debtor Lacks Any Path to a Viable Plan Reorganization

33. **Reorganization Built on a Speculative Navy Bailout.** The Debtor's reorganization strategy rests entirely on the speculative belief that the U.S. Navy will provide financial relief. At the Section 341 meeting, Mr. Shah stated the plan was "to get paid by the U.S. Navy". He elaborated, "I hope [a] letter [will] be written by the courts for the U.S. Navy to give us a program. We are trying to make sure that the U.S. government is responsible for what they have done to the industry and also to pay the 1700 [creditors] that we call our partners." When subsequently asked if the Debtor actually intended to file a plan of reorganization, Mr. Shah simply stated, "We sure can." At the Rule 2004 Examination, Mr. Saeed echoed this, testifying that the Debtor requested the Navy's assistance to recover $25 million to $28 million in supplier prepayments and sought permission to liquidate $18 million in LCU 1700 program inventory (Ex. 2 at 100, 145).

34. However, Contracting Officer Ryan M. Ksanznak flatly refuted this strategy, stating the Navy "will not engage in business matters between Swiftships and its vendors." (Ex. 3 at 15). The Navy noted the financial deadlock was self-inflicted because Swiftships declined a

pre-termination settlement. *Id.* Instead of a bailout, the Navy is strictly enforcing standard default clauses and demanding the turnover of all government-funded property. *Id.*

**Legal Standard**

35. The statutory and legal predicates for the relief requested herein are 11 U.S.C. § 1112 and Federal Rule of Bankruptcy Procedure 1017(f)(2). A bankruptcy court has broad discretion under 11 U.S.C. § 1112(b) to dismiss a Chapter 11 case. *In re Humble Place Joint Venture,* 936 F.2d 814, 816 (5th Cir. 1991); *In re Koerner,* 800 F.2d 1358, 1367 (5th Cir.1986). If there is cause to convert a case, a bankruptcy court should do so pursuant to the express language of section 1112(b), unless it specifically identifies "unusual circumstances" that warrant the continuation of the case. *In re New Towne Dev., LLC*, 404 B.R. 140, 146 (Bankr. M.D. La. 2009).

**A. Cause Exists to Dismiss or Convert This Case Under § 1112(b)(4)(C) for Failure to Maintain Mandatory Workers' Compensation Insurance and under § 1112(b)(4)(H) for Failure to Timely Provide Information Requested by the U.S. Trustee.**

36. Cause for conversion or dismissal exists under § 1112(b)(4)(C) and (H) based on the Debtor's unexcused failure to maintain insurance and provide requested information. Courts consistently hold that leaving estate property unprotected or failing to maintain proper insurance serves as an independent basis to terminate a Chapter 11 proceeding. *See, e.g., In re Pure Repair and Trucking LLC*, 658 B.R. 895, 904–06 (Bankr. S.D. Ohio 2024); *In re Bruno One, Inc.*, 619 B.R. 503, 509 (Bankr. M.D. Fla. 2020) *Gilroy v. Ameriquest Mortg. Co. (In re Gilroy)*, No. 07-054, 2008 WL 4531982, at *5 (B.A.P. 1st Cir. Oct. 3, 2008). When insurance deficiencies are coupled with a failure to respond to information requests, conversion is routinely granted to shield the estate from catastrophic risk. *See In re UFP Holding I, LLC*, 675 B.R. 302, 307–08 (Bankr. S.D.N.Y. 2025) (finding cause where "the Debtor has ignored a slew of reasonable requests from

[the U.S. Trustee] regarding the 1007 Affidavit, proof of insurance, the attorney retention application, and the attorney disclosure statement."). Louisiana law strictly requires employers to maintain continuous workers' compensation coverage. La. R.S. § 23:1035(A).

37. At the Section 341 Meeting of Creditors, the U.S. Trustee discovered that the Debtor's workers' compensation policy had been cancelled for non-payment. While management claimed the policy was reinstated, the Debtor failed to comply with formal requests to produce physical proof of reinstatement. Whether the policy was reinstated or not, the existing workers' compensation policy permanently expired on June 28, 2026. Despite four months of formal written demands from the U.S. Trustee, the Debtor has failed to provide proof of insurance. Operating an active defense shipbuilding and shipyard operation with zero workers' compensation coverage forces the estate to carry an intolerable, unmitigated risk of severe tort liability.

**B. Cause Exists to Dismiss or Convert This Case under § 1112(b)(4)(E) for Failure to Comply with a Court Order, under § 1112(b)(4)(F) for Failure to Satisfy Timely any Reporting Requirements and under 1112(b)(4)(J) Failure to File a Disclosure Statement and a Plan.**

38. A debtor in possession in a Chapter 11 case operates as a fiduciary to the bankruptcy estate and its creditors, with nearly all the rights and powers of a Chapter 11 trustee. This role demands transparency and strict compliance with the Bankruptcy Code, Federal Rules, local rules, and court orders. Compliance with court orders is strictly enforced in Chapter 11 proceedings, regardless of intent. A showing of willfulness, bad faith, or fraud is not required to find non-compliance. *In re Babayoff*, 445 B.R. 64, 80 (Bankr. E.D.N.Y. 2011). Violating a single bankruptcy court order provides sufficient cause for dismissal or conversion. *YBA Nineteen, LLC v. IndyMac Venture, LLC (In re YBA Nineteen, LLC)*, 505 B.R. 289, 303 (S.D. Cal. 2014); *In re*

*Turkey Leg Hut & Company LLC*, 665 B.R. 129, 140-41 (Bankr. S.D. Tex. 2024) (finding cause to dismiss under 1112(b)(4) case where debtor repeatedly violated the court's order).

39. The Debtor violated the Court's orders in four distinct ways: i) failing to file MORs; ii) failing to file a Plan and Disclosure Statement' iii) making an unauthorized payment for pre-petition legal services; iv) making an undisclosed, unauthorized payment to insiders.

40. **Failure to File MORs**. Monthly Operating Reports (MORs) are the "lifeblood of the Chapter 11 process," serving as the primary means to monitor financial performance and test a debtor's ability to reorganize. *In re Alston*, 756 F. App'x 160, 164 (3d Cir. 2019) (quoting *In re Andover Covered Bridge, LLC*, 553 B.R. 162, 173 (B.A.P. 1st Cir. 2016)); *In re Four Wells, Ltd.*, 2016 WL 1445393, at *10 (B.A.P. 6th Cir. Apr. 12, 2016). Consequently, compliance with this requirement is not a "mere technicality." *In re Whetten*, 473 B.R. 383, 384 (Bankr. D. Colo. 2012). Under 11 U.S.C. § 1112(b)(4)(F), "cause" for dismissal or conversion explicitly includes the "unexcused failure to satisfy timely any filing or reporting requirement." *In re DRTMG, LLC*, 667 B.R. 862, 873 (Bankr. S.D. Ohio 2025). Timeliness is paramount; a chronic pattern of delinquent filings establishes cause under § 1112(b)(4)(F) even if the records are brought current by the time of the hearing. *Four Wells*, 2016 WL 1445393, at *10. Courts flatly condemn the practice of filing eleventh-hour "catch-up" reports, noting that a "belated effort" to remedy overdue financial disclosures undermines the Chapter 11 process. *Alston*, 756 F. App'x. at 164; *Whetten*, 473 B.R. at 383 ("Filing catch-up reports is akin to locking the barn doors after the horses have already gotten out.").

41. Here, the August 2026 MOR (due on September 15, 2026) remains unfilled and is now 30 days overdue. The March 2026 MOR (due April 15) was filed 61 days late, the April 2026 MOR (due May 15) was filed 31 days late, the May 2026 MOR (due June 15) was filed 11

days late, the June 2026 MOR (due July 15) was filed 76 days late, and the July 2026 MOR (due August 15) was filed 45 days late. This severe pattern of reporting delinquency establishes clear cause for immediate conversion or dismissal under both § 1112(b)(4) (E) and (F).

42. **Failure to File a Plan and Disclosure Statement**. Submitting a chapter 11 plan and disclosure statement is the ultimate statutory objective of a reorganization proceeding. *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988) (holding a debtor must show a "reasonable possibility of a successful reorganization within a reasonable time"). Failing to file these foundational documents signals an inability to reorganize and establishes cause for dismissal. *In re Saber*, 527 F. Supp. 3d 1196, 1200 (Bankr. C.D. Cal. 2021). Missing a court-mandated deadline directly triggers 11 U.S.C. § 1112(b)(4)(J). *See* 7 Collier on Bankruptcy ¶ 1112.04 (16th Ed. 2026).

43. The Court's initial scheduling order required the Debtor to file its Plan and Disclosure Statement by July 16, 2026. On August 3, 2026, the Court granted an extension of the plan exclusivity deadline to Monday, September 14, 2026. (ECF No. 133). Despite receiving this formal extension, September 14, 2026 deadline passed with zero filings or further extension requests. This failure flouts direct court mandates and establishes independent statutory cause for conversion or dismissal under 11 U.S.C. § 1112(b)(4)(E) and (J).

44. **Violation of Prohibition on Payments to Insiders DIP Order Mandate and Local Rule 4002-1(*l*)**. After filing for Chapter 11, a debtor may operate in the ordinary course of business without court permission, but conduct outside the ordinary course strictly requires court authorization. *In re Willow Bend Ventures, LLC*, 2019 WL 2252498, at *11 (Bankr. E.D. La. May 24, 2019). Transactions with insiders—including statutory or "non-statutory" insiders who exercise actual control or lack an arm's-length relationship—receive heavy scrutiny. *U.S. Bank*

*N.A. v. Village at Lakeridge, LLC*, 583 U.S. 387, 389 (2018); *In re Matter of Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991). Insiders are held to a higher standard of fidelity, and their behavior is subjected to special judicial review. *In re Herby's Foods, Inc.*, 134 B.R. 207, 211 (Bankr. N.D. Tex. 1991); 2 Collier on Bankruptcy ¶ 101.31 (15th ed. 1991).

45. Implementing these principles, this Court's DIP Order explicitly prohibited the Debtor from entering into any transaction outside the ordinary course of business without prior court approval. (ECF No. 15 at 2). Furthermore, the DIP Order strictly bars paying any "compensation or other remuneration" from estate property to any present or former officer, without court approval. In addition to the foregoing, Local Bankruptcy Rule 4002-1(*l*) prohibits any such payments to any present or former insider without prior court approval. Under Local Rule 4002-1(*l*), a motion for insider compensation must be verified to compensate such an insider must be verified by at least one insider recipient and explicitly detail: (i) the necessity for retention and the exact services to be performed on behalf of the estate; ii) the proposed compensation, benefits and employment terms; iii) all compensation received during the six months pre-petition and the insider salary as of the petition date.

46. Here, the Debtor made an unauthorized $210,844.00 transfer to Sunrays, purportedly for services provided in April 2026. The funds paid to Sunrays were specifically designated to cover the hours worked and operational costs of the executive management team. Paying a third party to fund the salaries of current officers is, in substance, providing unauthorized remuneration to those officers using estate property. Because the Debtor never filed a formal retention application under § 327(a) or an out-of-the-ordinary-course business motion under § 363(b) to validate the Master Services Agreement and never filed any applications for compensation of its management team, the post-petition cash transfers to its insider Sunrays were

completely unauthorized disbursements of estate assets. The Debtor's hidden arrangement and use of the estate property to fund its executive leadership under the guise of "subcontractor charges" or "back-office services," (Ex. 2 at 10, 128) violates the absolute prohibition against unapproved insider compensation set forth in both the DIP Order and Local Rule 4002-1(*l*).

47. Although the CFO asserted that the $210,844.00 payment was "in the same range" as historical charges, the Debtor paid Sunrays a total of only $47,850.00 for the entire year of 2025, and zero dollars in 2026 until this unauthorized May transfer. (Ex. 2 at 129; Ex. 6 at 4, 16, 21, 22, 26, 44, 48). Under no objective market circumstances does a single month of unapproved services justify a payout nearly four times greater than the prior year's total compensation. This distortion of historical payment patterns—hidden from schedules and executed without court oversight—is a textbook example of why the Bankruptcy Code demands heightened scrutiny for insider transactions. It is precisely the type of unauthorized asset depletion for the benefit of insiders that Local Rule 4002-1(l) is designed to prevent.

48. **Making an Unauthorized Payment for Pre-Petition Legal Services**. The Debtor bypassed the Bankruptcy Code and the DIP Order by funneling unauthorized payments to two independent law firms without court oversight. Neither King & Jurgens, LLC nor Murhy Law Firm was ever employed as a professional person under 11 U.S.C. § 327, nor have their fees been reviewed or approved under 11 U.S.C. § 330. Despite the foregoing, the Debtor made a $1,850 payment to Murthy Law Firm and the Debtor's non-debtor affiliate, ICS Nett, Inc., made a $10,000.00 disbursement to King & Jurgens, a pre-petition unsecured creditor holding a $114,936.66 claim (Claim No. 40-1). By routing unapproved professional compensation through an affiliate, the Debtor actively concealed its true operational costs and stripped creditors of their statutory notice and vetting rights. In addition, satisfying any pre-petition debt without court

approval violates the express terms of the DIP Order (ECF No. 15 at 2) (prohibiting to pay any prepetition debt) and establishes statutory cause for conversion or dismissal under 11 U.S.C. § 1112(b)(4)(E).

**C. Cause Exists to Dismiss or Convert This Case Under 11 U.S.C. § 1112(b)(4)(B) for Gross Mismanagement.**

49. Subsection 1112(b)(4)(B) establishes that "cause" to convert or dismiss a Chapter 11 case includes the gross mismanagement of the estate. Crucially, this provision dictates an objective standard; a court may find gross mismanagement regardless of the good intentions of the debtor's management. 7 Collier on Bankruptcy ¶ 1112.04. Furthermore, because the statutory meaning of "gross mismanagement' is identical under § 1112(b)(4)(B) and § 1104(a)(1), case law addressing the appointment of a Chapter 11 trustee is equally instructive here. *See, e.g., In re Vascular Access Centers, L.P.*, 611 B.R. 742, 760-64 (Bankr. E.D. Pa. 2020); *In re Products Intern. Co.*, 395 B.R. 101, 110–12 (Bankr. D. Ariz. 2008).

50. **Unauthorized Post-Petition Disbursements and Insider Deals constitute Gross Mismanagement.** Bankruptcy courts routinely find gross mismanagement where a debtor-in-possession takes critical financial actions outside the ordinary course of business—such as paying pre-petition debts, incurring unauthorized liabilities, or compensating insiders and un-vetted professionals—without prior court approval. *See In re Alston*, 2013 WL 6210249, at *7-8 (E.D. Pa. Nov. 27, 2013) (unauthorized post-petition loans and unapproved counsel payments); *In re Wallace*, Case No. 09-20496 2010 WL 378351, at *4-5 (Bankr. D. Idaho Jan. 26, 2010) (unapproved payments to professionals, pre-petition debt satisfaction and unapproved unsecured loans from a subsidiary); *In re Canion*, 129 B.R. 465, 467 (Bankr. S.D. Tex. 1989) (unauthorized distributions to unapproved professionals).

51. In *In re Canion*, conversion was mandated because the debtor "failed in his attempt to balance his personal interests with his fiduciary obligation to the creditors and the estate." 129 B.R. at 470. *See also In re Products Int'l Co.*, 395 B.R. 101, 111 (Bankr. D. Ariz. 2008) (finding gross mismanagement where management was "more interested in engaging in self-dealing transactions to the detriment of the Debtor," including the president's unauthorized transfer of nearly $700,000.00 to another business he owned). Here, the Debtor has similarly subordinated its fiduciary obligations to the estate in order to benefit and protect its intertwined affiliate network. Without seeking court approval under §§ 327 or § 363, the Debtor executed a massive $210,844.00 insider payout in May 2026 to Sunrays—an amount nearly four times greater than Sunrays' entire compensation for the preceding year. Rather than operating as an independent, transparent debtor-in-possession, the Debtor allowed its affiliate to dictate estate expenses and drain cash outside of judicial oversight. Similarly, on April 17, 2026—immediately after receiving $1,499,998.00 from the U.S. Department of Defense without court approval—the Debtor transferred $1,480,000.00 to its affiliate, ICS Nett. Just as the debtor in *Canion* could not balance personal desires with estate duties, this Debtor's persistent reliance on an undisclosed Master Services Agreement and a hidden, affiliate-controlled ledger proves a total failure to balance pre-existing affiliate loyalty with its strict fiduciary obligations to this Court and its creditors.

52. Additionally, the Debtor used ICS Nett to funnel a $10,000.00 post-petition payment to King & Jurgens, LLC, to satisfy a portion of a pre-petition unsecured claim (Claim No. 40-1), flagrantly violating the DIP Order. The Debtor issued an un-vetted $1,850.00 payment to the Murthy Law Firm, masking the transfer by deceptively categorizing it as a routine employee fringe benefit. By routing transfers through an affiliate and manipulating reporting categories, the

Debtor engaged in the exact type of "inadequate financial reporting" and "violations of the Code" that the *Wallace* court expressly linked to gross mismanagement. *In re Wallace*, 2010 WL 378351, at *4. As the court emphasized in *Alston*, paying counsel without approval reveals a "fundamental misunderstanding of [the] obligation to the Bankruptcy Court and [the] creditors" and demonstrates a clear "inability to manage the estate." 2013 WL 6210249, at *5–6; *see also In re Grasso***,** 490 B.R. 500, at 518-19 (Bankr. E.D. Pa. 2013) (finding gross mismanagement where the debtor directed a controlled entity to pay a $30,000 post-petition retainer to bankruptcy counsel).

53. Just as in *Alston*, *Wallace*, *Grasso,* and *Canion*, using estate assets to fund unapproved insider distributions, affiliate sweeps, and un-vetted professional fees constitutes manifest gross mismanagement under 11 U.S.C. § 1112(b)(4)(B).

54. **False Financial Disclosures and Debt Understatement constitutes Gross Mismanagement**. Fiduciary transparency is the lifeblood of Chapter 11, and courts find gross mismanagement where a corporate debtor fails to accurately disclose its major financial obligations or files deceptive schedules. *See In re ARS Analytical, LLC,* 433 B.R. 848, 857, 865 (Bankr. D.N.M. 2010) (finding gross mismanagement where a debtor failed to list a multi-million-dollar liability on its schedules); *In re Peak Serum, Inc.*, 623 B.R. 609, 631 (Bankr. D. Colo. 2020) (condemning management for sitting on deeply inaccurate financial figures). Debtors have an absolute, unyielding duty to disclose all assets and liabilities, even if their ultimate bankruptcy status is uncertain. *United States v. Beard*, 913 F.2d 193, 197 (5th Cir. 1990); *United States v. Jackson*, 836 F.2d 324, 329 (7th Cir. 1987).

55. The Debtor in this case flagrantly failed to obey this disclosure mandate**.** On its April 15, 2026 schedules, the Debtor reported total liabilities of $44,083,285.49. However, on

September 14, 2026, the U.S. Department of Defense filed Proof of Claim 46-1 for $104,643,489.98, arising from contract financing. By understating its actual liabilities by more than $100 million, the Debtor provided a completely distorted picture of its financial reality to this Court and its creditors. This deceptive pattern extends directly to the asset side of the Debtor's schedules. The Debtor completely omitted any mention of a substantial $3.8 million claim it holds against its own corporate insider. Furthermore, despite the fact that the Debtor continuously asserts a multi-million-dollar claim against the U.S. Navy in its out-of-court correspondence, it failed to list it on its bankruptcy schedules. Lastly, the Debtor failed to disclose $7.3 million in pre-petition insider transfers, provided false and conflicting representations regarding the existence of officers, codebtors and which assets constitute collateral for the loans.

56. Much like the debtor in *ARS Analytical*, who left its primary multi-million-dollar transactions off its books because it claimed they were "disputed," the Debtor's dual concealment of its massive liabilities and its primary legal claims constitutes a "serious, material omission" that leaves the bankruptcy court and creditors without a "clear picture of [the] Debtor's financial affairs." 433 B.R. 848, 865, 867 n.11. Furthermore, under the standard set forth in *Peak Serum*, one of the "most fundamental and crucial duties" of a debtor-in-possession is to keep creditors informed of "the nature, status and condition of the business undergoing reorganization." 623 B.R. at 620-21. By manipulating its schedules to hide a $100 million liability while simultaneously keeping its $3.8 million insider asset, its Navy claim, and $7.3 million in pre-petition insider transfers completely off the grid, management sat on the information while providing "erroneous and misleading" financial data to the public. *Id.* at 624. Under this combined authority, such a severe distortion of financial reporting is independent, objective proof of gross mismanagement under 11 U.S.C. § 1112(b)(4)(B).

57. **Affiliate Fund Pooling and Commingling Constitutes Gross Mismanagement**. Finally, gross mismanagement exists where management obscures corporate boundaries, commingles funds into shared accounts, or conceals deep structural relationships with sister entities controlled by the same principal. *See Kingsway Capital Partners, LLC v. Sosa*, 549 B.R. 897, 901, 903-04 (N.D. Cal. 2016) (treating an outside entity as "one and the same" and utilizing its revenues without fund segregation); *In re Ashley River Consulting, LLC,* 2015 WL 1540941, at *10 (Bankr. S.D.N.Y. Mar. 31, 2015) (omitting deep structural relationships and commingling funds into centralized "sweep accounts" shared with a principal's other businesses, creating an unresolvable conflict of interest).

58. The Debtor's entire operational model relies on the exact commingling and hidden architecture condemned in *Sosa* and *Ashley River*. Treasurer Saadia Iqbal falsely testified under oath at the Section 341 Meeting of Creditors that the Debtor strictly segregated its funds from its owners and affiliates without any commingling. Further investigation established a systemic practice of shifting and pooling cash with non-debtor affiliates that seamlessly crossed over into the post-petition period.

59. By executing this hidden financial scheme, the Debtor's management engaged in the precise misconduct censured in *In re Ashley River Consulting, LLC*, where the court condemned the practice of "commingling funds . . . in 'sweep accounts' that contained funds of other entities that [the principal] controls." 2015 WL 1540941, at *10. Much like the insider network in *Ashley River*, where a singular principal operated as a "puppeteer pulling the strings of [the debtor] for his own advantage" Mr. Shah and his brother Khuram Shah have utilized Sunrays and ICS Nett to bypass judicial oversight, completely failing to observe the corporate formalities of these entities. *Id.* at *2–3. Because the Debtor remains structurally entangled with

these non-debtor affiliates under a unified command, there exists an unresolvable conflict of interest; compromised management cannot be trusted to protect the estate when they are actively "putting it to personal use in accounts [the principal] controlled of other entities." *Id.* at *2, *10.

60. This exact brand of structural deception and boundary-blurring was flatly rejected in *Kingsway Capital Partners*, *LLC v. Sosa*, 549 B.R. 897 (N.D. Cal. 2016). In *Sosa*, the court affirmed a finding of gross mismanagement because the corporate debtor "appear[ed] [not] to be keeping the [affiliate] funds separate from its own" and impermissibly treated a sister company and the debtor "as one and the same." *Id.* at 901. Just as the principal in *Sosa* used an affiliate's cash flow as "its own without a contract in place," the Debtor here treated its bankruptcy estate as an unmonitored subsidiary of its affiliate network. *Id.* at 904. Specifically, the Debtor's March, April, and May 2026 MORs reveal a systematic pattern of unauthorized post-petition borrowing, consisting of at least ten separate cash infusions from ICS Nettexecuted without prior court notice or approval under 11 U.S.C. § 364. *See also In re Gateway Access Solutions, Inc.,* 374 B.R. 556, 566 (Bankr. M.D. Pa. 2007) (holding that entering into unapproved corporate borrowings on "oral terms" constitutes gross mismanagement). Just as the court held in *Gateway Access*, entering into unapproved corporate borrowings on loose, informal terms represents a textbook example of gross mismanagement that completely eviscerates judicial and creditor oversight. *Id.* The Debtor concealed this financing pattern until the U.S. Trustee directly exposed the practice at the June 30, 2026 hearing. Only after its non-compliance was brought to light, Debtor filed a reactive Motion for Post-Petition Financing for future cash infusions.

61. Under the combined weight of *Sosa, Gateway Access,* and *Ashley River*, this chronic reliance on undisclosed affiliate cash streams and the total evisceration of corporate boundaries constitutes manifest gross mismanagement under 11 U.S.C. § 1112(b)(4)(B).

D. **Cause Exists to Dismiss or Convert This Case Under § 1112(b)(4)(A) Due to Substantial and Continuing Loss to or Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation.**

62. During the pendency of this case, the Debtor filed five MORs which disclose the following business activity since the petition date:

| MONTH | GROSS INCOME | COST OF GOODS | GROSS PROFIT | OPERATING EXPENSES/OTHER | INTEREST | NET |
|---|---|---|---|---|---|---|
| March 18-31, 2026 | $316,136 | $311,813 | $4,323 | $106,726 | $30,090 | -$132,493 |
| April, 2026 | $280,029 | $272,024 | $8,005 | $252,147 | $74,901 | -$319,043 |
| May, 2026 | $131,369 | $446,540 | -$315,171 | $243,896 | $75,311 | -$634,378 |
| June, 2026 | $1,131,233 | $1,859,410 | -$728,177 | $73,194 | $79,281 | -$880,652 |
| July, 2026 | $254,875 | $814,063 | -$559,188 | $212,458 | $77,061 | -$848,707 |
| TOTAL | $2,113,642 | $3,703,850 | -$1,590,208 | $888,421 | $336,644 | -$2,815,273 |
| AVERAGE | $422,728 | $740,770 | -$318,042 | $177,684 | $67,329 | -$563,055 |
| ANNUALIZED | $5,072,741 | $8,889,240 | -$3,816,499 | $2,132,210 | $807,946 | -$6,756,655 |

(ECF Nos. 96, 97, 107, 144, 145). As shown above, over a five-month span, the company has accumulated a total net loss of **-**$2,815,273.00 with an average monthly loss of **-**$563,055.00. If allowed to continue on this trajectory, the Debtor's annualized operational loss is projected to reach a devastating -$6,756,655, driven by an annualized gross profit deficit of -$3,816,499 and massive annualized debt service requirements ($807,946 in annualized interest).

63. The Debtor's inability to survive as a standalone-going concern is further confirmed by its own management. During the Rule 2004 Examination, Mr. Sayeed admitted that the Debtor's core operations are entirely unviable and have long relied on outside life support. Specifically, Mr. Saeed testified:

> This is not the case because if you see our trial balance and ledgers, actually we pay -- ICS or OCR they paid more amount because of the requirement on the ongoing program. And the cash --incoming cash in Swift is not sufficient to meet all these obligations because of the recent (inaudible). So actually, they end up paying more money from their own pocket to -- to these company -- to -- to -- to Swiftship, LLC. I've done this analysis of -- for the last three years. So every single entity eventually turned into -- like, these are the one -- they are financing the operation of Swiftship in last three or four years. (Ex. 2 at 97).

64. Mr. Saeed admitted that incoming cash flow is wholly insufficient to meet the Debtor's mounting obligations, forcing corporate affiliates—specifically ICS Nett, and OCR Global—to systematically fund the shortfall out of their own pockets. According to Mr. Saeed's own multi-year financial analysis, this persistent reliance on affiliate financing is not a temporary setback, but rather a structural reality; the Debtor has been completely unable to sustain its own operations for the last three to four years.

65. In addition, the Debtor's purported reorganization strategy rested entirely on the speculative belief that the U.S. Navy will provide financial relief. Predictably, this speculative strategy has yielded no results, and the Debtor has failed to propose any plan of reorganization, in defiance of the Court's deadlines.

WHEREFORE, the U.S. Trustee asks the Court to dismiss it with a 180-day bar from refiling or in the alternative convert this matter to a case under Chapter 7.

Kevin M. Epstein

United States Trustee
Region 5, Judicial Districts
of Louisiana and Mississippi

By: */s/ Anna Haugen*
Anna Haugen

Anna Haugen, FL Bar No. 89555
Trial Attorney, Office of the U.S. Trustee
300 Fannin Street, Suite 3196
Shreveport, LA 71101
Anna.Haugen@usdoj.gov
Telephone No. (318) 676-3456
Direct Telephone No. (318) 676-3554

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:
SWIFTSHIPS, LLC — CASE NO. 26-50237
Debtor — CHAPTER 11

**CERTIFICATE OF SERVICE**

I certify that a copy of the above and foregoing has been either mailed by first class mail, postage prepaid, or transmitted by CM/ECF to the following and entities on the attached mailing matrix.

Swiftships, LLC
1105 Levee Road
Morgan City, LA 70380-1001

Ryan James Richmond
Sternberg, Naccari & White, LLC
450 Laurel Street,Suite 1450
Baton Rouge, LA 70801

Emile Joseph, Jr.
Allen & Gooch, A Law Corporation
P.O. Box 81129
Lafayette, Louisiana 70598

Benjamin W. Janke
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170

Carli M. Worsham
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170

Duris L. Holmes
DEUTSCH KERRIGAN, L.L.P.
755 Magazine Street
New Orleans, Louisiana 70130

Ryan W. Lamb
U.S. Department of Justice
P.O. Box 875-Ben Franklin Station
Washington, DC 20044

Joseph E. "Josh" Lee III (Bar #26968)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

Claire A. Campbell (Bar #41181)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

PATRICK K. RESO
HENRI S. THERIOT
CHEHARDY, SHERMAN, WILLIAMS,
RECILE & HAYES, L.L.P.
111 North Oak Street, Suite 200
Hammond, Louisiana 70401

Seth B. Shapiro
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875

Rick M. Shelby
KELLY HART PITRE
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Amelia L. Hurt
KELLY HART PITRE
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Louis M. Phillips
KELLY HART PITRE
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

KREBS FARLEY, PLLC
Laura F. Ashley
400 Poydras Street, Suite 2500
New Orleans, LA 70130

KREBS FARLEY, PLLC
Elliot Scharfenberg
400 Poydras Street, Suite 2500
New Orleans, LA 70130

Charels M. Rush, APLC
202 Magnate Drive
Lafayette, LA 70508

Date: October 9, 2026

By: *___/s/ Samantha A. Woodruff*
Samantha A. Woodruff
Bankruptcy Analyst *(Detail)*
Office of the United States Trustee
300 Fannin Street, Suite 3196
Shreveport, LA 71101
Telephone No. (318) 676-3456
Direct Telephone No. (318) 676-3139