# Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

IN RE: CHAPTER 11

SWIFTSHIPS, LLC CASE NO: 26-50237

Debtor.

******************************************************

2004 Examination of the "Committee" of Swiftships, LLC, held by remote electronic means via Zoom, on the 10th day of July 2026, beginning at 9:04 a.m.

Reported by:

Alisha Patrice Armes

Certified Court Reporter

License No. 2025001

APPEARANCES:

KELLY HART PITRE
(By: RICK M. SHELBY)
400 POYDRAS STREET, SUITE 1812
NEW ORLEANS, LOUISIANA 70130
Telephone: (504) 522-1812
Email: rick.shelby@kellyhart.com
ATTORNEY FOR THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS OF SWIFTSHIPS,
LLC

STERNBERG, NACCARI & WHITE, LLC
(By: RYAN J. RICHMOND)
450 LAUREL STREET, SUITE 1450
BATON ROUGE, LOUISIANA 70801
Telephone: (225) 412-3667
Email: ryan@snw.law
ATTORNEY FOR SWIFTSHIPS, LLC

U.S. DEPARTMENT OF JUSTICE
(By: RYAN W. LAMB)
950 PENNSYLVANIA AVENUE, NORTHWEST

(CONTINUED)



26-50237 - #147-3 File 10/09/26 Enter 10/09/26 15:30:11 Ex. 2 2004 Exam Transcript Pg 3 of 250

(CONTINUED)

WASHINGTON, D.C. 20530
Telephone: (202) 252-2500
Email: ryan.lamb@usdoj.gov
ATTORNEY FOR THE SMALL BUSINESS
ADMINISTRATION

U.S. TRUSTEE PROGRAM
(By: ANNA M. HAUGEN)
300 FANNIN STREET, SUITE 3196
SHREVEPORT, LOUISIANA 71101
Telephone: (318) 676-3554
Email: anna.haugen@usdoj.gov
ATTORNEY FOR THE UNITED STATES TRUSTEE

INDEX

| | Page |
|---|---|
| AGREEMENT OF COUNSEL | 6 |
| EXAMINATION OF OMER SAEED BY: | |
| MR. SHELBY | 8 |
| MR. LAMB | 142 |
| EXAMINATION OF SHEHRAZE SHAH BY: | |
| MR. SHELBY | 162 |
| MR. LAMB | 190 |
| EXAMINATION OF MICHAEL POEL BY: | |
| MR. SHELBY | 220 |
| MR. LAMB | 230 |
| EXAMINATION OF SADIA IQBAL BY: | |
| MR. SHELBY | 235 |
| MR. LAMB | 242 |
| EXHIBITS: | |
| 1 2004 EXAMINATION NOTICE | 15 |

(CONTINUED)

(CONTINUED)

| | | |
|---|---|---|
| 2 | EMAIL | 17 |
| 3 | 6-30-26 EMAIL WITH INDEX OF SUPPORTING DOCUMENTS | 21 |
| 4 | ANNEX 14 UNBILLED 4-30-26 | 54 |
| 5 | ORIGINAL AND AMENDED SCHEDULE VERSIONS | 71 |
| 6 | 2026 TRIAL BALANCE SHEET | 107 |
| 7 | SBA LOAN AGREEMENT 3-1-22 | 113 |
| 8 | BOARD MINUTES 2025 4-7-25 | 120 |
| 9 | ANNEX 11 INVENTORY ON HAND REPORT | 149 |

REPORTER'S PAGE 248
REPORTER'S CERTIFICATE 249

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties that the examination of the "Committee" of Swiftships, LLC, is hereby taken pursuant to Federal Rule of Bankruptcy Procedure 2004 and Local Rule of Bankruptcy Procedure 2004-1(b), in accordance with law, pursuant to notice;

That the formalities, such as reading, signing, sealing, certification, and filing, are specifically waived;

That all objections, save those as to the form of the questions, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * *

ALISHA PATRICE ARMES, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the above-named witness.

* * *

MADAM COURT REPORTER:
All right. Counsel, would you like to introduce yourself on the record real quick? We can go on the record at 9:03, and then I'll swear the first witness for you.
MR. SHELBY:
My name is Rick Shelby -- my name is Rick Shelby. I represent the Official Committee of Unsecured Creditors of Swiftships, LLC. I am with the law firm Kelly Hart Pitre.
MR. RICHMOND:
And I guess I'll go next. This is Ryan Richmond. I'm with the law firm of Sternberg, Naccari & White. And I am the general bankruptcy counsel for the debtor and debtor-in-position, Swiftships, LLC.
MR. LAMB:
I am Ryan Lamb. I represent the United States, including the Small Business Administration and the Department of Defense, and I'm from the United States Department of Justice.
MS. HAUGEN:
And I am Anna Haugen. I represent the United States Trustee, and I am from the US

Department of Justice.
MADAM COURT REPORTER:
Okay. We will proceed with our first witness this morning.
Will you please raise your right hand for me, sir? Omer?
OMER SAEED
after having been first duly sworn by the Certified Court Reporter, did testify as follows:
MADAM COURT REPORTER:
Thank you, sir.
We'll go on the record at 9:04 a.m.
Counsel, you may proceed whenever you are ready.
MR. SHELBY:
Thank you.
(ON-THE-RECORD)
(WHEREUPON, THE 2004 EXAMINATION COMMENCED AT 9:04 A.M.)
EXAMINATION BY MR. SHELBY:
Q Good morning, Mr. Saeed. As you heard, my name is Rick Shelby. I believe we have spoken before. Can you please state your name and spell your name for the record?
A Yes, Mr. Shelby. This is Omer Saeed. My first

name Omer, O-M-E-R, and my second name is Saeed, S-A-E-E-D.
Q And Mr. Saeed, who is your current employer?
A My current employer is Sunrays International, and that is the back office function for all our affiliates that's providing the back office services to Swiftships.
Q And how long have you been employed at Sunrays?
A Since September 2019.
Q And do you -- are you employed by Swiftships, LLC?
A Technically, the -- the way we -- the structure is we are the employee of Sunrays, and the -- currently I'm also leading a role of CFO for Swiftship.
Q So you are an officer of Swiftships, LLC?
A Yes.
Q And you said, "CFO," is that chief financial officer?
A Chief financial officer.
Q And how long in that position?
A From last -- for this role, it's been like for two years.
Q I'm going to pull up an exhibit -- so let me -- let me start with a few instructions. You're

under oath.
A Yes, sir.
Q Have you ever -- have you ever had your deposition taken before?
A No, sir.
Q All right. So let me lay some ground rules if that's okay with you.
A Sure.
Q This is a remote examination similar to a deposition. You are under oath. I'll be pulling up exhibits on the screen, which makes it a little bit more difficult to share with you the entire document.
So I'm going to do my best to make sure that when I show you a document, that you're able to recognize it. And if you need to see the full document, just let me know, and I'll scroll through the document if that's okay with you?
A Sure.
Q And then, you know, we're having a conversation here, but we are remote, and we have a court reporter transcribing these proceedings. So it's -- it's easy when we have -- when I'm asking a question that you might assume the

answer, and you might cut me off or vice versa.
So I just want to make sure we cooperate together for purposes of the court reporter. Let me get through my question. I'll try to let you get through your answer. And I think if the court reporter has any issue, she'll let us know if that's okay with you.
A Yes, sir.
Q And when I ask questions, it may not be clear what I'm asking sometimes because the question might seem confusing. So if you need clarification, I would prefer, rather than assume what I'm asking, that you ask me for clarification.
You have a lawyer present for the debtor, Mr. Ryan Richmond. He will be able to object to my questions, but for purposes of today, you will still need to answer the question. Unless Mr. Richmond advises you that you are not to answer for whatever reason he states on the record. Do you understand that?
A Makes sense, sir.
Q Okay. And --
MR. RICHMOND:
And Rick, if I could make just one

clarification for the record. I represent Swiftships, LLC, the debtor and debtor-in-possession, not any of the individual examinees today. Just wanted to make that clear on the record.

MR. SHELBY:

You know, we -- I -- I appreciate that, Ryan. We may have that come up later. But I -- I think that if -- if you want to interject at some point and say, I think that, you know, I cannot object, and they may need counsel or however we deal with that, we can deal with that at that point.

BY MR. SHELBY:

Q So I think I got through everything. We can take breaks as necessary, Mr. Saeed. My only request on breaks is that if we're in the middle of a question, that you answer the question, and then we can take a break.

You should not be having any communication with any other person during the breaks. If you do, I expect that you will tell me what those communications were about.

For purposes of the remote deposition -- examination, I -- I don't want any papers in

front of you. I don't want your cell phone distracting you. Put it in a drawer.

If you do have papers in front of you that you need to refer to, I don't necessarily have a problem with that, I just need to know what they are.

And then -- I think that gets through most of the directions that I would need to advise you. Do you have any questions that you want to clarify for purposes of today?

A No, I'm clear. But I do have reference documents just in case. I took the copy of what we submitted, as well as I have an access to my -- an access online that -- if -- if needed, I can share my screen for the reference document.

Q Yeah, that may be helpful because I think most of what we're going through today is what you’ve provided. So if it's better for you to use paper, I have my paper in front of me, I -- I understand.

But any notes, anything like that, I would ask that you put those to the side for purposes of your testimony today.

Is there any reason why you would not be able to testify truthfully today? By that, I

mean medications and things like that.
A There's no reason.
MR. SHELBY:
Okay. I'm going to pull up our first document and get started here. All right. Can you see that on your screen?
THE WITNESS:
Yes, sir.
MR. SHELBY:
Is it big enough for you to read? Is -- is this okay?
THE WITNESS:
Yeah.
MR. SHELBY:
Okay. So have you seen this document before?
THE WITNESS:
I think we can only see your folder having a number of documents listed.
MR. SHELBY:
Okay, hold on one second. Okay. Now you should be able to see the document.
THE WITNESS:
Yes, sir.
BY MR. SHELBY:

Q Okay. Have you seen this document before?
A Yeah. When we received this document -- this is the request for 2004 having 48 points to be provided. Yes.
Q And do you understand that you're appearing pursuant to this notice of 2004 examination today?
A Yes, sir.
MR. SHELBY:
And let me -- Ms. Court Reporter, this will be Exhibit Number 1. The notice of 2004 examination.
(EXHIBIT No. 1 MARKED FOR IDENTIFICATION)
BY MR. SHELBY:
Q So prior to today, we had a discussion, "we" being Mr. Richmond and I, regarding the topics to be discussed today with respect to the production. And I just shared another screen. Can you see this email that I pulled up?
A Yes, I can see that.
Q And just to start off with, you're not copied on this email. This was a communication I had with Mr. Richmond regarding today's testimony.
And I just want to -- before we get

started, you understand that there may be other witnesses that can testify to certain topics that we'll be discussing today?
A Yes, I do.
Q And when I sent a high-level review of what I thought the analysis would be or the discussion would be today, you were listed as the first witness. And the topics that I think you are knowledgeable on that you'll have to confirm are the financials and the accounting for Swiftships, LLC; is that correct?
A Yes, sir.
Q Are there any other topics that you think would be within your scope for today's testimony?
A So that's mainly because on the financial side, I can cover the cash flow, which is mentioned on the Shehraze name. That's a part of our cash flow that is financial project.
The most important point is the project financials, the status on the financial aspect -- the contractual status from the financial aspect. So that's pretty much -- I can cover all these sections.
Q Okay. And that was -- that's my understanding. And as we go through our discussion today, I

think we're going to be primarily focused on
your testimony.
My next question is with respect to the
topics: Do you understand that if there is any
question that I ask, and you are not the most
knowledgeable person to answer that question,
that you can advise me on who would be able to
answer that question?
A For sure.
MR. SHELBY:
Okay. That's Exhibit Number 2, Court
Reporter, the email. I'll try to keep up with
that with you.
(EXHIBIT No. 2 MARKED FOR
IDENTIFICATION)
BY MR. SHELBY:
Q Okay. So what did you do to prepare for today's
examination?
A So likewise, we had our last session, and the --
pretty much was discussion on the ongoing
program, the cash flow management, and the --
the status. And one of the other topic that's
relates to the usage -- usage of our existing
banks, which are linked with our current ongoing
program.

So what I have done, I've prepared you a slide -- a very high-level slide that will give us some sort of overview of our current financial ongoing program, the status of the financial status, along with the current payment status. Where do we stand? What has been received? And what is expected to be spent in the coming months?

That will also give us an idea on the cash flow, what we are projecting, what are our projected inflows, and what are our projected outflows. That will give us an insight on how these projects linked with the banks.

The last discussion that we had on why we are using multiple banks. So I think this will give us a chance to explain in detail and to justify why it is so. So that was my first document or a slide that I can share via online if you allow me.

And then I'm open to answer all the question. I have all -- all my working documents ready pretty much based on these 48 questions that we provided. And I welcome all questions if you have any on these provided -- provided documents.

Q Let me start with your -- what I would call a demonstrative. Have you shared that with Mr. Richmond?
A The documents -- the presentation? What I'm talking -- the -- the slide?
Q The slide. Correct.
A Not yet. I just did it in a day or so.
Q Would you please send that to Mr. Richmond, and then he can share that with me?
A Sure.
Q And then at a break, I would request some time just to look at it, and we can make a decision on whether or not we need to -- after I ask the questions that I'm prepared for today to go into that. Is that okay with you?
A Yeah, that's fine.
Q Okay. And then you mentioned the -- the 48 topics and the documents that you produced. Appreciate the work that you did on that. Is that the exhaustive list of documents that you believe was necessary to reply to the request?
A I would say the document contain a universe of the data. We tried our best to provide all the required documents to the best of our knowledge and understanding. And some of the documents --

it's -- it's -- it took us, like, forever.
I'll just give you an example under account -- the point number three, which requires the general ledgers, and if you see the documents that we provided, it has -- in the relevant period, which is Jan 2023 through the -- 2026, the amount of the data is somewhere around, like, I would say, 421,000 transactions.
And in order to go through all these documents and every single transaction, just to make sure everything is aligned, it took us a pretty -- time for -- to -- to -- to review and finalize it.
Rest -- some of the documents are pretty ready, like -- like our financial statements, our taxations, and other communication, and some of the documents that we need to dig into, the emails, and so on to provide the best answer to the -- to our best extent.
Q Yeah. And we'll go through your summary, which, I think, was -- was helpful. I just wanted to make sure that -- well, let me ask you a question: Were you the person that was primarily responsible for gathering all this documentation?

A Yes, sir.
Q Did you work with anybody to prepare the documentation?
A Yes, I worked with my team. Every -- as you -- as you see in -- in one of our section, I provided the responsibility of my staff.
So every domain have a separate SME, which is, like, for accounts payable, I have a separate guy who's taking care of the accounts payable. For accounts receivable, it's a separate guy.
So a number of people, they helped me out pulling the data, and I was the one who was compiling and finalizing the documents before submission.
Q Okay. Well, let -- let's just dive into it since we started talking about it, if that's okay with you?
A Sure.
MR. SHELBY:
And I'm -- I'm trying to pull up the documents that -- okay. All right. This will be Exhibit Number 3.
(EXHIBIT No. 3 MARKED FOR IDENTIFICATION)

BY MR. SHELBY:
Q Do you see that, Mr. Saeed?
A Yes, I can see an email.
Q So this is an email that I received from Mr. Richmond that provided -- you can see here where my cursor is together with supporting documents identified in the company index, and the index is attached. Did you prepare this document?
A Yes, sir.
Q Okay. And this will -- this will be helpful for our discussion today, I think. Okay. So I'm going to just go through each topic.
There's going to be a lot that I'm not going to ask you questions on if that's okay. And then we'll ask questions on certain of the topics.
I'm just going to -- to move past number one because you did provide all financial statements from 2023 to -- up to date -- 2026, correct?
A Yes, sir.
Q All right. I'm going to move to then number two, which we asked for financial reports, financial packages, board or member reporting packages that are for the relevant period. And

I think you did provide several financial packages; is that correct?
A Yes, sir.
Q And -- so one of the topics here, I think it -- it -- it was maybe not very clear, was the last request where it says, "Reporting packages of the debtor -- board or member reporting packages of the debtor for the relevant period." Do you see that?
A Uh-huh.
Q And -- and if I scroll down to number 37, this topic asked for minutes, resolutions, written consents, and other records, meetings, or actions of the debtors. Do you see that?
A Yes, sir.
Q And you referred to Annex number 37?
A Yes.
Q And do you -- do you recall what Annex number 37 was?
A Yeah. This is relating to our annual board meeting minutes. And we -- we have provided, to the best of extent, the available minutes from the relevant -- for the relevant period.
Q So my question is: Is this a complete copy of all board meetings and corporate resolutions?

A Yes, sir. To the best of my knowledge.
Q So you -- you wouldn't say there's nothing missing from this package?
A Yes, to the best of my knowledge.
Q Go back up to number six. So we'll -- we'll keep going through these. Number three is all general ledgers, trial balances, chart of accounts of the debtor for the relevant period, correct?
A Yes, sir.
Q And you believe you provided all that information, correct?
A Yes, we did.
Q Same for number four: Tax returns?
A Yes. As I mentioned in the -- my comment: 2025, we have taken an extension, and that's why we provided the extension copy. And we are expecting our tax return to be filed by September 2026.
Q Okay. Same with number five: You provided all accounts payable, accounts receivable, aging information?
A Yes, sir.
Q Number six, I believe you referred to your team earlier, and in the response here in the middle

column there are several names. Is this the team that you were referring to?
A Yes, sir.
Q And then are -- are any of these individuals employees of the debtor?
A We -- they all are under Sunrays. As I explained, the way it's structured, we have a back office function for finance, IT, procurement, HR. All the back office functions are under one umbrella that is called Sunrays.
So accounting and finance is a back office function. That's why all of these are under Sunrays employ. Technically, we've been paid through Sunrays.
Q That -- that was my next question. Does the debtor pay any of these individuals directly for any of the services that --
A So -- so the -- the -- the answer is: We have an MSA agreement between or amongst all our affiliates. So our -- Sunrays is the core center, and based on our services to our affiliates or other entity, we are billing every month based on the hours spent, and the -- the -- Sunrays is not only for Swiftship, they are providing services to other.

And at the end of the month, we issue an invoice to all our affiliates for the work done based on the -- the rate that is based on our actual cost. And that is the billing to our affiliates every month.

Now the question is on the payment. It's totally dependent upon the cash flow situation of the affiliates. Otherwise, it's going to stay as a liability in the books.

This process has been audited by our -- every year it's been audited by the DCAA, Defense Contract Audit Agency, plus our CP auditors. So, that's how the -- the -- the whole process is.

Q Okay. You said a lot there. We're going to get into some more specific questions. But while we're here and you mentioned it, you mentioned there's an MSA between each of the affiliates?

A Yes, sir.

Q Did you provide any of those MSAs?

A Yes, I believe so. If it was -- was required, we did. Otherwise, I can check back.

Q Yeah. I didn't see any of the MSAs in the production. But we can get into some more detailed discussion about those a little later

because I do have specific questions related to that. But if you do have the MSAs, I will request that they be produced.
A That can be produced.
Q All right. Number seven, I'm going to kind of skip through. Do you agree you -- you provided all bank statements in --
A Yes, I did.
Q Number eight, all documents concerning the letter of credit. Do you agree you produced that information?
A Yes. If you see, I -- I have referred a couple of pages, which can give you -- though this document is about 36 pages, but to answer the specific question, page number 32 is for item number eight and page number 33. They are specifically addressing these questions.
Q Number nine asks for communications. Do you see that?
A Uh-huh.
Q And your response to number nine refers back to documents, correct?
A Yes.
Q So my question here was -- is: Were there any communications between the debtor and DCS or

Egypt-FMS programs?
A So regarding this question, which is the -- the -- there's a lot of communication, it -- but this document, Amendment 4, actually it wrap ups everything into one document for our outstanding and the open issues. So that's where -- if you read that 36 pages document, it's covering all of the open issues in one document.
Q Yeah, that's not my question.
A Yes.
Q The question is: Were there communications between the debtor and DCS Egypt?
A So, likewise are we -- this is an ongoing program. Then communication could be an email. Communication could be in a document sent for the project routine operation or for the invoice follow-up. So there could be a number of documents during the life of the project. With --
Q I'm not asking about --
A -- this specific -- yes.
Q Go ahead. I'll let you finish.
A So for the specific question, when we are questioning about this 375,070, this amount or the question is pretty much addressed into this

document.
Q I'm going to ask the question again.
A Yeah.
Q Did you produce any communications between the debtor and DCS Egypt about the receivables identified in Schedule A, B in Exhibit 3?
A I only provided Amendment 4.
Q Okay. So is the answer no?
A Okay.
Q No, I'm asking you. Is the answer no to my question? Did you produce any communications?
A So -- so that -- this -- Amendment 4 is actually a communication that agreed on the -- the open issues, which is covering all the related issues in one document. So I provided Amendment 4 only.
Q Okay. Let me ask you this way --
A Okay.
Q -- you just testified that there were communications between the debtor and DCS Egypt, correct?
A I did. Yes.
Q Did you produce any of those communications?
A No. I only provided Amendment 4.
Q Okay. We'll follow up on those communications,

okay?
A Okay.
Q All right. We'll move on to number ten. I think we can -- do you believe that you provided a response that is a full and final response to request --
A Yes. Yes, I did.
Q Number 11 is inventory. I believe you provided a spreadsheet related to inventory, correct?
A Yes.
Q And to the best of your knowledge, is that the full --
A Yes. It's -- it's an itemized inventory, and that is a pretty universal document.
Q And who would be the most knowledgeable to testify about the current inventory and status of that inventory?
A Yes, sir.
Q Is that you, or is that Mr. Poel?
A So we both -- what -- when it's come to the financial number, Mike and I worked together on the -- the overall operation as well as on the number scale.
Q And with respect to the value that you attributed to the inventory on the schedules,

your response -- and I'll read this final sentences, "The valuation reflected is based on internal judgment with an estimated fair market value at $0.50 per dollar. However, the assessment is considered very optimistic in nature and age of the inventory." Did I read that correctly?
A Yes, sir.
Q So you gave a 50 percent discount on the value of the inventory for purposes of those schedules, right?
A The -- the original document that we provided, if you look at the schedule, there is a column which is giving you the total value of the inventory. And then for the dead stock, we are just taking a fair market value, and that's based on our best judgment.
Even I believe this inventory ages from, like, 2018, 2019. So even this -- half a dollar is still an optimistic point of view.
Q And then you kept saying "optimistic." Why do you say that?
A Because we don't have any formal evaluation and keeping in view the market and the condition of that dead stock, which is sitting into a

warehouse, I still believe that it's wasted, and it doesn't have that value, which is the book value showing on the books.
Q Is the debtor able to dispose of any of this inventory?
A No, we haven't.
Q Let me ask it this way: Are you holding the inventory subject to release by any of the program parties that the inventory was intended to be for?
A So there are two types of inventory. And on my schedule, I try to classify into a program-related inventory and the dead stock. When I say "dead stock," that's mean for the closed projects which are formally closed, and the -- and then the leftover is sitting in a warehouse.
On the first column, it's all about the ongoing programs. Plus, the major portion of this inventory pertains to LCU 1700. That was the major program back in 2014. That contract was terminated in 20- -- sorry, 2024.
And out of -- if I have this $27 million, out of 27, 18 million pertains to LCU alone. And that inventory right now -- the fate of that

inventory is still under discussion.
Q And when you say "under discussion" --
A With the -- with the client.
Q Got you. So each -- on -- on the spreadsheet where you identify the inventory related to each project, you are still having discussions with those project owners as to the status of that inventory. Is that my understanding?
A Yes. Yes, sir.
Q Number 12, I think you just clarified this, and then you provided contracts, correct?
A Yes.
Q Then we go to number 13. And I'm going to scroll down through your response because it's a -- it's a -- it's a detailed response to this question. But my first question is: Do you understand what we're asking for here related to communication?
A Okay. So just for clarity, when we say "communication," does it include all emails, all daily base document back and forth, or is it only the complex documents?
Q I can't answer questions, but let me -- let me ask it this way: Did you review -- when you reviewed the notice of the request for the 2004

examination, did you recognize that there were defined terms within that document?
A Uh-huh.
Q Did you recognize that communications was one of the defined terms?
A Yes.
Q Now, I think I had that as -- I'll pull it back up, Exhibit Number 1. So here is the defined term communication. Do you see that? Mr. Saeed?
A Yeah. I can see that.
Q You under- -- do you -- I'll read it. The term communication means any transmission of information from one person to another by any means, including, without limitation, by email, text message, instant message, letter, memorandum, voicemail, or in person. Did I read that correctly?
A Yes. Yes, you did, sir.
Q Now do you understand what we're asking for with respect to communications?
A Yes, I do understand.
Q Did you produce any communications to response to this request?
A Not at that level. It's -- it's -- I would say

within the given time frame or the complexity of the data, it's human. It's not possible.
Q I think it's possible, but we can have a discussion on whether or not you think it needs to be limited, correct?
A I would say, like -- for -- for -- let's take an example of a specific program that is LCU 1700, which is over a span of five years. And the -- it's -- not -- not only one person is engaged with the direct program, it's hundreds of people.
They've been communicating with the client back and forth on a routine daily basis, and the -- they've been having different meetings, communication, calls. So to gather -- at that level of the information is -- I believe it's not possible within the given time frame.
Q But the -- there are communications that exist, correct?
A It's -- it's on a daily basis. Likewise, we've been discussing -- having a back-and-forth discussion with the client, the project management, or the team, the concerned SMEs of their respective domains. So it's -- it's -- it's a -- it's a -- it's a daily routine, I

would say.
Q I'll ask the question again: There are communications that exist with respect to these programs?
A Yes.
Q Okay. I'm going to -- I'm going to go back to your summary. Very good. It's -- it's very detailed. So we see in your response that there are three programs that were terminated prior to the bankruptcy case; is that -- is that correct?
A Yes, during -- during the relevant period.
Q And our discussion regarding inventory is some of the dead stock related to any of these programs?
A Yes, mainly the first one, LCU 1700, and the -- the second -- pretty small amount is for the (inaudible). But mainly it's LCU 1700.
Q And so, the first on your summary here identifies the LCU 1700 program, correct?
A Yes, sir.
Q And you -- you provided notes. So the first part of the note was that the debtor pursued the United States -- the USN. Is that the Navy? Is that correct?
A Yes, sir.

Q In the Court of Claims, but that was denied, correct?
A Yes, sir.
Q And then it goes on to say, "The USN is retaliating for being sued by Swiftships. We were debarred in SAM.gov." Just explain what that means.
A So as a consequence, on the -- on the LCU 1700, all government contract being awarded under the system called SAM.gov. And the -- after that legal claim being denied, Swiftships was put on the debarment list, where Swiftship is -- for the time being is not allowed to go for any future -- cannot bid for the US -- US government contract.
Later on in 2025, we had our discussion on a meeting with the AI Office in Washington Navy Yard, and we explained our situation on the challenges because of that LCU 1700 and our current progress on the FMS program, which is, again, with the NAVSEA US Navy.
And the -- based on that, they gave us a relaxation on the debarment. They removed the debarred status. We can go for overseas business, and they gave us a one-year period --

minimum one-year period to call itself debarment.

So that period started in, I believe, February 2026. And with the self-reporting -- quarterly reporting, we are taking care of that to show our progress and the performance on the ongoing program as well as pursuing for the future business.

So right now, it's -- I would say it's -- it's a partial debarment status in self-explanatory -- sorry, it's called a self-exclusion. So they removed that status -- debarred status from SAM.gov. We can go for any international market business or local private business within this time frame -- time frame.

Q Okay. And then the last sentence says, "The contracting office has not responded to our request. My last payments since then are still owed, nor those who owe us monies to obtain a letter from NAVSEA."

A So that is the area why we are into this Chapter 11. And all these liabilities piled up and the claims from the creditor. It's mainly because of this program. LCU 1700 program, where we owe money to the supplier for the period that we

issued on this program.

And the -- there are so many cases where we have paid prepayments to the suppliers, and which is -- I would say it's somewhere around 25 -- in -- in the bracket -- 25 to $28 million, that can be shown -- that can be seen on our balance sheet.

So now we are -- we have written a letter to the Navy requesting support on collecting those funds to offset our losses on this program and to honor our liability. That is one of the open area, which -- I believe we sent this letter early Jan 2026, and we are just waiting for Navy -- to get the response.

So that is a request to the -- to -- to the government on the open prepayments in the market. So we -- they can support us, and we can collect that money to offset our losses and to pay off our liabilities.

And the second request is about the status of the inventory. So that was -- I was referring that we have 18 million worth of inventory sitting in a -- into a yard, and we are requesting to give us the right to dispose of to -- in order to support and to pay off our

vendor's claim.
Q So the communications I asked you about earlier, this is what I'm referring to. Do you understand that?
A Yes.
Q So I'd like to see those communications. I think it'd be helpful to understand if you can produce those; is that okay?
A I have no issue. I'll -- I'll -- I'll arrange it.
Q And we'll go to the next one. This is the LC, the expeditionary -- I don't even know how to say that word, but I'll try, (Inaudible).
A Yeah. It's a DIU program with the Defense Innovation Unit. This is the active program right now on the ground with four boats. Two -- we have already handed over two boats, and right now, we are working on the next three and four.
Q And scrolling down to this bullet point, invoice and payments. The 1.5 million was paid in April 2026, post-petition, correct?
A Yes, sir.
Q And you're currently working, as you mentioned, on the other two boats, correct?
A Yes.

Q And then the last sentence says, "Warranty support is not invoiceable." Could you help me understand what that means?
A So warranty support is -- this contract is designed with the milestone payments. It's not based on the progress or the way LCU 1700 -- or the US Navy program has been set up, where you can just bill it, and they will pay you. So there are 10 or 12 milestones. Once you hit that milestone, then you will be able to invoice.
So at this moment, we -- we are -- right now we are under the construction phase. So this warranty support is linked with the delivery of spare parts, which need an investment of, I would say, 350 to 400k. So once we'll procure and deliver the material, then we will hit this milestone.
Q And -- well, so when you hit that milestone, what is the expectation to be that you --
A For -- for this specific milestone, it's 750 for the warranty spare parts.
Q And --
A 750K.
Q I'm sorry, what did you say?

A The specific milestone value is 750K.
Q Subject to Swiftships providing spare parts, as you just mentioned, correct?
A Yes, sir.
Q So that's an additional expenditure that hasn't --
A Yes.
Q So you would need to spend roughly half of that amount to get the 750; is that correct?
A Yes, sir.
Q But the only way to get the 750 is to complete the spare parts?
A Yes.
Q And does the debtor have the finances to fund that spare part?
A So this is the same program we talked about last time, where we are expecting the overall balance amount is $3 million. And 750 is a part of this $3 million.
In order to get this $3 million, we have to spend this -- we have to procure these spare parts. We have to procure the remaining material on Boat 3 and 4.
So I would expect -- and then there are a couple of trainings, which is a separate claim

under this program. We need to spend money on it.
So I would say I have prepared that number, which is a part of my presentation, and once you receive the copy, we can talk about that. It's -- there is an estimated value there in order to get $3 million, how much we need to spend.
Q And can you tell me what that is?
A It's around 800,000 to get the $3 million. And that's excluding our labor and the overheads. The material and -- I'm -- I'm only talking about the material or training services.
Q And what's the timeline?
A The contractual date is we have to deliver this boat by September 30th.
Q I'm talking about the timeline -- so -- let me start over.
You deliver the boats by September 30th, which means you're going to have to spend the $800,000 before September 30th?
A Yes, sir.
Q And then what is the timeline on the additional $3 million?
A So that $3 million is break down into a different milestone. One is spare parts. Spare

part can be received once you deliver the -- before September -- let's take an example. If I buy the spare parts today, and I'll deliver the spare parts in the next week or next month, immediately I can bill that 750 out of this $3 million.

So -- then -- once I've delivered the -- Boat 3 and 4 and the formal document being -- (Inaudible) being signed, I'll be in a position to bill the delivery milestone, which is again a part of this $3 million, somewhere around $1.5 million.

There is another milestone, which is called a training documentation. Right now, we are focusing on getting this milestone completed. My expectation is that by -- during this month, we will be able to complete this documentation so we can hit that milestone and bill the client.

So if I'll be able -- my team will be able to get this milestone done by 30th July, we will have the money next month for 300K. So that document, which -- my presentation it has all the breakdown. You can look into this when they are -- how the money is associated with this

milestone.
Q Okay. So maybe we need to wait on seeing your breakdown so I have a piece of paper to look at if that's okay with you?
A Yeah.
Q The next one is the 28-meter Coastal Patrol Craft, CPC, correct?
A Yes, sir.
Q And I think -- can you just tell me what is left on possibly being paid out of this program?
A So FMS program is the CDA program, Controlled Disbursement Account. That's mean the client is paying us based on our vendor invoices. It's not milestone based. So as of today, we have received everything except, I think, it's the last 90 or 96K remaining on the contract value.
So when I say "we have received everything," that's mean we have already paid to our vendor 100 percent advance payments. So the way it works, we receive the money and directly pay it to the vendor through the Controlled Displacement Account at the approval or discretion of US Navy, the client.
So the vendor, they get the 100 percent amount in advance. Then they will deliver the

material after a lead time. It could be two months, it could be one month, it could be -- once we receive the material, then they will come into our warehouse where the client, US Navy, NAVSEA, they are going to do the joint inventory, they will sign off the document, and then the material being loaded for the shipment to Egypt.

Once it's loaded, we will have our DD250 sign, and now we are done with the contract percentage. So 90 percent -- when I'm saying "90 percent," though, the procurement is almost paid, we are waiting for a few suppliers to deliver the material or services in case of commissioning.

So I still have the status. There are few supplier -- couple of them, they are holding the material, though they got the 100 percent payment against this program. So -- which is somehow directly or indirectly hurting my program completion date.

Q So is there an expectation that the debtor will directly receive any amounts from this program upon completion?

A This is the only amount, 90K. I believe it's 90

or 96. It's a rounded number. And the -- there is a potential liability of 50 to 60K for the commissioning of Boat 3, 4, 5, 6. So we -- we still have to issue a PO for -- for the -- for the commissioning phase.
Q I'll go to the next one. This is Coastal Patrol Craft program with the Egyptian Navy, correct?
A Yes, sir.
Q I'm just going to go down. Again, my -- my main question is going to relate to invoicing and payments. And right here, the significant majority of program funds have been invoiced and paid with the exception of 750,000 for warranty payments, along with the 1.5 million for performance bond to be released per three performance milestones; is that correct?
A Yes, sir.
Q So the performance bond, what needs to be done to get the -- or what is the timing on releasing the performance bond?
A So the performance bond is linked with the -- four different milestones, which can be seen on our document. The one that I was referring to point number nine, page number 33. They have clearly defined the four milestone of releasing

600K, 600K, 150, and 150. That comes to $1.5 million.
So the first milestone, they have linked it with the performance or -- of -- of our existing program, the one that we just spoke about, the third program, which we -- FMS via US Navy.
Q Okay.
A So once we deliver the complete material for boat -- let me give you a little more detail so -- so -- for more -- easy -- so the current program, which is FMS 28 meter -- there are six boats. We have to provide them the production kits for -- for six boats. If you -- you go to the -- point number three.
Q Yeah.
A We just talked about this. So there are six boats, and the -- the end user is Egypt Navy. And this is a current program -- ongoing program. But we had our previous program, which is program number four, called -- same -- the name -- the same name, 28 Coastal Patrol Craft Kit Production via DCS.
So FMS is the program, which is Foreign Military Services through US Navy. Our client is US Navy. They are the paymaster. DCS is a

Direct Commercial Sale where we have a direct contract with the Egyptian Navy, and they are paying us directly from their funds.

So this DCS program, we had completed this program back in '21 -- 2021, 2022 and right now, we are into a warranty phase. There are still 750 outstanding for the two warranty Boat number 5 and 6. 375, 375, that comes to 750.

So once we go on and complete that milestone, they are going to release 375, 375. And what are those milestones? They have provided us a list of spare parts. In order to get this 375, we have to provide them the pending outstanding spare parts.

For one milestone, it's 60K. We have already procure -- we have already paid to the supplier. We are just waiting for the delivery. Once we receive the delivery and deliver the material to Egypt Navy, we will get this 375.

Once I'll -- the plan is once I'll receive the 375, we have to spend another 120 in order to get the next warranty material. So this is about 750. Now 1.5 million is basically the performance bond, which is right now with the same client.

So they have linked it with the performance of our current FMS program. So they -- if you -- if you see the page number 33 of the Amendment 4, which is referenced in the -- item number nine, the first milestone is to deliver the complete material of Boat 1 and 2 of our current program.

So as I said, we are already reached to, like, 90 percent or 95 percent of delivery on Boat 1 and 2. So once we've complete the Boat 1 and 2 material, they will release the 600K.

The next milestone is delivery -- complete delivery of material for Boat 3 and 4, plus some of the spare parts they have referenced in the document, and they provided a list into our Amendment 4.

The third -- then they're going to release another 600K. The third milestone is to deliver the -- Boat 5 and 6, and then they will release 150. And finally, at the closure of the contract, they will release the remaining 150.

So it's clearly defined on this document how they're going to release it. So my 1.5 is totally dependable on the performance of this -- program number three.

Q So the program number three we just discussed being 90 percent done, and then you would get roughly $90,000, correct?
A Yes, sir.
Q So -- and you -- you -- all six boats are complete; is that correct?
A They are at different stages: 90 percent, 89 percent, 95. So the schedule that's -- I'm going to share with you, it will give you a boat-wise breakdown, how much material is received and how much material has been delivered.
Q Okay. Well, we probably just need to look at that document.
A Yeah.
Q That will be helpful. So I'll -- I'll move on. I -- I think I understand. I just want to make sure -- let me ask the question. The -- this program number four has nothing to do with the other two boats that you're completing under the -- I believe it's --
A The DIU program. Yeah. It has nothing to do with this program.
Q Okay. So those are separate amounts. That was what I was wanting to confirm.

A Yes, sir.
Q All right. And I think this is the last one, the DCS, direct commercial sale program to the Pakistan Navy, correct?
A Yes, sir.
Q And I believe there is something to do with the -- your explanation says a line of credit facility; is that correct?
A A line of credit. This is a program with the Pakistan Navy through Karachi Shipyard, and the -- the payment is being controlled through a letter of credit.
As I explained in the last meeting, letter of credit is a process where the beneficiary and the -- the buyer and the seller's banks, they take control of the funds and the -- to make sure that the material is being delivered.
So right now, at this stage, we are struggling with the -- one of the bank who was advising this LC, which is BMO, a Canadian bank. All of a sudden they have -- at -- at their unilateral decision or the risk assessment, they have stopped advising any further invoice for this program.
That's where -- I -- I -- I tried with a

couple of other banks, but the program is already 95 percent -- is already done, so no bank is interested to get the remaining five percent portion.

Just an update: over the weekend, I sent another request to the bank that they can reconsider their decision. It's only five percent of the remaining amount, and they gave me a little hope that they're going to escalate this to their management one more time, and I'm just waiting for the response from BMO.

So once it's resolved, we will be able to invoice the first invoice. The last invoice is -- it's -- again, it's based on the milestones. So that -- the first invoice is going to be 36K, and the remaining 500K is the retention money. Retention will be released upon the completion of the warranty phase.

Q And -- and this will be on the schedule that you mentioned earlier that we can review later?

A Yeah, it is there.

MR. SHELBY:

Okay. Now, we walked through this maybe a little early, but I want to share this one with you. I believe this will be, I guess,

Number 4. Maybe that's Number 5. I think it's -- summary is Number 4.

MADAM COURT REPORTER:

According to mine, it'll be 4.

MR. SHELBY:

Okay. Did I introduce the summary? The -- the one we were just going through?

MADAM COURT REPORTER:

No, sir. The last one I had was Exhibit 3, which was the email with the index of supporting documents.

MR. SHELBY:

Yeah, that's it. Okay.

MADAM COURT REPORTER:

Okay.

MR. SHELBY:

So this would be 4.

(EXHIBIT No. 4 MARKED FOR IDENTIFICATION)

BY MR. SHELBY:

Q Okay. Mr. Saeed, this is -- do you recognize this document?

A Yes, sir. I do.

Q And -- and did you put this document together?

A Yes, sir.

Q And can you walk me through each of the entries starting with the number one, Bahrain and --
A Yeah. So Bahrain, we have an unbilled amount of 775 from the contract. That was completed, or I would say that was the -- the boat was handed over in 2022 -- 2021 and 2022 phase. So this is the remaining funding on the contract.
When I say "unbilled," unbilled is as a result of data between your revenue recognized versus what you have billed. So this is the remaining contract value to on the program. But the question is: In order to get this 775, we have to provide them with the warranty spare parts, which is more than this amount, around 800 or 900K.
That's why -- plus from the discussion from the project management, they've been asking some other -- additional services, which is not in the scope. And that's going to be free of cost for -- for -- for this over and above the spare parts. So this is not into our priority right now, keeping in the cash flow situation and the management for funds.
We are not pursuing it for the time being to procure this amount, to spend $1 million in

order to -- just to get 775, and recently client is not pushing us on getting those remaining spare part at this moment, so it's not into our priority at this moment. So that is relating to our Bahrain program.

Secondly, Egypt Navy, this is the same program we talk about, DCS program, where we have 750K outstanding for the warranty invoices. So you can see you are looking at this $1.1 million for Boat 461 and Boat 465.

So there are a couple of other boats which had -- have a negative value, which is called deferred revenue. So if you knock out these two, it's going to come -- net value going to come to -- that is also a part of a balance sheet. I -- I think we have provided the breakdown.

So if you knock out these balances, you're going to get the net value of 300 or 200K, which we already invoiced it. So the remaining invoice is based on the completion of milestone number four, as explained in Amendment 4.

The third one is defense DIU. This is the major program on the ground. And the remaining amount is $3 million. This 1.6 million was the

data of our cost recognized versus billing. And 1.5 is already billed, so this number is coming down, but again, this is already invoiced. This $1.6 million, the one that we received in April or May.

Or I have to -- I just have to check. This 1.6 is as a result of cost recognized, and this will be billed -- once we receive the $3 million it going to knock out this balance. This balance will go up until the completion of the project. Once you bill the final milestone, at the end of the day this is going to be zero. So this 1.6 is against the remaining billing of the contract, which is $3 million.

And then finally, sir, this 68 is the one -- is the -- is the FMS program where we have only 96K remaining. Once we're going to bill this amount, it will offset the 68K.

And the last program is Pakistan Navy PNGB program, 63K. We still have 589K outstanding. 63 is our current invoice. It's going to offset, and the remaining five percent is the retention amount. So except Bahrain, the first one, all of remaining four are basically, I would say, it going to convert into cash on a

billing.
Q Okay. So removing the 775 number of the Bahrain Navy reduces the total to roughly $2.8 million; is that correct?
A Bahrain is only producing 775. Maybe I -- I didn't get your question.
Q No, I'm -- I'm saying your -- your explanation on the accounting is the 775 is not really a real number that will be realized by the debtor, correct?
A I -- I -- I would say in a different -- it -- it is a true number. It can be realized, but we need to spend more in order to bill this 775. So it's not in our priority at this moment, keeping in the -- contractually, yes, we have to provide it. But when it's come to cash management, we don't want to spend this million dollar just to get 775.
Q Do you know from the list of creditors that was submitted to the bankruptcy court if any of these amounts are earmarked or otherwise used to be paid directly to any of those vendors on that creditor list? Do you understand?
A Do I get -- sorry. Could you please repeat your question?

Q Yeah. I'll -- I'll try again. What I'm trying to understand is there seems -- the accounting is a little confusing to me because of the process that you're having to go through to procure materials to get to amounts to be paid.
So what I'm trying to understand is if any of the amounts shown on this exhibit are already earmarked to pay vendors for materials to complete the project.
A There could be a small portion I have to get into the detail, but for DIU, there could be some supplier, which is repetition. We are not paying them. FMS 28 meters 68,394, all of them are already paid. So the remaining we haven't even issued the PO. So this 68 is basically going to pay the future invoice of the super -- future POs.
60 -- for the last one, which is Pakistan Navy, we are into a sea trial, so we haven't issued the POs, or because of the funds, we are just waiting. So it's going to pay to the future.
Bahrain, we do have a liability for this program for a sale -- sale, which once we going to get this money, it going to pay out to the

pre-petition liability as well. So -- so we are holding it.
Q I think you didn't -- I think you didn't answer my question.
A Yes.
Q And that was: Are any of the amounts shown here -- are there any creditors of pre-petition with respect to the amount shown here? And I believe your answer was --
A Yes.
Q -- yes, but none of them get paid out of this (inaudible) --
A Yes.
Q -- other than through the bankruptcy estate; is that --
A Yes, sir.
Q Okay. That -- that was the question. I think I didn't ask it properly.
MR. SHELBY:
Are you doing okay? Can we keep going?
THE WITNESS:
Yeah. I'm --
MR. SHELBY:
Okay.
THE WITNESS:

-- ready. We -- we can continue. I think --

MR. SHELBY:

Let's go ahead.

THE WITNESS:

-- it's good.

BY MR. SHELBY:

Q I'm going to go back to Exhibit 3, which one was to -- summary. I think we have exhausted for now. Maybe your schedule will help me a little bit, number 13. But just to confirm, we did ask for communications I'll visit with Mr. Richmond, and maybe we can narrow that scope moving forward. Number 14, I'm going to -- this has to do -- I think we just went through that, huh?

A Yeah. This is exactly the same point we talked about.

Q Correct. So the vessel -- I'm -- I'm going to move past this because I have some questions later. I just want to confirm that you provided me everything you think you have in response to Items 15, 16, 17, 18, and 19 as it relates to the vessel.

A Yes, sir.

Q And "the vessel" being the Risen Sun, correct?

A The Risen Sun. Yes.
Q All right. Well, I said I was going to skip through this. Actually, I want to ask about number 18, and I'll just read it. "All documents concerning any analysis of the avoidability, validity, perfection, or priority of any lien asserted against the vessel."
And your response, I'll read it. "The debtor is not prepared, commissioned to receive any formal analysis concerning the avoidability, validity, perfection, or priority of any lien asserted against the vessel." Is -- is that a correct statement?
A So the -- if I try to explain this wording. So when it's come to the formal analysis or -- apart from our vessel valuation or appraisal, we don't have any other document that can be -- that can be addressed under point number 18.
And those appraisal, I have already provided under some other section. So maybe if you can explain this further, if there is anything else needed, I can look into this.
Q And that's a fair response. And I think I have some more specific questions later that -- that might help clarify that. So I'm just going to

keep moving on.
A Sure.
Q Let's see, number 20. You provided all documents related to the SBA loan?
A Yes, we did.
Q Number 21. So all documents concerning any guarantee, indemnity, or pledge by any insider or third party of the debtors obligations to the SBA. And you provided the SBA loan in response to that, right?
A Yes. All the attachments are under next 20.
Q And we'll deal with that later. I think I'm going to ask you questions about that later. Again, number 22, I think maybe there was some confusion from your earlier testimony about communications, and your response refers me to Mr. Richmond, correct?
A Yes.
Q And then I'll -- I'll follow up with Mr. Richmond to see if we can clarify what we're asking for there, because maybe that -- that was not the right way to ask that question. But your response to this is, "I need to speak with the attorney," correct?
A Yes, sir.

Q All right. Affiliates and insiders. I'm -- I'm going to skip through this section because I have some specific questions that relate to your explanations. I think it's going to take a little bit of time. So if it's okay with you, I'm going to move past this.
A Sure.
Q And I'm just trying to do this to preserve all of our time today. This section refers to directors and officers. I believe that you provided, as you mentioned, the annual report for articles, organization, and operating agreement, correct?
A Yes, sir.
Q And then you provided the insurance policies; is that correct?
A Yes, sir.
Q Now, let me ask you: Did the -- does Swiftships, LLC have any directors and officers liability insurance?
A Insurance is basically a specialized domain from our treasurer, Sadia. She -- she is the one who's handling all these insurances. So that's basically under her domain. She'll be in a better position to answer this question.

Q Okay. Well, thanks for clarifying that. Okay. Okay. Earlier, I asked about number 37. I think we covered this, but just to confirm, the annual board meeting minutes are all that you produced in response to number 37, correct?
A Yes, sir.
Q No meetings, no resolutions, the debtors, members, managers, officers, directors during the relevant time period were produced; is that correct?
A These are the -- these are the only known directors board meeting -- annual board meeting minutes.
Q Okay. Number 38, "All documents concerning debtor solvency analysis" -- and I won't read all of it, but you understand the requests there? Mr. Saeed, do you understand the requests there?
A So that would be good --
Q Let me ask you this way: Your response here is, "Recently conducted a third-party solvency analysis and also prepared a six-month cash flow projection." Did you produce a third-party solvency analysis?
A So that's -- the document is for tax purpose.

Right now we are like -- we have taken an extension, and the -- I just got the copy two or three weeks ago. I haven't provided that copy, but that is purely for the tax purpose. So I would say --
Q Go ahead.
A I would say if you want a copy, I can provide you that copy because when I was preparing this document, coincidentally, I got the same document by that date. So I haven't provided that copy.
Q Who prepared the analysis?
A It's a third party called Valuation Company.
Q Called Valuation Company?
A Yes. VSI.
Q VSI. Okay. Can you provide that document?
A Sure.
Q Number 41, I think, relates earlier to my question regarding analysis of avoidability of liens. But this is -- this is a little different than 41, and it concerns any pending or threatened litigation or demand asserted by or against the debtor at any time during the relevant period.
So you're not aware of any threatened

litigation other than the litigation related to the Risen Sun, is that --
A Yes. The only known judgment is from the creditors, but I don't have any knowledge about any litigation from the -- or -- or the investigation from the government, or any other third party.
Q And then number 42 is the opposite of the request. This would be any actions, claims, counterclaims, cause of action that the debtor has or may have against any third party. Do you understand that?
A So not in a formal way. We sent few letters for the recovery of the funds. Again, that's the same thing which we talked about, this LCU 1700, but there is no formal document.
Q Okay. Well, I'd like to see those letters that mention that.
A For the recovery or for prepaid funds?
Q And do you know who Jeff Leleux is?
A Yes, sir.
Q Who is that?
A He was the ex-director of minority partner.
Q Are there any claims that the debtor is pursuing or could pursue against Mr. Leleux?

A It's under discussion, but we haven't formally -- we responded to a couple of requests. That's -- that was coming from his side, and we responded it through our attorney. And that's the management -- maybe Mr. Shah, he can explain better on this action point.
Q Okay. I'll ask Mr. Shah. Well, and you mentioned the letters related to the US Navy program, and you'll provide those, correct?
A Sure.
Q Other than that, you're not aware of any other -- and I can ask Mr. Shah, but you're not aware of any other?
A Yes.
Q I think -- let's see. (Inaudible) did provide the information on the 90-day transfers, correct?
A Yes, we did.
Q And on any payments related to Mr. Shah?
A That's the only small amount, which is 250. And that's because the account was set up as an ACH, and it -- they are automatically debiting our account for his insurance payment, which is 250 per month.
I saw a couple of transaction -- we -- we

are -- we are working with the bank or -- or the provider to change this to some other bank account, not on the Swiftship. That was the practice, so -- but it's a small amount, 250K per month.
Q Yeah, I think -- I think I'm done going through your summary, but I -- just to keep the record clear, all the responses under Swiftships response were prepared by you?
A Yes, sir.
Q And do you want to change any of those responses through your testimony today, or you believe everything is accurate as you listed it on this document?
A This is accurate as to the best of our knowledge and information available.
MR. SHELBY:
Okay. Do you mind if we take a short break so I can get rid of some coffee?
THE WITNESS:
Sure.
MR. RICHMOND:
Yeah. That's agreeable here. I need some too.
MADAM COURT REPORTER:

I will take us off the record at 10:31 a.m.
(OFF-THE-RECORD)
(WHEREUPON, A BRIEF RECESS WAS TAKEN AT 10:31 A.M.)
MADAM COURT REPORTER:
Okay. We can return to the record at 10:46 a.m.
You may proceed whenever you're ready.
MR. SHELBY:
Okay. Thanks.
(ON-THE-RECORD)
(WHEREUPON, THE EXAMINATION RESUMED AT 10:46 A.M.)
BY MR. SHELBY:
Q Mr. Saeed, earlier you testified that you're an employee of Sunray [sic]?
A Yes, sir.
Q And Sunray provides back office support to the debtor, correct?
A Yes.
Q And that's pursuant to an agreement -- a master services agreement?
A Yes, sir.
Q And I have asked for that document, so I'm

hoping you'll be able to provide that.
A Yes, sir.
Q So I'm going to go -- I'm going to pull up -- before I start, are -- are you -- did you assist with preparing the schedules and statements on behalf of the debtor?
A Yes, I did.
Q But you did not sign that, right? It was, Mr. Shah?
A Yeah. That's Mr. Shah. But I'm -- I'm the -- primarily, I -- I've -- I was the one that -- who prepared these documents.
Q So you'll be able to answer some questions about what's on there?
A Sure. Sure.
Q Can you see that document?
A Yes, I can.
Q Okay. And do you recognize this document?
A Yes.
MR. SHELBY:
This will be Exhibit Number 5, Ms. Court Reporter.
(EXHIBIT No. 5 MARKED FOR IDENTIFICATION)
BY MR. SHELBY:

Q And these are the schedules and statements that you just -- are preparing on behalf of the debtor?
A Yeah.
Q I'm going to try to scroll all the way down because what we did was -- well -- well, is -- was there an amendment to the schedules and statements that was subsequently filed?
A Yes, Ryan?
Q I'm sorry.
A Yes, we did. Ryan -- Ryan can confirm this.
Q Yeah. So you can see at the bottom, this is a stamp from the Court when these documents were filed. So the original schedules and statements were filed on or about April 16, 2026, correct?
A Yeah.
Q And then an amendment to the schedules and statements was prepared, correct?
A Yes.
Q And that -- that was -- on this document, it's stamped June 26, 2026. Do you see that?
A Yeah.
Q So does that align with your understanding of when an amendment to the schedules was filed?
A Yes, I do.

Q And are you okay that I'm showing you this exhibit with those two combined in one exhibit?
A Uh-huh.
MR. RICHMOND:
Hey -- hey, Rick, it's Ryan. Just want to confirm for the record that when we're referring to Exhibit 5, we're referring to both the original schedules as well as the amended schedules; is that fair?
MR. SHELBY:
Yeah. That's fair. That's what I was getting at.
MR. RICHMOND:
Yeah. Yeah. I just want to make sure that's clear on the record.
MR. SHELBY:
Thank you.
BY MR. SHELBY:
Q All right. Are you familiar with the entity BOT, LLC?
A Yes, I do.
Q And who is -- who -- who is that entity?
A BOT is -- BOT is basically entity that is an affiliate to Swiftship owned by Mr. Shah -- the same owner. And they are the one who is



26-50237 - #147-3 File 10/09/26 Enter 10/09/26 15:30:11 Ex. 2 2004 Exam Transcript Pg 74 of 250

basically property management. The main -- the core business is property management.
Q Is it okay if I refer to BOT, LLC, as BOT?
A Yes, sir.
Q And does Sunray provide services to BOT?
A (No verbal response.)
Q Is that a, "Yes"?
A Yes. So BOT basically -- the yard currently leased -- is from -- basically, BOT is the one who own those properties, and it's been leased to Swiftship. The yard currently -- the one that we have the lesser is BOT, and we are the lessee -- Swiftship is the lessee.
Q And does Sunray have an MSA with BOT?
A Yes. Sunrays has an MSA with every single entity.
Q Okay. I'd like to see all those. I'll get with Ryan on that. So what is the address of BOT? Do you know?
A It's the same address, the one that we have, Levee Road, Swiftship.
Q Is that the Morgan City address or the --
A Yes. So Virginia is our, basically, corporate office. And then we have our yard at 1105 Levee Road. Then we have one office on -- in Morgan

City. I can provide you the addresses.
Q I think your answer is sufficient. I'm familiar with the two addresses, but BOT's address is the Morgan City address, correct?
A Yes.
Q And you testified a minute ago that Mr. Shah is the owner of BOT?
A Yes.
Q Are you familiar with the loan agreement between BOT and the debtor?
A Yes, sir.
Q And you produced that document?
A Yes, I do.
Q I'm going to refer to it, but if you want me to pull it up, I will. Just let me know, okay?
Why did the debtor loan money to BOT?
A So that balance is inherited from 2016, 2018, and that is a result of FNBC. If you go to -- into our financial statement, there was a history on -- on -- on forbearance loan. So that money is basically inherited back in 2016.
And that balance is carried forward from, like, ages, and over a period of time, that balance is coming down because of -- if you see within the relevant period, it started with $3

million -- $3.7 million, and now it's coming down to $2.4 million.
Q And what's reducing the amount of the loan?
A So the -- the amount that is being reduced is -- there are a couple of thing, which is interest payment -- I would say the services for the rent. That is being monthly invoice from the -- which is like $13,000 per month. Swift is actually not paying that at this moment.
Let me -- if -- if I can bring that document in front of me so that will -- I already provided a schedule that shows movement. Why it is so -- what are the -- on a very high-level brackets. So if you allow me, I can refer to one document that is --
Q Well, let me ask a question: So the -- the amounts being reduced by the amount of the rent that is not currently being paid by the debtor, correct?
A Uh-huh. There -- there are a couple of other that is pretty explained on my document summary.
Q And I appreciate you referring to that. You did provide a summary of the accounting there. And then Swiftships continues to pay some expenses on behalf of BOT, correct?

A Yes. Because the properties -- these properties were owned by BOT. So any property taxes and insurance, eventually we have to back a charge to BOT because the property owner is BOT.
Q So does BOT provide any other services at all to any other party?
A No.
Q So BOT basically currently has no revenue; is that correct?
A They have -- they have no revenue except their -- basically, there are -- there's couple of revenue. One is from Swiftship that is for the couple of property, 13,000, and then they have one more property that was leased for 25K, so that's the only --
Q Okay. Where is that property?
A That is in Texas.
Q But that's not leased to the debtor?
A No.
Q My -- my -- so I'm looking at the -- Exhibit 5. I've got pulled up here item number 71, which identifies notes receivable held by the debtor. Do you see that?
A Yeah.
Q And an amount is listed here due from BOT, LLC

of roughly $2.5 million; is that correct?
A Yes.
Q And what the schedule identifies is this full amount is collectible. Do you agree with that?
A Yes.
Q How would that amount be collectible against BOT?
A So there are -- there are -- there are a couple of avenue which is right now the property rental that we are generating from the -- Texas, it's coming into Swiftship account. So it's -- every -- every -- every month we are getting 25K, which is eventually, let's say, if I'll do a simple math, it will give me like $300,000 per month.
Plus the -- plus the lease rental, which is 156,000. So all in all, half a million dollar -- we are recovering half a million dollar every month from -- sorry, not every month. Every year we are recovering half a million dollar from BOT. So that's how it's recovering its receivables over a period of time.
Q In your opinion, is it common practice for the debtor to have loan agreements on any loans that it provided?

A Yes.
Q So I'm going to move to the -- the next entity listed on item number 71. You see that that's identified as Trojan Firearms, LLC?
A Yes.
Q So some similar questions. What is the address for Trojan Firearms, LLC?
A This is the property that we have at the -- in Morgan City. I can provide you the exact address. That is our -- also our corporate office for Swiftship. So that address is being shared by two -- two entities, Swiftship and Trojan. I'll provide you the exact address.
Q So what does Trojan Firearms provide to the debtors?
A So they are not providing anything. If -- again, I would say this balance is inherited from ages. And if you see in the last three years, there is no as such movement.
It's only the property sharing payments that the -- the -- technically the lease for the property is under Trojan. And I would say 75 percent of the -- of -- of the area occupancy is by Swiftship.
So Swiftship is basically -- was paying its

rent, utilities, and other -- any related expense over a period of time. And that's what we can see in the top summary. There is no major transaction over a period of -- maybe a couple of supplier we paid, like, few years ago. That's why this balance of 300K been piled up.

But during this overall relevant period, I don't see any major amount being paid. It's all about the utilization of the common facility, their rent, their -- their utilities, plus, if there is any small amount being paid.

Q So is the lease between Trojan and BOT for the property?

A No, no, it's not a BOT property. It's the third party. Outsider.

Q Okay. Who owns the property?

A It's -- it's -- basically, they call it (Inaudible) Properties. They are the third party. I think I've been provided the rent agreement in our annexes.

Q Okay. Who owns Trojan Firearms, LLC?

A It's an affiliate entity owned by Mr. -- it's -- basically, Trojan is a subsidiary of OCR. It's owned by another person, not Mr. Shah, but it's an affiliate -- family member.

Q And who -- what was that person's name?
A It's Mr. Khurramshah.
Q And there is a loan agreement between the debtor and Trojan Firearms?
A Yes, sir.
Q And you -- you produced that document, correct?
A Yes, we -- we did.
Q And from your explanation, was -- was there actual money loaned to Trojan Firearms, or was this some type of assumed-type debt? I'm trying --
A These were mainly the utilities, rental payments over a period of time. Plus, there were a couple of suppliers being paid on behalf of Trojan because of the cash flow situation. So beyond 2023, that is our relevant period. I don't see any major payments on -- on behalf of Trojan. So if I have to go into the history, then I have to dig into more.
Q The same question that I asked with respect to BOT. As it's listed on the schedules, do you believe this $327,000, roughly, is collectible?
A Due to the current situation with the Trojan, I would say it's -- it's difficult for the financial position. So, eventually --

Q Has there -- go ahead.
A Yeah. So -- so this 327, because they don't have any assets or something like that, I would say it's -- it's doubtful -- doubtful provision.
Q Has there ever been any demand made on the note, --
A Not really.
Q You mentioned the property in Texas going back to BOT, LLC. Does the debtor pay any expenses related to that property?
A If -- in case any, that's been back charged to -- because we are the one who's receiving the rent, in case -- if there is any tax or insurance we are paying, it's been back charged to BOT.
Q And is there an agreement reflecting that?
A I need to check.
Q I'm going to ask about some of these other entities while we're -- while we're discussing entities. One -- one entity is ISC Nett, Inc.?
A ICS.
Q ICS, sorry, Nett, Inc.
A Yeah.
Q Are you familiar with that --
A Yes, sir.

Q -- company?
A Yes, sir.
Q And what is the address of ICS Nett, Inc.?
A ICS is a Virginia address.
Q And who are the owners of ICS Nett, Inc.?
A Mr. Shah.
Q And what -- what does ICS do?
A ICS is basically an IT company for the cybersecurity working with the government contract. So we are the -- currently, the major one is we are providing our technical support or manpower to -- to -- to the government on the -- on the cybersecurity side. It's -- it's a services --
Q It's a what? I'm sorry.
A It's -- it's an IT cybersecurity services. So we -- we provide technical manpower staff to the -- to the government.
Q I'm -- I'm referring you back to the schedules that I have pulled up, if you can still see that. ICS Nett, Inc. is identified here with the Virginia address, correct?
A Yes, sir.
Q And it's showing as being owed a claim of roughly $4 million?

A Yes.
Q Are you familiar with this $4 million claim?
A Yes, I do.
Q Can you describe what that claim amount could be?
A So -- so ICS Nett is basically providing temporary support over a period of time to support Swift operation and the cash flow. And given the period -- given the relevant period, that amount is like, I would say, in -- in a rough bracket, we provided -- ICS provided Swift with the billions of dollars, and I would say like $8.2 million in a nutshell.
Out of $8.2 million, the -- if you see the schedule somewhere, I explained it on -- on my top summary, that because of the recoverability from Swift at some point -- on 31st December 2023, we write it off this balance to give Swift a sort of an equity support or to -- to -- to improve its financial capability.
2023 -- 31st December 2023, we write off these balances in the book. Later on, because of the cash flow situation, ICS is providing cash flow support throughout 2024, 2025, and even though 2026.

So that number, which we are looking at, $4 million, it's the running balance. I can provide you the top-level summary that we have already provided, the ledgers that explain every single transaction. But in -- in -- in summary, it's temporary support to support Swiftship operation and the payments -- the cash flow.
Q Does ICS Nett, Inc. have an agreement? Master --
A Yes.
Q -- services agreement? Okay. I'm going to ask the same question; please provide that document.
Is there any reason why any of these agreements were not listed on the schedules?
A I think the -- if I go back to the question, they have specifically asked for BOT and Trojan, which we have already provided. I have to double-check. If it's been provided, I can go back to the annex. With respect to the other entities, I don't see any -- or maybe I overlooked, but I don't see any direct request regarding these agreements.
Q But there is an agreement, right?
A Yes.
Q Does ICS Nett, Inc. invoice the debtor?

A Because they are not providing any services. They are only sending us at the end of the month if there is any support being provided. So both entities can record this transaction in their financial books.
So I would say it's not an invoice. It's more like a debit note for all the activity during the period, what has been paid, what has been given, and what has been received just in case. So there is no as such cost related. Mainly, it's all about the funding support.
Q So no invoices, correct?
A Yes.
Q Is ICS Nett, Inc. still providing services to the debtor?
A They are still providing the support as and when required. Since our Chapter 11 petition, we -- we have -- our -- in discussion with our attorney that in order to get this, we have to get the formal approval. That's what we are working on. So -- to -- now, at this moment, no.
But we -- as planned in our cash flow, in case -- if there is any cash shortfall or something, the -- the -- the financial

commitment that we have to honor, we might have to go back to ICS Nett for our temporary support, but for that, we are working with our attorney to get it formalized through the court of law.
Q And you're referring to your cash flow budget that you submitted in connection with cash collateral use?
A Yes, sir.
Q So ICS Nett, Inc. would be the entity that would provide the cash infusion if that gets approved?
A Yes, they are the saviors.
Q In your summary response, and I can pull it up, when I asked when the request is made regarding providing documents related to affiliates, the response related to ICS Nett, Inc. was there was no common control. Do you recall -- and -- that response?
A Yes, I do.
Q Do you -- did you just testify that Mr. Shah is also the owner of ICS Nett, Inc.?
A Yes. Mr. Shah is the owner.
Q And he's also the owner of Swiftships?
A Yes, he -- he is the owner.
Q So can you explain to me why your response was

there was no common control?
A Yeah, that could be -- that could be overlooked. When it's come to a common control, I might have a different definition, but your comment makes sense.
Q Okay. So you weren't trying to give me a legal analysis there, right?
A Uh, no.
Q Okay. I'm going to go to the next one, which is right below it. That's easy enough, ICS Nett Limited.
A Uh-huh.
Q Same questions. You can confirm that the address is the same address in Virginia?
A Yes.
Q Who is the owner of ICS Nett Limited?
A He -- he -- he is an affiliate owned by Mr. Khurramshah.
Q So Mr. Shah is not the direct owner, it's an affiliate? Is that what you --
A Yeah. Yeah. He's not the -- Mr. Shehraze Shah, he's not the direct owner of this ICS Limited entity.
Q Is it Swiftships Group that is the --
A No. So this limited doesn't fall under

Swiftships Group.
Q Okay.
A It's a -- it's a totally separate entity.
Q So let me make sure I understand and ask the question the right way. ICS Nett Limited is owned by an affiliate of a company owned by Mr. Shah?
A They are affiliate, but not under the common ownership.
Q Got it.
A Mr. Shah -- Shehraze Shah is the owner of Swiftship Group, which is eventually the owner of LA Swiftship, LLC, and he owns ICS Nett, Inc. 100 percent. ICS Limited is a separate legal entity and that is owned by Mr. Khurramshah. So they are not under the direct same ownership.
Q Understood. Is there a detailed organizational chart that would show the relationship between these entities?
A We can -- we can provide you -- we can prepare a more precise and simple for a better understanding.
Q Yeah. That -- that would be helpful. So the same question to ask about ICS Nett, Inc.: What does ICS Nett Limited do?

A ICS Limited is basically -- pretty much at this moment, they are providing their services to the foreign government. They don't have pretty much business right now. And the -- this balance is carried forward. I would say 2016, 2017, when they've been working as a subcontractor to Iraqi program.

So since then, there is no major program or activity going on ICS Nett Limited. And the balance, if you see, on within the relevant period, there is no, as such, fund inflow and outflow, except we have, because of the audit and tax, few of the amount -- I would say, like, a million dollar, 800,000, a million dollar being written off in favor of Swiftship because of the non-recoverability of the interest and so on.

So the last three years, there is no as such movement or fund -- major fund movement or -- or repayment from one entity to another entity. So this balance is carried forward from -- from ages.

Q Is there an agreement between ICS Nett Limited and Swiftships?

A Yes.

Q Same request, I'd like to the agreement.
A Sure.
Q Same question asked before: Are there any invoices reflecting any transactions between ICS Nett?
A It's the only interest invoice at the end of the month from one entity to another because they owe money to -- so they are accruing interest. And the -- the share invoice, it's been recorded for -- in a formal way. So there is an invoice from -- I would say debit note. The right word is debit note for the interest accrual. But there is no as such services between these two entities.
Q Are there any employees of ICS Nett, Inc. being paid directly by Swiftships Group --
A No.
Q -- or Swiftships -- sorry. Not Swiftships Group, Swiftships, the debtor?
A No.
Q Same question for ICS Net Limited: Any employees being paid?
A No.
Q Okay. Do you see -- my next question is going to be regarding Multinational Defense Service.

A Yes, sir.
Q Same question. Same address as the other entities, correct?
A Yes.
Q Who is the owner of Multinational Defense Service?
A MDS is basically on a legal structure. It is -- fall under our OCR. We have this OCR here as well, and then OCR is owned by Mr. Khurramshah.
Q So there's a claim here in the amount of roughly $900,000. Can you just give me some background on that amount?
A Yes. So this balance is again -- it's carried forward from a number of years. And the last three, four years, there is no as such movement between two entities except the interest accrual invoices.
So there is no services currently rendered between these two entities. So I can dig more into the historical numbers, which is coming from 2016, '17.
Q So ICS Nett, Inc., ICS Nett Limited, and Multinational Defense Service currently provide no services to the debtor other than --
A Yes, sir.

Q -- the financial support?
A Yes, sir. Yes, sir.
Q And again, same question: Is there an agreement between Multinational Defense Service and same --
A We have all -- yes, we have all these MSAs --
Q Okay.
A -- back in 2016, '17, '18.
Q All right. Maybe we can get some more detail now with the next entity, OCR Global, Inc.
A Yes.
Q Again, same question: Same address as the Virginia address?
A Yes.
Q -- the other entities? Who's the owner -- I believe you just testified, Mr. Shah, as the owner of OCR Global, Inc.?
A Mr. Khurramshah.
Q That's the relative of Mr. Shah?
A Shehraze Shah.
Q Yeah. Okay. And -- same question: What does OCR Global, Inc. do on behalf of the debtor?
A So OCR is basically a defense industries contractor for the -- for the defense agencies into -- right now, there is a major program

called 50 Caliber Program with the US government, and the -- we are providing -- it's -- it's a long-term contract for four or five years, and they -- they are more -- mainly into the defense sector.
Q And then there's a claim amount shown, roughly an amount of $5.676 million.
A Yes, sir.
Q Is that a carry forward amount as --
A No. The -- the OCR, they supported Swiftship in these rainy days in 2022, 2023, 2024. So this amount is piled up recently in the last three, four years.
Q Are there invoices that will reflect the transactions?
A Is -- is the -- is the payments note, debit notes for the fund support, and only invoice would be for the interest accrued. There is no services invoicing because there is no service between these two. So it's all about the temporary support -- funds movement.
Q Yeah. So when you say "debit note," you mean reflected on the trial balances?
A Yeah. Yeah. Yes. They are reflecting on our general ledger every single transaction.

Q And again, is there an agreement between OCR Global, Inc. and Swiftships?
A Yes, sir.
Q Please produce that when you can. Are you familiar with the bank accounts --
A Yes, sir.
Q -- for the debtor?
A Yes, sir.
Q One bank account is with PNC Bank, correct?
A Yes.
Q Is -- in reviewing those bank statements, there were a number of transactions where the debtor is transferring money to OCR, and then OCR is transferring money back to the debtor; is that correct?
A Yes, sir.
Q Okay. And can you explain to me what the basis of those transactions were -- are?
A So -- so the main reason -- let me start in -- in this way. The practice was in the last two, three years since we are been hitting with all this garnishment into Swiftships, so any money that we are receiving, we just need to secure it from these garnishment. We are pulling it into either ICS Nett or either OCR.

And the -- if -- you can also see there are money coming back to PSB or PNC Swiftship that will support our operational outflows and the payments. So we are not keeping any extra money into these account because of those garnishment.

And if we net off all these things, eventually its affiliates, who provided more funds than it's being moved back into these accounts. I can give you an example: OCR in the relevant period, they provided 1.4 million extra from their -- as a support loan, what they have received, what they have paid.

ICS Nett, they have paid $8.2 million more in this relevant period than what they have moved back into their account. So that was the practice, just to secure these funds -- the project funds, to avoid any unnecessary hassle that we -- we -- we -- we were facing in the last two, three years. That was the only genuine reason.

Q Okay. So let me understand then. Money was being moved out to avoid seizure by creditors --

A Yes.

Q -- correct? Money was being returned as necessary for what on behalf of the debtor?

A Yes, sir.
Q No. That was not the question. What was the money being returned to the debtor for specifically?
A For their payroll, for all their material, procurement, operation expense, fix overheads. Every single item.
Q And then any monies not returned are applied to balances owed by the debtor?
A This is not the case because if you see our trial balance and ledgers, actually we pay -- ICS or OCR they paid more amount because of the requirement on the ongoing program. And the cash -- incoming cash in Swift is not sufficient to meet all these obligations because of the recent (inaudible).
So actually, they end up paying more money from their own pocket to -- to these company -- to -- to -- to Swiftship, LLC. I've done this analysis of -- for the last three years. So every single entity eventually turned into -- like, these are the one -- they are financing the operation of Swiftship in last three or four years.
Q So you understand that I represent the unsecured

creditors?
A Yes, sir.
Q And you understand there's a pretty large pot of unsecured creditors that have not been paid?
A Yes, sir.
Q So all the money that was sent to OCR Global, Inc. and/or ICS or any other cash pooling was not necessarily returned to pay all the creditors. Is -- is that my understanding?
A So not exactly -- these mean, like, wherever those suppliers being necessary on the ongoing program, the first priority is to get this program completed so we can generate enough cash to support our open liability and the -- this -- the -- the -- the pool of the creditors, I would say it's pretty much -- pertains to our LCU 1700 program.
And since 2024, the last two years, we have been into a back-and-forth to -- to have some sort of a settlement with the client to see some of the cases. The supplier, which they are claiming they haven't even delivered the material, and they are claiming their amount. So we have our own numbers. Some of the supplier, they -- they owe us in shape of

prepayments.

So the first priority is to complete our ongoing program because these are program-specific funds coming. You are -- we are spending that money on the same program from where we are getting this money.

So once we have the -- once we complete the program, anything that's going to be a profit or leftover it's going to support the open liability. So it's not something that Swift is moving this fund to support its affiliate. It's a vice versa where affiliates have been supporting the Swift operation.

And there are so many cases where we have paid the suppliers from pre-petition, which -- which have our judgment. There -- there are -- there are few examples. We paid Sortech (spelled phonetically), we paid some other suppliers, and that is coming out of support from ICS or OCR, or these are the ones who provide these funds.

So the money coming as an operational fund's first priority is to put this money back on this program to generate enough cash. That's going to give us a liability to take care of our

suppliers.
Parallel, our main focus is to get some sort of relief or -- or support from LCU client, because pretty much liability pertain to that program, which is hurting us every single day.
Q So your testimony is that the amount of money that was being sent to ICS Nett and OCR Global is less than the amount of money that was returned or funded by --
A Yes, sir. It can be verified from the general ledger.
Q Right. Yeah. I guess my issue is -- is not reflected necessarily in the PNC Bank account statements. Is -- is that an accurate statement? They'd be reflected somewhere else?
A Sorry -- sorry, sir, come again.
Q So the PNC Bank account statements show transactions to ICS Nett and OCR Global over the last couple of years.
A Yeah.
Q In looking at those bank statements, a significant amount of more money is going out to those entities than coming back in.
A Uh-huh.
Q But your statement is more money was provided

than what is reflected on the bank statements?
A Not every single transaction is recorded on the bank statement. In case -- if ICS is paying their payroll or so directly, it's been routed through our payment on behalf. So if we go into our ledger for this specific account, we will see every single transaction. And that has a counter effect into its liability on the payroll.
Q You -- you didn't answer my question. There are certain amounts being paid directly by OCR or ICS Nett, in addition to amounts being returned to the debtors. And that's what --
A Yeah. Our best practice is to move the funds, but sometimes when it's come to the payroll deadlines and the -- the risk of the garnishment onto a PSP or PNC with the Swift, payroll is -- is -- sometimes it's a -- it's a sensitive issue.
Q Okay. I think you answered my question. I think I have one more. And that you are familiar with this one, Sunrays International, LLC, same question: Same address as the Virginia address for the other entities? And then who owns Sunrays International, LLC?

A It's an affiliate, brother, Mr. Khurramshah.
Q Okay. And then same -- same question: If you can just describe the services provided by Sunrays International, LLC, to the debtor?
A Yes. It's -- now here it's different. Sunrays is the -- basically providing services to -- to the Swiftship and other affiliates. Even some of the employee under Sunrays, they are directly stationed at the ground HR function, and one of my finance team member, she is their project manager.
He's on our payroll organization because these are the indirect function. So we pool them in one organization in order to get the maximum benefit of the cost saving, rather having our finance in every single entity -- procurement -- every -- in every single entity. It's more like the -- the -- the logic is to save the cost with the common shared services.
So I don't have to have my five teams in -- in every single entity. So we put all -- all these function in one entity, and they are providing their services to rest of the affiliates. At the end of the month, based on our timesheet, we charge our hours to respective

entity at the function or task. So in the last --
Q So the --
A Yes, sir.
Q Go ahead. Go ahead.
A So in the -- if I -- if I do the precise summary of Sunrays, I can see that the -- the number -- the services that we provided to -- to -- to Swiftship, it's more than what we have received. So around, like, the data is $1 million. They owe us more.
They haven't paid our services because of the cash -- whenever cash flow permit, they -- they -- they still owe us. But because Swiftship is struggling with the -- in the last three, four years, so that balance is piling up every month. It's -- it's an accrual of the expenses.
Q And then is it the time invoiced to Swiftships?
A Every month. At the end of the month, we -- we invoice it to Swiftship and other affiliates -- once we close the month.
Q Okay. I'd like to see those invoices.
A I will provide you the sample of any recent month or -- or -- or any specific month you'll

need.
Q Okay. Does Sunray provide services to any other affiliates?
A Yes.
Q And --
A Based on the time sheets and the support to other affiliates.
Q Okay. And so, that claim is -- is roughly $4,375,000?
A Yes.
Q So, you testified about each of those entities. I think you called them all affiliates; is that accurate? So when these affiliates provide support, is -- I think you're calling it cash support, is my understanding of your description; is that right?
A For ICS Nett, for OCR, yes. These are the cash temporary support. When it's come to Sunrays, it's the services that we are providing to our other affiliates. So it's a -- it's a cost charge.
Q Yeah. So was there ever a time period agreed upon for repayment of these amounts, or was it just as cash flow permits?
A It's been, like, again, totally depend upon the

financial position of the Swiftship. We -- we have pretty hopeful that with the ongoing efforts on the business development and for the future.

Definitely once the -- the cash flow permit, they have to return this money back to these entities. Otherwise, it's going to be an offset -- write-off in the other accounting books. It's going to be a blow for them. So --

Q You mentioned -- yeah, you can finish.

A Yes.

Q You can finish.

A So -- so -- so in -- in short, this is just a temporary support, and once the cash flow permit, they have to return this money back to these entities.

Q You mentioned earlier that interest was being charged on some of these amounts. Is -- is there an agreement, or how did you come into the amount of interest to be charged?

A So the amount of interest is based on the -- our tax attorney, that is 2.91 percent. So that is the minimum interest that we are charging over a period of time. And that is accrued over a period of time. That can be reflected into our

general -- general -- general ledgers. We can see every -- at the end of the month, you can see one transaction that is for the accrual.
Q Was there ever -- and maybe you're not the right person to answer this question. Was there ever a decision by the debtor to go to a bank for these amounts that could be used for cash support?
A Yes, we tried with a number of banks. We tried with the -- to get some line of credit to support our cash flow recently, like in the last six months or a year. But given the balance sheet or the overall financial situation, we didn't get any positive response from the banking sector.
Q So you had to rely on the affiliate funding?
A Yes. That's -- that's why we have to get this temporary support from affiliates.
MR. SHELBY:
Moving along here. I believe this will be Exhibit --
MS. HAUGEN:
Exhibit 6.
MR. SHELBY:
-- 6 or 7. I can't --

MS. HAUGEN:
Right.
MADAM COURT REPORTER:
It is 6.
(EXHIBIT No. 6 MARKED FOR IDENTIFICATION)
MR. SHELBY:
And -- it's 6. Okay. Thank you. It's a little small. Let me see if I can expand this a little bit. And that is for my benefit, maybe not yours.
BY MR. SHELBY:
Q Are you familiar with this document?
A Yes, this is our trial balance for Swiftship. If you can see the file name, this will give us the year for -- which it's pertained to. Because they -- we provided you, I think, four trial balances --
Q Yeah.
A -- 2023 --
Q This is the 2026. I'm sorry, but --
A Okay. Okay. Okay.
Q -- this is the 2026, and I'm going to scroll down here. So I'm looking at entries. You might have explained this. I just want to make



26-50237 - #147-3 File 10/09/26 Enter 10/09/26 15:30:11 Ex. 2 2004 Exam Transcript Pg 108 of 250

sure when I'm looking at this now, I understand. Okay. So here the entry is intercompany payable Sunrays, correct?
A Yes. Yes.
Q And it shows the -- the amount that's on the schedules. And then -- why is this playing games with me now? Let's pull it up again. All right. All right. And then there is an amount in this column. It's identified as a credit in 2026 of $773,000. Do you see that?
A Yes.
Q And that then adds additional amounts.
A These are the back support office invoicing in Sunrays every month. And you see there is no payments being made, only 16,000 that can be looked into, that 16,000 for 645. So mainly it's the billing for the services to Swiftship.
Q And then there's -- appears to be a difference here on what's booked as a payable and then what's booked as a loan. Can you help me understand why these other ones are booked as loans for these related entities versus a payable?
A So loan -- so the classification is -- payable is basically the one where you are providing

services. And that's the -- that's the classification for -- for the tax side. And the loan is when you transfer funds given to -- to -- back and forth for the temporary support. That is considered as a loan.

So payable is considered as the services. So Sunrays -- in our case, it's only Sunrays was providing services to other entities. So that's why Sunrays is being reported as an intercompany payable.

Q So I think you answered this question already that there's no documents other than the trial balance reflecting a loan by these affiliates?

A I think we -- we have the transactional data in general ledgers that will give you the breakdown of this $4 million -- 4 -- 4.8, whatsoever. So it has every single transaction that's going to give us the listing -- what happened in the last three years.

Q Yeah. My -- I'm asking a little different question. I'm asking: Is there a loan agreement?

A Yes, there is a loan agreement. Yes.

Q So there is a written document identifying the loan agreement between each of the affiliate

entities?
A Yes. That's a practice where we update that schedules every year.
Q Okay.
A So I can have the last -- latest available for December 2025, and that schedule. But loan agreement is basically the cover sheet, and then you have supporting schedules for every year activity.
Q Yeah, that's my question. Does this agreement, for instance, provide any maturity date for the loan?
A I have to go back to the date. It's open-ended, or I think it's 2036. I have to -- I have to check that -- this is just top of my head. Maybe it's 2036.
Q Okay. But it's in -- it's in the documents that you --
A Yeah. There is a -- there is a formal document for -- for -- because it's a part of our internal control and audit. We've been auditing by different audit agencies. So that is the -- one of their key area to make sure that the -- everything -- every transaction has supported by the formal document.



26-50237 - #147-3 File 10/09/26 Enter 10/09/26 15:30:11 Ex. 2 2004 Exam Transcript Pg 111 of 250

Q Were there any guarantees for any of these loans?
A It's between two affiliates, so there is no as such guarantees. But the -- I can check if there is a promissory note been signed over a period of time.
Q And then, who approved the loans -- or do you know who approved the loans by the debtor with these affiliates?
A It's -- likewise I said, it's a temporary support. So it's a blanket agreement within that given range. Treasury is basically using that money and back and forth -- I mean, transferring that money back and forth. So for every single transaction, there is no as such formal approval in place. It's covered through this document, which gave us the overall bracket limit.
Q The -- earlier you mentioned some of the debt was "carried-forward debt" from 2016 to 2019?
A Yeah.
Q And -- I guess my question is: When and how is the decision made to repay on any of these loans versus other creditors?
A So as I said earlier, for the payout, it is

under consideration that -- again, we are pretty hopeful that Swiftship will be back on its track once we hit those overseas or the new business development. Once cash flow will permit, definitely first priority would be our supplier.

And then over the period of time, gradually, it might going to take ten years, it might going to take five years, or it might going to give us, like, maybe if things turned out on -- on a couple of avenues, which we are working right now, definitely it would be one year.

So there is no definite timeline that -- for -- for -- when it's come to the affiliate. The -- the whole objective is to bring back Swiftship on its track with the new business and those open issues with the settlements on LCU 1700, Risen Sun sale, and couple of other open areas.

Q So when the -- you mentioned they're loan agreements, correct?

A Yes.

Q When the debtor doesn't pay back its loan on these loan agreements, is there an extension provided? Is there a forbearance agreement

negotiated or anything like that?
A I -- I think I answered my -- previously this question that it is covered under the master agreement. So the back and forth, which is mainly -- recently because of the garnishment.
So these are -- at the end of the year, we prepared the schedule. What has been transferred, what has been received. And these have been signed off by the -- as -- become the part of those master agreements.
So there is no as such formal approval for every single transaction. Because it's already covered under the master agreement.
MR. SHELBY:
Will be marked as Exhibit Number 7.
(EXHIBIT No. 7 MARKED FOR IDENTIFICATION)
BY MR. SHELBY:
Q Do you see that on your screen? Do you see that document that's saved?
A Yes.
Q Are you familiar with this document?
A Yes, this is our SBA loan. Two million loan.
Q Scroll down to the collateral section. And my -- my question on the SBA loan, and I'm not

asking you for a legal opinion. I just want to know if you know, was there any security document in favor of the SBA related to the Risen Sun.

Meaning, was there a ship mortgage or anything like that that you're aware of issued in favor of the SBA?

A I would refer this question to Ms. Sadia. She's our treasurer --

Q Okay.

A -- and she has more insight or know-how about this arrangement.

Q And there were -- there is a guarantee on the SBA loan, correct?

A Yes.

Q And I --

MS. SADIA:

Sorry. Sorry. Would --

MR. SHELBY:

Sorry?

MS. SADIA:

Sorry. Do you guys need me to respond for the Risen Sun?

MR. SHELBY:

No. We'll -- we'll get -- we'll get to

you in a minute.
MS. SADIA:
Okay. All right.
MR. SHELBY:
Thank you.
BY MR. SHELBY:
Q I'm looking here. Do you know who guaranteed the SBA loan?
A Yeah. That's where -- Ms. Sadia can provide more insight on this.
Q Okay. I'll -- I'll move on then from this. I have a couple other questions regarding the SBA loan, but I'll -- I'll ask those when we get to her.
Are you familiar with the loan provided by Patterson Bank?
A Yes, sir.
Q Okay. And is that loan secured by the Risen Sun?
A Yes, it is.
Q And are you aware if they have a security interest in any other collateral?
A If I see the document, I think they have collateral on the properties as well -- the -- properties.

Q Okay. That was the question. I -- I -- I haven't looked at their proof of claim, but I understood as far as the debtor's collateral it was just the Risen Sun.
A Just the Risen Sun.
Q So I'll get -- talking about the Risen Sun -- let me go back to the schedules. I'm just really at this point, confirming what is reflected on the schedules. And I'm going to go down to the amendment because this is what was filed as amended schedule on 6/26.
And -- no, I thought you had amended that. I guess not. It's in the original. I just want to go through the list of secure parties here.
So the first here (Inaudible), what do they have a security interest in? Is it equipment?
A So this is something which has popped out into our list when we -- when we have this search on the portal. So the first one that was services for our laptops and the -- and -- and the equipments that we had the leased.
Q And then we have Industrial Alliance Services has a judgment lien --
A Yes. They have a lien on this Risen Sun, and they -- they had provided material on our

different programs.
Q And really, I think it's your list under here, which are all identified moving down. These are all the parties that I'm pointing at here: Industrial Alliance Services, KAD, Louisiana Machinery Company, Patterson State Bank, and LeBlanc & Associates.
A This are the five known. Yes, sir.
Q And then if I -- I do sort of just a high-level math, we've got 97.5, 160,000 to KAD, 124 -- 125,000 to LeBlanc & Associates, another 97.5 to Louisiana Machinery, and then 1.5 to Patterson.
I mean, do you roughly agree that's about $2.7 million that's been scheduled as secured by the Risen Sun?
A I think for LeBlanc, you read it 124, though it was showing as 824.
Q Yeah.
A So ballpark -- in ballpark figure, it's somewhere around $3 million.
Q Okay. And that -- I don't know if you've looked at the claims that were filed, but the claims -- and I'll represent to you because I reviewed the claims register and each of these parties have filed proofs of claim. And the difference is --

is not much. I think it's roughly on the proofs of claim about $3.2 million. But do you agree with me, roughly $3 million in secured claims?

A So the only item that has a dispute is LeBlanc. Though -- though -- though, we have a different number. They've been claiming some invoices against which they haven't delivered the material.

When -- when it's come to these four suppliers, we had a detailed back-and-forth discussion when we had our attorney at that time. But because of the seizure with the -- they already got the judgment, and the number came down to this.

But they are claiming that includes some of the payments or the invoices which they haven't delivered. So again, this is a debatable question on the 824.

Q But they have a judgment, right?

A But they have a judgment. That's -- that's the -- that's the upper hand they have on -- they got the judgment. And we disputed this number later on. We had some back-and-forth discussion, some clarification with supporting documents being provided to both parties.

Again, we were pretty much stuck with this seizure, so we have very limited option. But when it's come to the accounting, one plus one is two -- always two. So we have all the supporting documents to prove this.

Q Is there some reason why you didn't check here that the amounts disputed?

A Maybe that's an overlooked something.

Q Okay. But they do have a judgment. So that's --

A Yes.

Q Earlier we talked about whether an analysis was done of the liens, and it sounds like your testimony was -- there was some type of analysis.

A So that analysis from the -- the -- the one that I was referring is relating to the overall financial situation of the entity, not specific to any area that the -- and again, that is the -- the objective of that analysis.

The third-party analysis is to see the overall -- the financial situation of the company. So it will -- it -- it -- the -- the objective of that evaluation is totally different.

MR. SHELBY:
Okay. I -- I just pulled up another exhibit. I believe this will be 8.
MS. HAUGEN:
Yes.
(EXHIBIT No. 8 MARKED FOR IDENTIFICATION)
BY MR. SHELBY:
Q And are you -- are you familiar with these documents, Mr. Saeed?
A Yes, sir.
Q I don't know if you're the right person to ask, but --
A Yes, you can ask me. And if -- if there is any question, we can refer it to Mr. Shah.
Q So I'm going to go down to the board minutes for 2025. And you see here you were one of the attendees?
A Yes.
Q And so, this is why I'm asking, is this resolution where it says, "Engage outside counsel to pursue legal action against OEM/suppliers, to remove all liens against Hull 624 Risen Sun, pay existing suppliers their balance to secure first lien for SBA and PSB?"

A Yes, sir.
Q Can you give me a little explanation on what this resolution is referring to?
A So I'm not sure if you have a history for -- relating to this lien. The first lien, the seizure, came up with the four different suppliers, Sortech -- I can't give you the exact names of the suppliers.
So they had their first seizure by integrated Sortech, then there were a couple of other. So in order to get this boat back, we agreed to pay this money on the -- we pay this money somewhere around -- in September or, I would say, July, August, or September timeline.
I can't provide you the exact dates. Once we paid this off to get this boat back, we came to know that the very next day, the four other suppliers jumped into the seizure, and whatever we paid, we are back to square.
That's -- that was the background. So this were the -- the resolution is basically referring to the first seizure that we had in that timeline.
Q Okay. I think you anticipated some of my questions here because when I look at the PNC

Bank accounts in the last quarter of 2025, there's a significant amount of money that was sent to a number of law firms?
A Yes. I think it was somewhere around the settlements -- was somewhere around two million plus.
Q Yeah. I'm -- I'm showing legal disbursements from October through December of 2025 around 2.275 million?
A Exactly. There were four suppliers plus (Inaudible) fee, and these were the one that we paid at that time. The -- the -- the very last day when we were about to get our boat back, we came to know the very next day someone else jumped into this boat, and now we are back into the same situation.
Q Where did the debtor have 2.275 million -- $2.275 million in the last quarter of 2025?
A That was the settlement for one of the program, MUSVL.
Q Are you familiar with the law firm Miller, Sullivan & Demarest [sic]?
A I can get back to you. I can write it down, as we have, like, 200-plus suppliers --
Q I -- I -- I don't want to get into this too

deep, but it just sounds like my understanding, from what you're telling me, is the boat was seized by other suppliers or manufacturers, correct? In 2025.
A Yes, sir.
Q And payments had to be made to release the boat, correct?
A Yes.
Q That was about $2.2 million, correct?
A Yes. Yes, sir.
Q And then subsequently, additional amounts or -- or other suppliers then seized the boat?
A Exactly.
Q Okay. And no amounts were paid to any of those that are listed on the schedules?
A Yes, we -- we did. We made the payments. I have a schedule. Because when we were -- we were engaged with these new -- the new seizure, we -- we had a discussion with all the suppliers.
We tried our best to get them back on the terms, some sort of a payment being made just to avoid any sale of this Risen Sun. I have this value. We paid 150,000 to LeBlanc. We paid 25,000 -- or 25,000 to other small suppliers.

So there is a -- there is a series of payments, but it's not much.
Q Yeah. I --
A And these -- these were somewhere around in December or Jan.
Q Yeah, I see that in the bank statements, and I --
A Yes.
Q -- think that's what --
A I have the complete record of what has been paid on which dates.
MR. BORER:
Okay. I'll ask Ryan for that.
BY MR. SHELBY:
Q Now, are you the right person to talk to about the -- the marketing of the Risen Sun and any updates, or should I talk to --
A I have complete know-how, but this -- this exercise is being leading by Ms. Sadia.
Q Okay. Well, I'll wait, and that was my understanding that Ms. Sadia was sort of leading up that -- that effort.
But I'll ask you, as the financial person, is the expectation that the sale of the vessel will provide enough cash -- and I'm setting

aside the SBA loan for now -- it will provide enough cash to pay the claims that are judgment liens of around $3 million?

A Yes, sir.

MR. SHELBY:

I think -- I think that's right.

MS. HAUGEN:

Yeah. Once you're done, so --

MR. SHELBY:

Yeah. I mean, everybody, I -- I think I just have a few more questions. It shouldn't take more than 15, 30 minutes.

Are we okay to keep going, Mr. Saeed?

THE WITNESS:

Yeah. I think --

MR. SHELBY:

Okay.

THE WITNESS:

-- it's good to wrap up this session -- first rest session.

MADAM COURT REPORTER:

Okay.

MR. SHELBY:

Let's --

MADAM COURT REPORTER:

You're going to continue now?

MR. SHELBY:

Yeah. Yeah.

MADAM COURT REPORTER:

Okay.

MR. SHELBY:

We're going to keep going --

MADAM COURT REPORTER:

Okay.

MR. SHELBY:

-- then we'll take a break for lunch.

MADAM COURT REPORTER:

Okay.

MR. SHELBY:

Is that okay --

MADAM COURT REPORTER:

Yeah. Of course.

MR. LAMB:

Rick, this is Ryan Lamb. I have about 20 minutes of questions that I'd like to ask Mr. Saeed after you're complete, if that's fine with your --

MR. SHELBY:

I will be.

MR. LAMB:

-- timing? Okay.
MR. SHELBY:
I'm -- I'm hopefully going to get through these fairly quickly. I mean, I'll try -- it that way.
MR. LAMB:
Great. Thank you.
BY MR. SHELBY:
Q Okay. Mr. Saeed, can you see the document I have up on the screen?
A Yes, sir.
Q Are you familiar with this document?
A Yes, this is our monthly operating report.
Q And are you the responsible person for preparing this report?
A Yes, with the support of my staff. But the final review before submission has to go from me.
Q And -- scroll down to -- there are -- you -- you provided a total disbursements table?
A Yeah.
Q My first question is: With respect to the entry on May 6, 2026, subcontractor charges paid to Sunrays International in the amount of $210,844?
A Yes, sir. That is for them -- for the services

for the month of April.
Q Okay. That was my question.
A Yes. Yeah.
Q So it seems like a larger number than what was typically charged?
A It is pretty much in the same range depending on the activity or -- that the support team is providing to Sunrays -- sorry, Sunrays to Swiftship. So this is within the normal range, I would say.
Q So this is supported by time entry, invoices that --
A Yes. Every -- every single document -- is like every single employee, they have their timesheets. I'll give you an example: today I'm going to charge my full time to Swiftship -- if I'm going to -- after this call, if I'm going to go to do any other activity, I'm going to charge it to respective tasks.
So that's how this 210 is billed up with the timesheet, applying the rates, department, every single employee. So we have a complete back-up document for this 210,000.
Q Okay. All right. And then I'm going to go down to -- starting, I guess, on the first top of the

page, and then it continues. There is a large list of what is described as overseas contract employees.
A Yes.
Q What services do those individuals provide to the debtor?
A So we can see these lines, which is, May 15th and May 20th. Basically, they are needed because we owe them two months salary. So I'll start with the -- one team, which is starting from May 15th, Omer -- Abbas, and then Araby and then Omer.
So basically they are our technical design team sitting in Egypt. And as a part of our schedule, we provided the list of these employees. They are five through eight. Five plus three for the DCA -- the current DCA warranty.
So there are only eight plus, minus staff, and the main role of their -- the domain is engineering. They are providing their engineering services because of the cost benefit of having our US local team for the cost benefit.
We have this team outsourced, or -- they

are basically our employee, but they've been stationed in Egypt. They've been engaged on DIU. They are engaged on PNGB technical documentation. They are engaged in every single program at this moment.

So the amount that we are seeing, it's 1,700, 1,600, 1,500. They're -- this is their monthly salary. So we can provide you more specific that this 1,600 is for the month of April. This is for May, or it's for the March.

Then we have one guy we can see, Khurram Shazal (Spelled phonetically), he's taking care of our Pakistan operation. He -- we have laid him off. The other guy is Hashim. He's also in Pakistan taking care of the PNGB program.

So these are -- are our overseas employees taking care of our technical design plus the project management, plus there is one in the marketing side on the business development. So as a supporting document we provided a list of every single employee. If -- they are not more than nine or ten people, the overseas.

Q Well, I guess my -- okay. One of the things you said was technical design?

A Yes.

Q What is the debtor designing right now?
A We are providing our technical support on the DIU ongoing design. It's not only when I'll -- when -- I have this explanation from my relevant department. If you allow me, I can take the document of their services.
I can explain this document of the ongoing -- but they are providing their services on all ongoing departments. Let's say develop vessel design and technical data package for the boat construction at the Morgan City, which is a DIU, PNGB, and FMS.
And prepare engineering changes proposal as required during the production and develop -- the associated TDP's revision for DIU, PNGB, and FMS 28 meter, and it's an ongoing.
It's not something that the -- the job is going to end up on the very first. Once the program is awarded, they are going to stay there, providing their technical services at the end of the day.
They provide their update and maintain design documentation, TDPs for the new construction projects, and modification. Mainly -- currently we have DIU, FMS, and PNGB.

Also, they are providing their support on the pipeline projects for the proposal that we are working on it. That's also one of their major domains.
Q It's a -- it's a -- it's a big number for the debtor to continue to keep paying these employees on a monthly basis; do you agree?
A Yes. It is -- like we -- this is the only design team that we have. We cannot survive without the technical support unless we -- then we have to hire the whole department here in the US to -- to support this function. And that's going to be a more -- it's not going to be cost-effective.
Q I guess that's sort of my question, given the fact the back office support, I think, as you described it, that Sunrays provides --
A More like it's -- it's a back office for support function for the engineering departments.
Q So Sunrays can't provide the services that these individuals are providing?
A No. This is a specific area -- specialized area. So Sunrays is providing finance, HR, procurement, IT, project management. So technical services or design services, it's a

specialized area.
Q Are you familiar with the wage motion that was filed at the beginning of the pay -- at the beginning of this bankruptcy case?
A Yes, sir. I'm aware.
Q And in that wage motion, I believe there were 26 employees identified?
A Yes, sir.
Q Are any of these individuals one of those 26 employees?
A No. I think we also provided -- as a part of our overseas -- you -- you see the schedule; there are two or three, and they were part of that.
26 were the direct employee under ADP for Swift, and we also provided this list in the schedule, maybe one person, maybe plus, minus. But given the information at that time, that was correct. So we had these people in that motion as well.
Q One more -- make sure. Actually, this is -- okay. Do you see this document in front of you here?
A Yes. Yes, sir. Yeah. It's --
Q Let me expand it a little bit. Small, yeah?

A Now -- now I can see the --
Q Yeah. But are you familiar with this document?
A Yes, sir, I do.
Q And what -- what is this document?
A This is a 13-week rolling cash flow.
Q And it shows through June -- the first week in June, correct?
A Yes.
Q Have you updated this at all?
A Yes, we did.
Q So do you agree with me that these totals of 2.5 million did not get collected by the first week of June, the total?
A We received $1.5 million. We received 148. We -- the 50,000 is stuck because of this LC issue that was planned. I have -- right now we are struggling with this BMO. 375 was planned based on the investment of the spare parts, as I explained on the warranty payment.
We haven't received it yet. It's going to drag a little bit, and 450 I can provide you the exact support that's been provided during this quarter from affiliate, that is, ICS Nett.
Q So ICS Nett has provided $450,000 to the debtor --

A Yeah. That was the projection based on meeting the bottom line. I can get back to you what has been provided through June 2026. But that was the best estimate at the -- that given date.
Q And is this $450,000 a loan?
A Yes. That was the plan.
Q So just following up on the payroll number, it looks like you -- you make payroll biweekly, correct?
A Yes, sir.
Q And this would be the 26 employees through ADP; these salaries?
A Yes.
Q And then the non-ADP are the overseas employees we just discussed?
A Yes.
Q And that's roughly just under $50,000 a month for the non --
A This -- this 8,700 this is the guy on 1099. But the rest is overseas. He's -- he's on ground. But this -- he's been paid through 1099. He's on the ground.
Q When you say "he's on the ground" --
A He's -- he's the -- he's our production guy.
Q In Morgan City?

A Yes.
Q And who does he work for?
A Swiftship.
Q I think this is --
A Yeah. This is the -- yeah. This is the breakdown, how we calculated the salary based on the benefits and associated costs. These are the supporting documents to the above calculations.
Q Right. This was what you produced in response to my request for the cash flow analysis, correct?
A Yes.
Q And then these are the overseas employees?
A Yes.
Q This is the individual, Joyson (Spelled phonetically), that’s in Morgan City --
A Yes. That's -- that's -- the one I was referring --
Q And what service does Mr. -- Mr. Joyson, I guess, provide --
A He's -- he's our -- he's our production lead. Heading our production department. In general, production guy. I would say he's a key guy.
MR. BORER:

That's -- I think I need to go there. Yeah. I need to go back. Before I forgot to ask you about this one entry. I kind of skipped over the section to ask Mr. Shah some of these questions, but -- okay.
BY MR. SHELBY:
Q I'm -- I'm back on the monthly operating report --
A Sure.
Q -- 2026. And we'll scroll down. This is the balance sheet?
A Yes, sir.
Q And did you prepare this balance sheet?
A Yes, I did.
Q And then I want to go down to this entry due from partner. I believe that should say stockholder.
A Yes, sir.
Q And it shows 3.8 -- $3,841,745; is that correct?
A Yes, sir.
Q And who is that due from?
A This is Mr. Shah.
Q And that -- that's an amount owed by Mr. Shah to the debtors?
A That's -- yes. And there is an explanation how

this number come up. It has been provided in our 2004 document, where I have given the explanation why this 3.8 million, that is basically one of the key audit adjustment, is for $2.4 million.

Which is actually owed from -- when -- when we did this 4.5 million write-off for ICS Nett, just to give an equity support to Swiftship in 2023, it was assumed that this liability has been taken care by Mr. Shah, though that was relating to the net -- offset of ICS Nett.

But in -- in order to give a financial strength or equity support to Swiftship, that loan is being taken care by Mr. Shah, and the 4.5 million is being -- I think I have given a well-detailed explanation on my -- I can give you the exact number on this related item.

Q Yeah. I'm -- I'm familiar with -- with what you're describing there in your explanation. I just --

A That's why it seems like it's 3.8 million, though technically, Swift has to return money back to ICS, but just to improve the financial outlook of the company, that was the contribution towards Swift financial help from

the ICS and the owner.
Q Yeah. But my question is: Is that amount owed by Mr. Shah to the debtor? I believe your response was yes?
A Yes.
Q Do you know why that amount was not listed on the schedules?
A It is. When we provided this balance sheet as a part of this, it is there.
Q You know, I understand it's on the MLR, but it's not on the schedules and statements filed with the bankruptcy that we reviewed earlier. If you recall, there was a receivable owed by BOT, correct?
A Yes. And that's going to be shown on the asset side.
Q And there's a receivable owned by Trojan Firearms, correct?
A Yes.
Q And this reflects a receivable owned by Mr. Shah, correct?
A I would take it as an equity portion. The negative equity portion for the company.
Q I don't even understand what that means.
A That's mean when the company generate cash, it

will offset this $3.8 million from the -- from the accounting aspect.
Q And I believe the explanation was that Mr. Shah assumed the loan due to -- or the loan due to the debtor by ICS Nett; is that correct?
A Yes. So in 2023, ICS, like -- like what I said, there was two balances being write off, $4.5 million, and the -- this two-point -- I can give you the exact number, 2.4 million or 2.7 million off the top of my head.
So in order to improve the bottom line of the equity, that portion out of the liability is being assumed by Mr. Shah and the remaining amount being written off in the books of -- I -- on -- on the Swiftship side.
That's why this 3.8 million -- out of 3.8 million, 2.7 or 2.4 million is just like an audit adjustment. Otherwise, Swift is -- actually owe money back to ICS. So we clean up everything in 2023.
And now may -- I know this is -- this is more like an accountant stuff. And any accountant can easily go into the detail. I can provide you more detail, more explanatory along with the supporting document, but pretty much

that was the audit adjustment to improve the financial length of the company.

So once the company is going to generate equity, this will offset against this receivable either in shape of a dividend or either in shape of equity generated through a profit. So I don't see dividend, but in shape of a profit, they're going to get into the bottom line.

It's not something -- cash being taken away by Mr. Shah. It's more about the audit and tax adjustment in 2023, which is explained on the document in the well-detailed explanation.

Q I -- I understand there's an explanation. My question was: Is this an amount that Mr. Shah owes to the debtor? My understanding is the answer is yes?

A Yes.

MR. SHELBY:

I think that's probably it for me. Mr. Saeed, I appreciate your patience. I think Mr. Lamb may have some questions for you now.

THE WITNESS:

Thank you, sir.

MR. SHELBY:

Thank you.

EXAMINATION BY MR. LAMB:
Q Hey, Mr. Shah [sic]. My name is Ryan Lamb. I'm an attorney with the Department of Justice, representing both the Navy and the Small Business Administration. Can you hear me okay?
A Yes, sir. This is Omer Saeed.
Q Omer Saeed. I'd like to kind of go over and -- some information that you've already shared and reviewed and -- and kind of understand some -- some clarifying issues that I have.
The first thing I'd like to go over with you is the -- what I believe -- well, let's start -- let's start with, I believe, it's Exhibit 3, which is the index of the supporting documents. I will hopefully be able to share it with you. Can you see my screen?
A Yes, sir.
Q Okay. So item number 13. This was communications during the period between the US -- between the debtor and the US government agency regarding the LCU 1700 program?
A Yes, sir.
Q You mentioned earlier that you understood that the contract was terminated in February 2024; is that correct?

A Yes, sir.
Q Okay.
A Yes.
Q And here you state that post-termination, when we sued the USN, I presume that means the US Navy for non-payment, the Court of Claims denied it under the grounds of the request. There was not an appeal to that Court of Claims denial, correct?
A Mr. Shah can better explain this point.
Q Okay. Then you mentioned you subsequently had or tried to have conversations with NAVSEA about what you call finalizing payment -- or responded to our request to finalize payments to the vendors still owed nor to those who owe us money?
A Yes, sir.
Q And you mentioned earlier that there is some documentary evidence on that point. You wrote a letter making this request, but you haven't heard a response; is that accurate?
A We just received a simple answer the day before yesterday. And our -- we are -- our legal team is reviewing it, but we sent a letter -- when we were writing this document -- we sent the letter

in Jan 2026, and we've been pursuing and having a back and forth with follow-up. So in the last five months they haven't responded back.
Q Until yesterday?
A Yes. Day before --
Q Okay.
A -- yesterday or yesterday.
Q Did -- have you read that response?
A It's with my CEO. Yes, we -- it's a one-pager response.
Q Okay. Is -- is that Mr. Shah?
A Mr. Michael. He's the one who received this letter.
Q Understood. Were you part of the initial request or -- or discussion if there was one, to generate a letter back in January of 2026?
A Yes. Yes, I was a part.
Q Do you recall what the request was?
A So the request on the letter is different sections. The first one pertains to the inventory, which is sitting in a yard. And the second request is relating to the partially built hull. What's the fate of the hull?
The third major request is relating to the prepayment that we paid on this program to our

vendor, and the -- they haven't delivered the material. So we need support from Navy in order to collect that money and to pay off our LCU relating liability plus to offset our losses on this program.

So first one inventory to get the right, or -- or what's the fate of this inventory? We -- we -- we need a right that will basically give us some sort of relaxation on -- on the ongoing challenges -- financial challenges and the losses.

And the second major one is relating to the prepayment, the money, which is right now with the vendors. These were the two -- in summary, these were the two main requests.

Q And the inventory you're referring to is that approximately, I believe, $16 million of inventory you associate with the LCU 1700 program?

A Yes. As per our record, it's $18 million.

Q $18 million. And that is inventory that is -- let me rephrase.

What's the status of that inventory?

A It's stationed at our warehouse.

Q Is it installed or anyway --

A That's --
Q -- attached to the --
A No, that --
Q -- hull -- 1700 hulls?
A No. This is the inventory, which is uninstalled inventory.
Q Okay. And if that -- if -- let me rephrase.
What resolution, if you're able to speak to it, is Swiftships hoping to achieve with NAVSEA?
A So my leadership, they can provide you more insight, but from the financial aspect, pretty much of this liability that we are talking about on this creditor side, its pertains to this program, which means some of them, they have already delivered the material. And that material is -- is a part of this 18 million.
But we haven't paid the -- the supplier because this program was a CDA, which is controlled disbursement account, meaning the money comes directly from the client and it -- routed through a bank as per the instruction of the client, which is -- in our case is NAVSEA.
So the inventory, which is a partial -- if -- if you see the letter, we will provide you the copy, it give us all breakdown that this

liability pertains to open vendors. They have already delivered the material, which is a part of this $18 million. Now we owe this money to them.

If -- our request is, if Navy allow us, we can dispose of this inventory, and we can recover some funds to pay to the suppliers. Then there are some claims on the same program for the open purchase orders.

The program is canceled, but Swiftship has already given this purchase order and so many suppliers. I can tell you an example by name, but some of the supplier coming back to us, "Guys you owe us this money. Material is sitting in our yard. So pay us this money," or they are going into the legal cases.

So our request is to get some sort of relaxation on this inventory, especially on the prepayment side. If you -- the -- the money -- the real money is sitting on the prepayment side, and -- which we can recover and offset these losses.

But we tried our -- we need support from NAVSEA to -- to -- to resolve these open issues, which is sitting in our financial for, like,

almost two years.
Q So I'm just trying to understand. The -- have -- have -- have these vendors been paid? That are associated with the -- your -- LCU 1700 contract, or they're expecting to be paid?
A They are expecting to be paid from -- either from our source or -- or that's where they have all these judgments against Swiftship because Swiftship is the one who issued the PO. So the --
Q Okay.
A -- contractual arrangement is between Swift and its supplier. And our main contract was with the client. So the -- when the program is being terminated, so some of the supplier they are in the limbo how they going to get this money.
So they are hitting back with Swiftship through legal cases, and they are claiming that, "We delivered this much material. You haven't paid us. Now we know the program was already terminated. So this liability is not on -- on us at this moment."
Some of the supplier, they got the money during the time of LCU era, and they haven't delivered the material. We are trying to

recover that money. The program is terminated. You are already delayed on the delivery. So you owe us money, X, Y, Z.

So they are -- they are coming back with the different excuses and the timelines, and so -- so we need sort of support from the client that will help us out to offset these liabilities and the losses right now we are into.

And that letter that we sent on January, it's pretty well detailed about all the scenarios with the -- all the listing of the suppliers.

MR. LAMB:

Understood. Okay. I'd like to turn your attention now to what is marked as Annex 11. And I believe this would be -- is Exhibit 9.

(EXHIBIT No. 9 MARKED FOR IDENTIFICATION)

MR. SHELBY:

Do you need me to pull it up, Ryan? Is that what you want?

MR. LAMB:

I -- I -- I think I got it.

MR. SHELBY:
Okay.
BY MR. LAMB:
Q Mr. Saeed, can you see this spreadsheet?
A Yes, sir.
Q Okay. So did you generate this document? Are you familiar with it?
A Yes, I did.
Q You generated it. Okay. So the LCU 1700 program here, the sum total cost is identified as 16,937,567 --
A Yes, sir. Sorry, I was referring it to 18 million. This is $16.9 million. Yes.
Q So you're referring to the 18 million before --
A Yes.
Q -- is 16 -- Okay.
A Yes.
Q Okay. And this is for a terminated program?
A Yes.
Q That -- would it be fair to say Swiftship is hoping for a resolution with NAVSEA or the Navy so that it can, I guess, do what with this inventory?
A Yes, sir.
Q Sell it on the market?

A That could be the possibility.
Q Okay. So on -- in this same document there's two tabs. We're looking at summary report. I'm going to click on inventory on-hand report. This identifies all of the inventory associated with the summary --
A Itemize --
Q Are you familiar with this?
A Yes. That's coming out of our system. And this report is basically become the part of -- basis of the summary report.
Q Great. So it's categorized, you know, largely by project. So I'm focusing mainly on the LCU 1700 program. Some of the financial cost amounts, I assume this is the valuation that was assigned?
A Yes.
Q Some of them are positive, and some of them are negative. Can you explain why some of them are negative?
A It's mainly because of the system. It's run on LIFO and -- sorry, it's first -- first-in, first-out. So when you bought the one item back in, let's say -- so we always go by this number per quantity, which mean if you bought an item

for $1,000, like six months ago, and now the average price is -- now the recent price is, I would say, $1,200.
So when you issue the job -- when you issue the inventory, so it's going to take the last-in, first-out. So these kind of discrepancies in the number are -- we are aware of it, but this is a system -- basically the limitation of the system.
So we always go by the quantity. How many quantity do we have? Price would be a plus, minus on certain item because of the LIFO and the FIFO system, last -- first-in, first-out.
Q Okay. So -- so if I were to just limit the spreadsheet to the LCU 1700 program only, all of these negative numbers are discounted from the positive numbers, resulting in the 16th -- nine number?
A Yes. I mean, we can -- we can do this kind of analysis. Yes.
Q Okay. What -- what valuation methodology did you use to generate the financial cost amount?
A This is basically -- as I explained, it's coming out of the system, which is based on the inventory. For example, it goes by item by

item. If you have -- let's take an example of this steel row number 14,411, which is steel AS36 or anything. Let's take this example.

So the amount right now -- the quantity is showing as zero. If you see the columns physical and available physical, the -- the -- the units, but the value is showing as 2,970 against this item. The same item could be available on some other project.

So the system is going to pick the first-in, first-out value. Everything is being reported through -- controlled through the project domain. If we buy this PO, it's going to issue on the project. It's going to receive this inventory. But when the system is reading the cost, it's reading as a one.

So it's been controlled through the unit of item that we have. Price could be plus, minus. It's not a big variation, but it can be controlled to the number of units available into the yard. When we do our accounting, it goes by physical available.

Q So just so I'm understanding and it's clear for, I guess, the record. This 14,401 column is showing a negative number because this

particular piece of inventory is associated with two programs or --
A Yes, this item could be found in two different programs. And if you see the column available physical, it's zero. So there is not any single item against this. It's already been issued.
So if you filter this data on physical -- available physical, so then you're going to see, okay, these are the item actually sitting in a yard with those dollar -- dollar amount as I said, it could be a slight one, two percent plus, minus, but on the physical side, the -- whatever is reported on the column available physical it is in the yard.
Q Okay. So some of the -- I would say, the majority of the cost amounts are positive for the 17 -- LCU --
A Yes.
Q -- 1700 program? I asked earlier, and -- and you may have not understood my question. The financial cost amount, that is the valuation you've assigned to that particular piece of inventory?
A Yes, sir.
Q How do you generate that valuation?

A That's based on the -- so the -- let me explain it in a way. If you order this three-by-eight-inch straight clip. So then what's going to happen? You're going to issue a PO. That PO is showing us the quantity. Let's say, 10 units at the rate of $10. So there is somehow a PO for $100. Once you receive this PO, it will show as physical available. You will see ten quantities with $100.

But let's say the same item is being procured and sitting in a yard, ten units at the rate of five. It's going up, and you're going to charge it out, it's going to give you a cost slightly -- this -- this is not going to be in many cases, very few cases, but it will give you a slight different average cost when it's -- it's going to be the cost of goods sold.

But when you're going to check the inventory, it will give you seven quantities sitting here at the rate of 2,450. And the -- as -- as I said, it can -- can be only a few cases, not the -- every single case.

Q So the definition of fair market value that you're using and -- and mentioned earlier today and -- and throughout the documents is the

replacement value or that --
A It's -- it's -- it's the book value, not the replacement. What has been bought at which PO, amount, and what was this unit price. Yes, on the negative side, I explained why it is so, because -- it could be -- these are the item which has been bought on a slightly different rate.
And the -- when we issue the job -- material to the job, it -- the quantity going to be zero, and it will be left with the negative amount. So it's -- it's -- it's --
Q Sorry. I'm just -- just so I can understand. I'm sorry.
A Yeah.
Q I didn't mean to cut you off. Please continue.
A So this is what I -- what I explain, like when we -- you see the negative and you don't see any unit available, that mean it's not into the inventory. You have to filter this data based on the -- the physical available.
Q Right. Right. I -- I understand that. What I'm focusing on here is financial cost amount. So --
A Yeah.

Q -- let's just pick three -- line 3,064. There's seven available units of this. The financial cost amount is $2,455?
A Yes.
Q The --
A We can --
Q -- cost amount for seven units is $2,455. Is that a correct statement?
A Yes, sir.
Q So the valuation methodology used here would be the fair market value? Or you're defining the fair market value as the replacement value; is that --
A So fair --
Q -- correct? Or is this the amount, or -- I'm sorry. Let me finish.
A Yes, sir.
Q Either -- is -- is the financial cost amount here the replacement value, the cost that -- which I'm defining as the cost that Swiftships would incur to replace these seven units, or is this the amount that Swiftships paid at the --
A That Swiftship paid --
Q -- time that it made this purchase?
A Swiftship paid at the time of purchase order.

Q Okay. So the valuation of the 16-point -- approximately nine million, is the amount that Swiftships paid for the inventory associated with the LCU 1700 program?
A It can be seen into a detail out of 16.9 million, there are certain amount of inventory which we haven't paid to the supplier, and that can be seen on that -- the letter detail where we owe -- we still owe.
When it come to the payment, we issued the PO. We received the material. More -- in the most cases, the vendor already got the payment, but there are certain cases -- I can name one of the supplier, they delivered the material, but they haven't got paid.
So yes, this 16.9, mostly been paid out, but there are certain suppliers and the amount we still owe money to the market, but they -- they already delivered the material. So the counterpart is sitting in our liability side, asset inventory, and the counterpart liability in our balance sheet or to the vendor.
Q Okay. And so, the amount -- and I'm -- I'm sorry for belaboring this, but just so it's clear, the financial cost amount that was -- the

sum of which was used to generate the value of the LCU 1700 inventory of approximately 16.9 million, is the amount that Swiftships paid at the time that that inventory was purchased?
A Yes. Paid or still payable on certain cases under certain circumstances --
Q Understood. But that -- that's the value of the --
A Yes, sir.
Q -- inventory -- the -- the costs that Swiftships did or would have paid out at the moment that the inventory --
A Absolutely.
Q -- was acquired and became property of Swiftships? Okay.
What period of time, if -- if you are aware, did Swiftships make these purchases for this LCU 1700 inventory?
A It's ranging from 2020 through 2023.
Q Okay. And is this inven- -- you mentioned earlier, this inventory is currently in -- is warehoused, correct? Not installed --
A Yes, sir.
Q -- or anything?
A Yes.

Q If the -- if Swiftships were to attempt to sell this inventory, and you may not be the person to answer this, so please let me know, what -- what amount of value could you possibly understand it -- it to be worth on the secondary market?
A I'm not the right technical person for this. But if I'll get -- if -- if we'll get a dollar to $0.50 -- I'm just looking at the -- dollar to $0.50, it's going to be 8, $9 million.
Q Okay. I'd like to turn now to -- well, I'd like to speak about the Risen Sun, but you mentioned earlier that Ms. Iqbal may be the better individual?
A Yes, sir.
Q The Risen Sun?
A Yes, sir.

MR. LAMB:

Okay. Okay. I -- I don't have any other questions. Thank you very much, Mr. Saeed.

THE WITNESS:

Thank you -- thank you, Ryan.

MR. SHELBY:

Y'all want a break until 1:30? Is that enough time? Ryan?

MR. RICHMOND:
Yeah, I think that's a good plan. 1:30 Central Time?

MR. LAMB:
That works for me.

MR. SHELBY:
Okay. Yeah. All right.

MR. RICHMOND:
And then we'll move on to Mr. Shehraze Shah at 1:30 Central. Does that work?

MR. LAMB:
Yes.

MR. RICHMOND:
Okay. Good deal.

MADAM COURT REPORTER:
I have taken us off the record at 12:55.

(OFF-THE-RECORD)

(WHEREUPON, A BRIEF RECESS WAS TAKEN AT 12:55 P.M.)

MADAM COURT REPORTER:
We'll go on the record at 1:37 p.m.

SHEHRAZE SHAH

after having been first duly sworn by the Certified Court Reporter, did testify as follows:

MADAM COURT REPORTER:

Thank you, sir.
Counsel, you may proceed whenever you're ready.
MR. SHELBY:
Thank you.
(ON-THE-RECORD)
(WHEREUPON, THE 2004 EXAMINATION RESUMED AT 1:37 P.M.)
EXAMINATION
BY MR. SHELBY:
Q Good afternoon, Mr. Shah. This is Rick Shelby with Kelly Hart. I represent the Unsecured Creditors Committee in the Swiftships case. I believe you were present during the earlier testimony by Mr. Saeed; is that correct?
A Yes, sir. It is. I was listening onto it.
Q And --
A (Inaudible).
Q -- did you assist Mr. Saeed in preparing the responses to the 2004 requests?
A I had not participated in any of that, except for just observing that the -- the process was ongoing.
Q From the earlier testimony that the -- Mr. Saeed provided, is there anything that you would want to clarify from that testimony on behalf of the

debtor?
A Just a few clarifications. I'm sure we'll go through those while I'm -- I'm being deposed as we speak. So I think I'm going to re-answer some of those facts in relevance to what Ryan asked and also in relevance to what -- the case that we have right now.
Q You know, I'm not -- I'm not planning to go through --
A Okay.
Q -- everything I asked Mr. Saeed because I'm -- wasn't sure if that would be necessary. I guess I'm asking you now, with respect to any of the questions that I asked, is there something that you want to clarify?
A The only thing I'd like to clarify is that the particulars of what is considered to be a request to the government, since I'm -- I'm primarily working with the Congressman's office and also with my executive officer, which is Michael Poel, who's present on this deposition as well, is that we've requested the US Navy to give us some sort of leeway or to be able to sell the assets pertaining to the contract LCU 1700 only.

And they have refused to even participate in any discussion because it would make them feel that the US Navy is responsible for this failure of a shipyard.

Now, particular to the response that Mr. Saeed provided the list of -- of -- of the queries that we've sent to them six months, it took them to respond to one page, which basically says, "Thank you for giving us the assistance of inventorying," what Mr. Saeed presented as 16.9 million and change, "We will come with our team to inventory it, but we will not participate in any -- any funding of any vendors or suppliers pertaining to 1700 program."

Now let me just parlay this for everybody on this call, including Mr. Ryan, that we have $111 million worth of assets in the yard, not just 16.9. 16.9 is material that's sitting in the warehouses. 11 -- 111 million was paid to us as a contractor. And the hulls that we have have 90 percent of the material already inside of it.

And whatever was not supplied to us, still sitting in supplier’s warehouses with 100

percent of payments already made to them, and partake, one of the supplier, which is SIT, had filed a motion to want to sell these assets, which I believe Ryan has already accepted their motion; is that correct, Ryan?

MR. LAMB:

This is Ryan Lamb. Which Ryan are you referring to?

THE WITNESS:

Ryan Richmond. Sorry. Not Ryan Lamb. Sorry, Ryan.

MR. RICHMOND:

Yeah. I -- I'm really not here to answer questions.

THE WITNESS:

Okay. Not a problem.

A So again, back to the point, we are trying our best to find customers in -- pertaining to the LCU 1700. We did pose this as a proposal to the Egyptian Navy. They said, "Absolutely, we want it."

We even sent them a proposal, $50 million. And the only thing that we need is one piece of paper that says, "Yes, those assets can be sold." And we have a plan. We presented it,

but the US Navy will not respond to us for us to be whole and make the suppliers whole as well.

So in reference to all what I just said, Rick, we have a golden chance of making our suppliers whole in just one shot by selling the assets which are sitting in the yard collecting dust.

And just so you know, I cannot build a single boat in that yard because I don't have any space. These assets have encumbered the entire facility, if not 90 percent of it. And the only thing I could do is keep 26 people and not even produce a single vessel. So how do I do business?

We are trying to find business overseas to be able to do co-production, just like what you saw in Pakistan program and in the program of -- in -- in general, Egyptian Navy or other navies. So that was the only clarification I wanted to bring to your attention on what Omer Saeed had mentioned in reference to what our -- our case is at the moment.

BY MR. SHELBY:

Q Okay. Thank you for that. Let me follow up on your clarification --

A Yes, sir.
Q -- back to the discussion of the LCU program. My understanding is there was a claim made for non-payment to the Court of Claims, correct?
A To the suppliers.
Q Yeah. And that was denied?
A I'm sorry, repeat that question. Was the claim made by who?
Q By Swiftships to the Court of Claims.
A Correct.
Q And that was denied in the Court of Claims?
A So let me give you some background in that claim. The claim was that the price increase based on the design changes and the changes that the United States Navy asked for were -- were just in negotiation. So the Court of Claims what they were submitted a claim was actually far beyond the claim that the US Navy had accepted.
Now, imagine if you're building a house, and you keep making changes to it. There's one claim that takes six months for the US Navy to even go through. And then you have another claim, so in all the vessel price that we agreed on per vessel in an agreement with the United

States NAVSEA Contracting Office was 21 million. After the fact, six months from that point, they made more changes, which we asked them to come back to 23.5 million a boat.

Again, this was a mod to a mod, which they denied that motion if we had filed again, and I think Ryan had -- Ryan Lamb had asked the question, "Hey, why didn't you go and oppose to that"? Do you know, Rick and Ryan, what they have done to Swiftships? Just me sending a lawsuit to the United States Navy, or NAVSEA, I'm doomed already. And we're facing the challenges as we speak.

If I had gone back to them and refiled the motion in the lower courts again, they would have dragged us to two years, and we wouldn't even be in situation right now. So we then gave them a letter stating, "We will support you." Now, Rick and Ryan, they blacklisted us on SAM.gov.

For six months, we couldn't do -- we couldn't even brush our teeth. The Risen Sun that you -- that you keep talking about was being bought by Hanwha Defense, was being bought by Lockheed Martin. Just because of us being

debarred, they wouldn't touch us.

So that's why we're trying to get this boat to a commercial supplier, oil and gas operator over to Nigeria, and I wouldn't be the first to tell you those people are scam artists. So whatever Ms. Sadia Iqbal and the team are doing, this will take a year before we even get to an actual company -- a real company in Nigeria who would buy this asset.

And this particular asset is a gold mine in terms of commercial conversion to military, but who's the buyer? United States Navy. Why wouldn't they buy us? No defense contractor would touch us because we -- we are doomed, and we're not looked at the highest regards as we used to be because we filed for bankruptcy also. So it's a catch-22.

But we have found partners that are overseas that are willing to overlook to all of this. We just need to get to a point where we can actually become of -- you know, a whole and be able to support even a performance bond on a new program.

What that means is, Rick, I have an e-mail from Pakistan Navy, which I'll share with Ryan.

I won a ten-boat USV contract five weeks ago on technical grounds and on pricing grounds, on commercial and on technical. But I don't have funds to put up a performance bond, which is ten percent of the value of the contract.

And you know what that means? That same contract, which is the Egyptian contract where we had to put the ten percent, 1.5 million that's still sitting in the bank account, these are commercial programs that require a performance guarantee from the prime, which is Swiftships.

So we were sent a letter: "Thank you very much for participating, and we're awarding the contract to the Chinese." So I can win as -- as much as I want, but I don't have the capital to put, and I've tried to -- to borrow money.

I've tried to go to loan sharks to -- to loan against the vessel, but it has too many incumbents or too much of UCC creditors on the -- on the Risen Sun itself. That's the only asset I have. The rest is all under the bank's name.

But, you know, it's -- it's PSB, for guaranteeing the loan, they have all the land as

-- as well -- NSB in this case. So it's -- it -- we're trying. We're doing our best. I've not lost hope. Again, this is a war for us, and we're going to win it.
Q Okay. You said a lot there, so let me try to break it down a little bit. So the denial in the Court of Claims, does it have anything to do with the ability in the future to collect amount -- amounts owed to Swiftships under the LCU program?
A The -- the answer is yes; we can go back. We can again file another claim based on the letter that we have received, which -- as Omer Saeed mentioned, we just got it back after six months. There's only two paragraphs. It's literally one page for a six-page letter that we responded with our legal help -- legal team.
It says, "Sorry, we're not going to pay your vendors." And -- oh, "Thank you very much for giving us the opportunity to visit with our asset supply chain team to inventory the asset." That's it.
Now I can -- on that ground, I can file for another lawsuit claiming the same thing as we're all discussing right now. The vendors were paid

directly by US Navy. We had no involvement, not a single say. They would pick the invoices for the milestones.

Now, Ryan went through a list of material. You saw in that material you had 12 hulls: 1701, 1702, 1703, 1704, 1705. We have six hulls in production in our shipyard, and we will share profusely the pictures of each hull in what condition it sits.

We have been protecting these hulls because somebody would come and give us something for these hulls, but you know what the NAVSEA contracting officer told me? "Sell it." That's how you collect your money.

But nobody would -- would now go back to that point. They would not confirm whether we can sell it or we -- whether they pay us for it. So we don't know what to do. The boats have engines in it, Ryan -- I'm sorry, you know, Rick. It has engines inside of it. It has gearboxes inside of it.

Q So let me understand your testimony. There were some invoices of suppliers paid directly by the US Navy?

A Every single supplier was paid directly by the

US Navy.
Q Okay.
A We had no say in it.
Q So the inventory that's on the property, these hulls, and other inventory, are you saying all that was paid for by the Navy or Swiftships?
A I -- I did not -- I did not say that. The ones that have been received -- see, the way it works -- the way the contract was written, they had challenges with small businesses. So they set up a controlled disbursement account, which would -- is perfect for us.
They bought the performance bond, $3.5 million, just so if we were to corpse, they would collect the money from that. Three years in -- down the road, they cancelled the performance bond themselves. They didn't want to renew it because they said everything was going great.
Now the design's finished, we go to production. We give them a list of material to procure, the POs. They said, "Okay. These are the stages. We will procure -- will pay for these, these, these suppliers."
A prepayment penalty or prepayment was

induced by the US Navy to the supplier. Either it was 50 percent or 100 percent. The prepayment clauses were removed. The payments were made to the supplier. The supplier supplied the material.

What part of the suppliers have not been paid are the last phases when they said the program is being terminated and was being -- was -- it took them six months, and supplier already supplied the material to us because we were still making milestones. So those are the only suppliers that we have not paid out of the CDA.

Q I think I understand now. So maybe there's a portion of the 16 million that was paid for by --

A Of course.

Q Okay.

A Of course.

Q Yeah.

A And we have the exact amount that's still left, and some of the negatives that Ryan Lamb was recording and seeing the inventory, that system records what has been paid and what has not been paid.

Q That's how I understood.

A Sorry.
Q Thanks for that. Then you -- you discussed in your clarification testimony that the -- the company Swiftships is having difficulty with cash. I believe Mr. Saeed verified that, correct?
A Correct.
Q So -- and my -- my question to you -- well -- yeah. My question to you is: What does the debtor intend to achieve with Chapter 11 reorganization?
A So I'll answer that very easily. This is to buy us some time so they won't collect the asset. That is the only asset that we can sell today.
Now I'll give you another case in point here. Maybe you've never visited the shipyard, but if you do, we have two hulls. One is Risen -- Risen Sun, which is Hull 624, and the second one is called Hull 649. It's a sister ship.
Hull 649 is 65 percent completed. Only needs engines and gears. So we don't have just one asset. We have two. Hull 649 has a better chance in being sold faster than Hull 624, AKA Risen Sun. Risen Sun is completed.
Hull 649 can be built to a customer's

requirements, and that's where Royal Grenada Police Force comes in. So I'll give you a walk-through. 21.7 million is the price they've agreed upon. 30 percent down payment means we get $8.4 million for that specific hull. Does that make sense?
Q I -- I think I'm following you.
A So these -- these are milestones we have already met. Design is completed. Those people that are still doing the design engineering, they're doing it because we have to present a certain milestone to collect money against the engineering plan.
And again, the hull is already completed to a certain stage, which means now we have up to 35 to 40 percent completed for the cash to come in and the production to start.
Q So --
A And we're about 95 percent -- we're 95 percent on the green with the client. They want to -- to take this program forward because it's an EXIM Bank, you know, guaranteed loan. It is only to be used by the US companies.
Q So if I can summarize, and you can confirm, the idea is that there is existing hulls, materials

on the property in Morgan City that would support some type of reorganization in the near future to fund future operations to complete vessels that are on the property, is that --
A That is accurate. Now, one thing outside of that as well that helps you understand is; to generate cash, we have created an autonomous solution, which is a software that allows unmanned vessels to operate.
Everybody wants the code, and you know how much the code is? For each country, it's $5 million. So marketing our unmanned boats is important because that mothership that we're talking about, Risen Sun and the Hull 649, they are motherships for the USVs.
So in all of this time, what we've been doing is building, building, building that system and technology to get us ready for the big show, which is to go out and sell the mothership and the USVs combined as one package without anybody saying, "Oh, we don't want the mothership." We will not give you the technology if you don't buy the mothership.
Q So does the debtor own this technology?
A Absolutely, sir.

Q And this would -- this -- this would be some type of intellectual property the debtor owns?
A 100 percent.
Q Okay.
A And -- and we have -- we have a document being prepared for Ryan Richmond, which documents all the countries that we have listed, and we have delivered the prototypes for. Everybody has accepted with annexes that you will see all these proposals being submitted to these countries. Nobody has this technology right now, which is why countries are dying for.
Just Egyptian Navy itself is $5 million just for the code for -- to be -- to be -- to be transferred. So that's the plan. And the plan is not only just in motion. If this war had not stopped all these countries from -- from finalizing these deals, I would say we wouldn't even be having this conversation right now.
Q I should have asked Mr. Saeed this question, but I -- I didn't, so I'm asking you. The -- the schedules and statements having a line item for assets for the debtor to identify any interest in intellectual property, designs, drawings, software, technology, and nothing was listed on

the schedules. Are you aware of that?
A BOT is where you have to -- BOT is the intellectual property owner of designs and the specific property. Just like Mr. Saeed mentioned, BOT is where all the IP designs to protect the interests. This was structured by the banks.
Q Okay. Because Mr. Saeed testified earlier that BOT had land.
A Well, it's property. In -- in general, this is where I come into play, and Mr. Saeed comes into play because technically, all our designs are property of BOT but used by Swiftships.
Q Okay. Is there a license?
A So, yes and no. And I'll tell you yes because any design that you have heard us building a 28-meter coastal patrol craft in Egypt, there's a license under Department of State. But Egyptian government never pays us for that license. It's called a Technology Assist Agreement. And the reason why they don't pay that is because they keep us -- keep giving us business.
But there's a $50,000 per -- per license per boat, which has offset it by business that

they give us. So anytime the Egyptian navy gives me this ration of BS of not being able to deliver, I always raise the flag and say, "Okay, I'm sorry. We can't. We're broke. Guess what? You owe me this much money for the designs." And -- and we get -- become friends really fast. So it's a bargaining chip.

I can charge the design costs, but there's so much competition, Rick. I can't even tell you that somebody else will come in and offer somebody else's design. So I'll be the one, you know, kicked out of the curb. So we give that design as part of our sales.

Q I was more interested in who would be the owner. That sounds like BOT is the owner?

A BOT, sir. Yes, sir. It is.

Q And then --

A And -- and the autonomous design is in collaboration with ICS, which is my IT company. And they are the software developers. So is -- what you see, Swiftships is the owner because they're the ones who are given the assets to test this software on. Of course, they'll collect some royalty, but once we sell, everybody's going to be happy.

Q Okay. And with respect to the debtor --
A Sure.
Q -- Swiftships Group is the owner, correct?
A Swiftships, LLC, is the debtor.
Q Yeah.
A Swiftships Group is just a holding entity for BOT and for the shares to be equally distributed amongst the two partners, which in this case Swiftships, LLC is 100 percent owned by Swiftships Group. And Mr. Leleux and myself are the only two owners of the -- the Swiftships Group, which holds BOT as well in there.
Q And what -- and this may be not the right question for you, but I can ask it, and you can tell me --
A Sure.
Q Is -- is the intent that Swiftships Group will retain the equity in the debtor through a reorganization?
A Great question. I've been asked to -- you know, before the -- before we file for -- for Chapter 11, we were asked by equity partners or venture capitalists or even private equity funds to come in because this is the gold rush of USVs; unmanned technology is being pushed to the US

Navy.
And of course, Mr. Leleux was trying his best to push his way in to sell Swiftships, which is why he was removed from the position because of -- of course, play.
So in this particular case, we have looked into even selling Swiftships as a brand and even looking into -- but for that particular matter, Rick, I have to stage some programs overseas that have magnitude for anybody to look into -- to buying the debt, which isn't a lot, but in this particular case, they can rebrand it, they can take the yard, they can take the IP, and those are in plans.
For that, I have to win a massive program, which I'm really working hard to get -- get through, and we're providing you with an entire plan through Ryan.
Q So there -- there could be the possibility that there would be new equity subject --
A Of course.
Q -- to some capital raise or --
A I'm ready to -- I'm ready to sell 100 percent if they want to buy 100 percent.
Q Okay.

A But obviously --
Q How many --
A -- but obviously today -- but obviously today my -- my chips are down. So as soon as I win one contract without anybody's help, they would buy instantly in Swiftships and buy the debt, convert that over to a new market, and a new program study for them to make it to the next level. So that's the plan if everything else fails.
Q Mr. -- you mentioned Mr. Leleux?
A Correct.
Q And there's some reference in the annual meeting documents regarding a potential claim against Mr. Leleux. Can you explain to me -- well, I think --
A So --
Q -- starting to go there, but if you could just clarify.
A Absolutely, sir. Absolutely. Mr. Leleux has been trying to part ways by either owning one of the properties and going away with being -- being opportunistic in the fact that he wants to have one of the properties and he'll go away.
Now, he started his own company outside of

the nine dots of what we call an NDA and non-compete, which is called Gulf Coast Tactical. And he does -- and he's doing the same exact business, claiming it's Swiftships property.

So yes, we have a right to go after him. Unfortunately, we don't want to at this -- at this particular time because, again, we're not at that point to have invites. We want to make sure that, you know, debtors are -- are -- you know, Swiftships is able to take care of its suppliers, which are very important to us.

It's always been very important to us. And that's why you've seen enormous amount of money has been poured into the company to help Swiftships even pay some of its debts without even any recovery of -- of any amount from the US Navy. It's always a hope, but that's what owners do. They take the risk.

Q So Mr. Leleux had a non-compete with Swiftships?

A Wouldn't you if you were a partner?

Q That's not the question.

A Absolutely. In fact, he even claims that on his new website that he was part of Swiftships.

Q Okay. I think -- I probably have enough there.

I'm probably going to follow up on it on getting some documentation.
A Of course. And -- and we have everything that -- that you require. We will provide that to Ryan.
Q Okay.
A And -- and we have a case file on that with another law firm that was representing us with Mr. Leleux.
Q Which law firm was that?
A You know, I have no idea, but I'm sure Ms. Sadia Iqbal can provide you with the name, or Mike can provide you because he deals with those kinds of issues on a daily basis. I apologize.
Q That's okay. Would it be Kings & Jurgens, or do you know?
A You've -- you -- you got it. Kings & Jurgens.
Q And are they still engaged to do anything with respect to that, or do you know?
A Honestly, Rick, we are in the process of this Chapter 11, and once we get through with some of that, when it's -- to a point where we can engage them again. But they have been supporting, you know, across the board.
MR. BORER:

Can -- can you hold on? Give me a second and see if I kind of got -

THE WITNESS:

Absolutely, sir. Absolutely.

BY MR. SHELBY:

Q Thanks. I have one more set of questions here that we discussed earlier. It has to do with the cash infusion, I believe, by ICS Nett, Inc.

A Yes, sir.

Q We discussed that earlier with Mr. Saeed, if you recall.

A Yes, I do. Yes.

Q And that -- that would come in as some post-petition financing, as sort of a funding to keep operations going, correct?

A That is correct, sir.

Q And is it the debtor's intent to request debtor possession financing through the bankruptcy court to get that through?

A That is the -- that is a request, yes, and it's been already approved to us because we want to continue paying our employees as much as, you know, we are behind on some of the suppliers. We definitely want to make sure that these houses still have food on the table.

Q And that's to cover ongoing payroll?
A That is -- and -- and electricity and utilities, of course, and any small procurement activities that we can support with an invoice that's backed up to generate some revenue to be able to sustain the business again.
Q You -- you did mention earlier guarantees of some of the debt and one of the loans, the SBA loan, you are a guarantor personally; is that correct?
A That is correct, sir.
Q And I -- I can ask Ms. Iqbal this question, but in the amended schedules that were filed, Ms. Iqbal was listed as a guarantor of the SBA loan and not you. Do you know why that -- that was listed that way?
A And -- and of course, basically the reason could be that it was at -- at a point she is a board member. So she was appointed a board member, and any board member can sign on behalf of the company. So at that particular point, Ms. Iqbal, you don't have to answer any questions right now it's not your deposition.
So again, we could just ask her again, but in reference to the board meeting minutes, you

probably saw that that's actually been logged as a resolved item. I have personally reached out to the SBA office.

I have emails to prove that I have asked them for loan forgiveness, and they've said, "Sorry, at this particular time, we are not in a position to forgive any loans. You have to make payments." So we are making the payments that we are required to do.

Q Who -- who is we?

A We as Swiftships.

Q Has the SBA made a demand -- demand upon you personally for the loan?

A No, sir, they have not. They have not. We have not deferred any exuberant amount of -- amount. We have been making payments as much as we can. Of course, if you don't pay, they actually add a loan percentage, which is standard practice.

Q And I believe Mr. Saeed explained that Patterson State Bank has a security interest in the Risen Sun and the Morgan City property, correct?

A Correct. And the reason for that was because we wanted to remove the forbearance. We wanted to buy out the forbearance amount from a specific, I guess, instrument from banking. From FMBC's

debacle, we had to buy that $23 million back from them. So they gave us the last 1.3 million or 1.5 million, I believe.

And that had to be secured by some asset, and of course, you know, Patterson State Bank is in Morgan City. They know the Risen Sun is a -- is a valued asset, and plus, Morgan City property is fully paid for. So those are the two assets that they encumbered.

And of course, they are now -- also receive the funds from the -- from the rent on the Texas property, which Mr. Saeed also mentioned. So that is the payment towards the loan, and we are not in default of that loan.

Q Did you guarantee that loan?

A All the members of the -- of the -- the -- the board, yes. Swiftships was myself and Jeff Leleux. Both were on the loan documents.

MR. SHELBY:

I don't think I have any further questions today. Thank you, Mr. Shah. Thank you.

THE WITNESS:

Appreciate it, Rick.

MR. LAMB:

Rick, this is Ryan Lamb. Do you mind if I ask some questions?

MR. SHELBY:

No, sir.

MR. LAMB:

Great. Thank you.

EXAMINATION BY MR. LAMB:

Q Mr. Shah, I believe Rick asked you -- confirmed that you were on the previous discussion with Mr. Omer Saeed?

A Yes, sir.

Q Is there anything that Mr. Saeed said in response to my questions that you would like to clarify or, otherwise, correct?

A Of course, the point that I mentioned in the beginning, the letter from the US Navy we just received two days ago, July 8th, and it is after six months of what NAVSEA responds back. The contracting officer just responded back after having to go back and forth and asking them to even have a meeting with us.

And the AIO's office, which is the integrity office of NAVSEA, has been also involved in trying to get back to the contracting officer to get some response for

them, but their response was merely two paragraphs, which Mr. Omer Saeed never mentioned, but I'm just going to state.

They said, "Thank you for allowing us to come inventory. Secondly, we're sorry we cannot pay any vendors. The contract is cancelled." So that's it. So that was the only point I wanted to add to what Mr. Omer Saeed couldn't clarify or couldn't provide the explanation.

Q Do you know who sent or who signed the letter that you're talking about that you received --

A Yes.

Q -- two days ago?

A Yeah. We will send it to Mr. Ryan Richmond. It's from the contracting officer, Ryan Ksanznak. Ksanznak was -- it's a very hard last name. But Mike Poel can actually provide. He's been in communication with Mr. Ksanznak, and he is a contracting officer who took over Scott Anderson as the branch head.

In my conversation with Mr. Scott Anderson two years ago, he had mentioned it to me very clearly. Here's a clean piece of paper. I'm not giving you anything. Sell all the material on your yard and get paid. Other than that,

we're not paying you anything. But they have not given us any documentation to state that fact.

And it's now three years that we've been waiting because nobody would touch the asset. And I can't get a license to ship the vessels to any country because it's government property -- considered government property.

Now, as you were referring to some of the values, Mr. Omer was very kind in stating $0.50 over a dollar. I wouldn't even call it $0.10 over a dollar, because this is how steel values today.

It's considered scrap because any time it's exposed to atmosphere, now you have to be -- you know them -- some scrap yards in the Morgan City, Louisiana, or in Lafayette will come in and give us whatever market value is, although the market value may be higher today than yesterday, as Mr. Saeed mentioned, material has gone up, which could be an advantage to us.

What we have done very well, Mr. Ryan, is we have preserved this material in Conex boxes in preserved warehouses just so inventory cannot be disturbed. Now, I cannot provide 100 percent

coverage on some of the metal plates. I can't, because, you know, I'm protecting the assets.

Now, if you come in, I've protected the hulls from bird -- you know, bird nests, birds, you know, just doing everything they can. So we've done everything because anybody who wants to come from the United States Navy, they're welcome because they're next door to our building.

US Navy's office is within Swiftships. They live in Swiftships. They know everything within the property, and we have not moved a single asset, just so we know that the government can come back and say, "Okay, we have not sold, we have not touched, we have not -- we keep inventory, every single item."

In fact, if there is a discrepancy in my report card, I call Mike because every week all management has to provide their weekly meetings or weekly agendas. And we've -- we watch them like hawks.

The material is a US government material, and we're waiting for the US government to give us some sort of leeway out of this and give us a form of letter saying, "Okay, pay the vendors

through this."
Q When you say "the material is US government material," what material are you referring to?
A So -- so material is in two forms: one completed and non-completed, which is consumable. When I say "material," I have Hulls 1701, 1702, 1703, 1704, 1705 that are still sitting in my shipyard, completed or partial.
Which means four massive ships are parked inside my bays with assets inside and materials inside, and then the consumables that are supposed to go in the -- in those are still sitting as open material, if that helps.
Q I'm -- I'm trying to understand the -- the -- we seem to be using terms that may have different meanings than we understand them to be. So --
A Okay.
Q -- if you could help me understand, and we'll kind of back up. What was -- what is your understanding of what the LCU 1700 contract was for?
A For assets for the US Navy and Marines. LCU is landing craft utility. We were contracted to design and build 32 LCU 1700s. That's the program name. 1700 is the class. Landing craft

is the type of craft. We -- were contracted for six -- I'm sorry, seven in the beginning.

Once we completed the design, they gave us a task order for five, then they extended it for additional two. That's total of seven. Then they extended it to 12. Why? Because the funding -- every year they would get money from the Congress. They would appropriate towards that particular program.

The reason why we're in this situation is NAVSEA decided to complete three boats with the funding of seven because they were increasing their ceiling every time, and we were not smart enough to go and claim them.

So we kept building as good Samaritans, then the US Navy will come back and give us. Now we have four completed hulls -- four completed hulls that have materials that -- we just refer to them as "materials." They're inside of it. $111 million was awarded towards these programs in which 30 percent is labor, 70 percent is material.

Now, in the 30 percent, we still have a claim against US Navy, but they have not paid for two years of labor, which is in close

proximity of, let's say, 11 million and some dollars. And we kept the yard open. Those people were still there just so if the US Navy decides to change.

The material that Omer Saeed mentions on $16.9 million, that's consumable. That is O-rings. You are talking about specific components that go in the fitting of the pipes. This is copper-nickel that we're talking about.

So that is the material that still -- and -- and the plates. You know, certain type of plates are cut. Certain angles are cut. They were never put into the vessel. Engines that are still sitting in the bay covered in tarp, obviously.

And these are assets that the government is very interested in coming and picking them up, but they can't just have one and not the other. The -- we have asked them we need to have a final decision on what is the -- what is the shipyard able to sell and whether -- and what does the US Navy wants. They will not give us a definitive answer.

Of course, Ryan, you know this that if they come and say, "I will take Hull 1, 2, 3, 4, and

move it out," I have to charge them a disposition fee; is that correct? I mean, I've been parking these things for almost three and a half years in my shipyard, and of course, they won't give us an answer for that either.

So nobody knows what to do with these vessels. And if I remove them and sell them, I'm committing a crime because it's government property.

Q So you mentioned four completed LCU 1700 ships that have -- you mentioned -- you said, have materials in them. When you say "materials in these four completed vessels," do you mean inventory that is part of the approximate 16.9 million of inventory that the debtor asserts is debtor property, or is that what you're calling "material" in these four completed ships something else?

A Materials in the four ships, completely different. What you're calling 16.9 is what is out, and you can see and pick one by one, and it will collect 16.9 million market value.

Q Okay.

A It is -- it's --

Q Go ahead.

A If I may, I can show you a picture of what we call a hull versus what a material is. And I'm -- I'm not sure if that's the right way of describing. You could see these absolute giants sitting inside constructed by nothing. We don't know what to do with them.
Q I think it may be helpful to have pictures, and certainly I will -- Ryan will -- Ryan Richmond will talk about that.
A Absolutely. We will send you an entire deck.
Q Wonderful. You also mentioned $11 million claim for labor costs against the Navy. Can you expand on that?
A So this is labor that is expanded with -- when the government came in and did a stop work. Stop work means, okay, stop work, but stop doesn't mean that I let -- fire all the people. I mean the contracting services, the CATS, LLC that you see as a claim, these are contractors that were on our site. We still have to maintain level of effort.
Again, when they said stop work, we were continuing to make schedule to be able to get to where the next level is, and that's unpaid labor that we have not been paid by the US Navy.

There's stop work and termination.
Q How did you generate the $11 million figure?
A That's over two years of unpaid labor from stop work to termination of the contract.
Q Okay. What actions has Swiftships taken in regards to this $11 million claim?
A In regards to 11 million, that's part of our claim to the US Navy, which was denied by the low court or lower courts or claim court. And then we entered into a plea bargain with the US Navy through AIO's office, which is the integrity office, saying that we will not file any more claims and we will go back to US Navy to have these discussions.

We can have a Kumbaya and get into a feel-good. But again, Mr. Ksanznak is not -- has not done any part or helped in any shape -- any shape or form to Swiftships' claims of even paying the supplier. Forget about Swiftships' own labor claims.

So a claim is a claim. It's my claim versus the US Navy, and the US Navy might say, "I don't owe anybody anything. The contract's cancelled."
Q So the formal -- the pursuit of this $11 million

claim was associated with the Court of Federal Claims action, or is that --
A So we --
Q -- separate?
A So we -- if -- if Ryan -- we can provide Ryan the first initial legal suit against the US government, United States of America versus Swiftships, which was wrong. DOJ contacted us and said, "Sorry, this is not the claim that we will -- you know, you need to go back to the NAVSEA -- NAVSEA."
Then instructed us that you have to go to a federal claims court. So we didn't apply, or we -- then went back, and we filed the claim. After almost 12 months, Claims Court came back and said motion -- or the case was denied. The -- the government had already settled with Swiftships on the payment.
Again, as Rick just mentioned, that we could resurface that claim again, but we're going against giant in this particular case, NAVSEA, which is one of the only customers that Swiftships has.
Q So the Court of Federal Claims denied the relief you were requesting on the --

A That is correct.
Q -- $11 million claim?
A In part of the -- the 150 million claim -- $150 million claim, 11 million was a significant amount for the labor, yes. And we can -- Mike can elaborate more on that claim as well because he's been the one directing with the legal term -- teams also.
Q So just so I'm understanding just the process here and -- and maybe insight into your thinking. The federal claim -- the Court of Federal Claims denied, among, I guess, a couple of other things that you included in your petition, the $11 million claim for lost wages and --
A And the loss of business. Yeah.
Q Okay. You're -- you're -- you're currently asserting that despite that, there's still a potential $11 million claim against the United States Navy?
A Oh, there's a bigger claim than -- I mean, you're not just talking labor. You're talking material that the shipyard has -- they have not paid for it. Because remember, in the last 60 to 90 days, the material that we got shipped

never got paid by US Navy from the supplier. That was already given 50 percent in advance by the US government.

NAVSEA paid 50 percent for these suppliers to supply the material. When the material showed up, it was inventory, and then they would release the rest of the money. Just a standard practice across the world.

But in some cases, they had to pay 100 percent. To fix the price of buying a bulk, for example, in this case, I always go back to my classic 3D group, who was paid 4.8 million or close to even $5 million in advance, and they have not submitted one single piece of artifact until today because they were the painters. When the hull is not even produced, why would you paint the vessel?

So they just locked the price, the government paid them 100 percent. And we have written to them internally through our legal team, and they say, "Please give us a piece of paper from the US Navy. This money is -- is -- and we will transfer the money." That's how simple it is.

They have already responded to us through

the legal team, right? So -- and that said, in -- in that gamut of things, there are some suppliers that were only paid 50 percent and some suppliers were paid 100 percent, which never delivered any material, and they still have them in the stock.

And of course they're charging stock fee, and, you know, when you should cancel the -- we have sent them all termination of purchase orders. Every single one of them. That's part of the process of completing a program.

So now we're just waiting for some sort of guidance from the US Navy on what to do with these suppliers' payments, who are -- who actually have money in their accounts transferred by the US government into their business account, and there's a transaction notification available for the -- for the court. If that helps.

Q That -- I'm -- it does. Thank you.

The LCU 1700 contract was terminated in February of 2024, correct?

A I don't recall the exact date, but yes, in -- in that time frame.

Q Okay. But you can confirm that you understand

that it was terminated?
A Of course it was.
Q What's your understanding of what it means to have a contract terminated? That -- that specific contract.
A Very bad. Why -- why was the contract terminated? And of course this was stated in our lawsuit, which is a -- which we can provide for your understanding of not meeting a certain schedule -- a certain schedule of a vessel that you have been commanding to change the design, which keeps changing.

How can you complete the vessel when you haven't finished the design yet? And you keep modifying the pipe which is installed, and we have to recut to install again. So it was the program executive office who is absolutely to be blamed.

The underpinning authority within the US Navy was challenged even by the program executive office himself, the admiral. And he was -- he referred to everybody signing an NDA with NAVSEA's contracting office branch, which, by the way, Swiftships Gulf Coast lives in our shipyard to manage the program activity.

And unfortunately, because the admiral wanted to get the program to Austal, who still has not delivered one actual boat. They have done testing, but they have not delivered yet. This is online as well.

Of -- of course, we are still trying to figure out what happened and why such a turn. You could have actually picked two suppliers. You would have actually gotten two contractors to build more vessels. But again, Swiftships couldn't deliver, and we were 31 days late -- 31 days late in delivering a program. First boat to be launched in 31 days.

Q So that -- that's helpful. Let me -- let me kind of rephrase the question a little bit. What -- what do you understand the effect on Swiftships was when the contract was terminated?

A Ryan, it's like having a divorce, and everybody announces that divorce amongst friends. Guess what? Nobody's going to talk to you if they're related to the other party. This is what happens in this industry.

In fact, signing a contract with Hanwha Defense -- sitting Hanwha Defense in my shipyard, they found out that we have -- that US

Navy has canceled our contract, they walked out. They came -- 23 people came from South Korea to buy Risen Sun. Poof, July of 24th last year.
Q What -- what obligations does Swiftships still have to the now-terminated contract?
A Obligation-wise, none.
Q What obligations does the United States Navy have to Swiftships to do --
A What obligation does United States Navy --
Q -- contracts -- contracts in Europe, in your understanding?
A What obligations United States Navy has? I'm sorry. Repeat that.
Q What -- in your view -- in your understanding, what obligations does the United States Navy have to Swiftships in regards to the now-terminated contract?
A Pay the suppliers. They were CDA accounts managed by United States government, and under the contract itself, they were the paymaster, not Swiftships.
And by the way, just a small note. In that same contract it states that the US Navy will not authorize Swiftships to pay a single penny to any supplier because it will never get

reimbursed.

They instructed the bank -- they instructed the bank's teller department of what amount through a US government portal. Each amount was approved based on the amount that has to be scheduled for milestones to be met. This is a -- this is a pure math game. If we met a milestone, they had to pay.

Why? Because we get paid our overhead fee, labor, and our profit from that percentage. So if I completed 19 percent, I'm not going to get 100 and a half or $5 million. I'm only going to get what material I've installed or burned, as we call it, because we're welding, burned in that ship.

If we met the milestone, we get paid. That's how construction works. So we're not getting profusely unlike millions of dollars. We're getting just for the labor, 12 percent on top. That's it. And of course our overheads --

Q I'm sorry?

A And of course our overheads, which were baked into the -- into the price itself. So every dollar was $1.52, 150 times -- multiplied by a dollar.

Q You had mentioned earlier a project that Swiftships is currently working on called Hull 649?
A Yes, sir.
Q And you stated that you estimated it was approximately 65 percent completed?
A It has been completed for the longest time. We've kept this hull in our shipyard. So it would be the sister ship. And if you were to ever Google, and you can just write down N-O-M-A-D, Nomad is a US Navy USV. It's the sister ship of that boat.
Q And that -- who was -- who's -- who was that ship built for? Who was --
A Nomad was converted -- see these are commercial vessels that are converted for the US Navy. So 649 is the same size, same boat sold to a commercial supplier, who then sold it to the US Navy to be converted as a USV, and we are in possession of that.
Q I'm -- I'm just -- I'm a little confused. Hull 649, is that -- did Swiftships build Hull 649 on spec, or did Swiftships contract with an entity to build Hull 649?
A Swiftships does not contract with any entity.

It's our design. It's built on spec. We built that vessel as a sister ship for a company named Rodi Marine. Rodi Marine went bankrupt. They only bought one and didn't want to buy the other -- the boat.

So we literally completed the vessel and bought it ourselves. Like as in, you know, hey, I'm -- I'm going to complete it myself. We never completed it. It's been an asset of Swiftships since 2021 or even longer.

Q Okay. And -- and Swiftships is -- it would be fair to say Swiftships would refer to itself as a shipbuilder?

A Of course. Absolutely. And a repair facility.

Q Okay. And so Hull 649 would be considered a work in progress?

A 100 percent. As I mentioned, it needs engines and -- and machinery and electronics, and that's it. The hull is completed. All the piping is done.

Q And it -- it's essentially being held for sale pending completion to a willing buyer?

A 100 percent. Yes, sir.

Q Is -- where in debtor's assets and schedules would this ship show up as?

A It's a work in progress. It's in our -- it's in our financials as well, I'm sure. Omer can provide the guidance on that.
Q Would it be referred to as Hull 649, or is there some other identifier?
A Absolutely. Yeah. Absolutely, Hull 649. Everything in the shipyard is a hull. Risen Sun would be Hull 624 if you want to ever look at that.
Q And I'd like to -- to kind of get to the -- the -- the Risen --
A The Risen Sun.
Q -- Risen Sun. What -- what was the -- the Risen Sun -- well, first of all, did Swiftships build the Risen Sun?
A Yes, sir, we did.
Q Who was it built for?
A So it was built for Y&S Marine and funded by a bank called FMBC. And Y&S Marine lost the contract that it was actually going after for Chevron in 2017. And FMBC asked us to buy the hull as -- and complete it, and that would be funded. And of course, FMBC went under. I'm not sure what year they went under. 2018 or -- or not.

And then we completed the hull, and we've been -- we've had it since 2018 as a brand new hull. We have not sold it. We have not given it to anybody. We have not put any man-hours except for testing of 200 hours. Still brand new. It has still the smell of a brand-new vessel.
Q So, Swiftships has been holding the Risen Sun vessel for --
A Eight years.
Q -- for eight years?
A Yes.
Q What -- can you explain the -- and describe the types of marketing activities for this vessel, --
A Of course.
Q -- the Risen Sun, -- that you've engaged in? As well as Swiftships has engaged in?
A So Risen Sun is a military conversion aspect, which means anybody who wants to have a fast converted vessel available ASAP with the capability of unmanned, Risen Sun is 100 percent match for that. Because it has the technology already to be converted in less than a million dollars versus building a brand new boat and

spending almost close to $36 million.
An actual boat of that size is now in the market for $30-plus million, just construction. And it takes 28 to 30 months to construct a 60-meter vessel of that size.
Q So what actions has Swiftships taken to market this asset? Because --
A We -- as I described earlier, we've had two sales that were rejected based on our experience with the US Navy debarring us from SAM.gov, which is a portal where large contractors usually go to actually contract you to check whether you are still in good status with the US government or not. What -- that status has been cleared by AIO's office.
Hanwha Defense, Lockheed both wanted to buy those vessels, couldn't. Shield AI had a contract for US Marine Corps, couldn't. We submitted that proposal to the US Navy. We couldn't sell it to the US Navy because of being debarred last minute with the best price, but guess what? We're debarred by the US Navy, and all of this is because we sued the US Navy. Direct quote from the client.
Q Is it -- is Swiftships work on the Risen Sun

incomplete based on your previous statement that Swiftships anticipates, or you anticipate or expect, that the ship could be made available for a purchaser for less than $1 million?
A I would not even give it to anybody for one million. I've not given it to anybody for $5 million.
Q I'm sorry. Let me rephrase.
You stated earlier that there is a -- there is interest in the market for a ship like the Risen Sun, correct?
A (Inaudible response).
Q Would a -- what would be required to make that vessel seaworthy or otherwise useful for a purchaser?
A It is absolutely seaworthy. You could turn the engines on tomorrow. They're brand new. We just need a buyer, and we have not found a buyer. Which -- again, because the news travels very fast in the Louisiana sector that there's a problem in the company, financially this -- partners have -- you know, news, right?
So everybody just walks away from this asset. Now, there have been instances where Sheriff’s sales -- Sheriff’s sale was denounced

to be, I think, seven million as a minimum amount before they even were allowed to bid.

You know, everybody's taken a strike at it. Like, I'll give you a million dollars. I'll give you $2 million. The asset is worth seven million minimum if you were to build or sell it just as is.

Because again, this is a 2017 build, but it meets the requirements of the tier emission. And it has a DP2 system, which again, is a boat business. It's a very, very big thing. So seven million is minimum of the share of sale required for the -- the bidders to bid at. Nobody had -- had put that value on.

Q Is it a Louisiana-titled and numbered vessel?

A Yes, sir. It is by Coast Guard.

Q I'm sorry, by Louisiana State?

A Coast Guard has -- this is a Coast Guard vessel -- a certified or registered with Coast Guard by Louisiana -- I guess, registered in Louisiana.

Q Registered in Louisiana. Okay. I just have a couple other questions. I'd like to kind of switch gears and discuss the SBA issue. I'm going to share a document on my screen. You're able to see documents on your screen if I do



26-50237 - #147-3 File 10/09/26 Enter 10/09/26 15:30:11 Ex. 2 2004 Exam Transcript Pg 215 of 250

that?
A Absolutely.
Q Great. You see this document?
A Yes. Yeah, let me --
MR. LAMB:
I believe this would be Exhibit 9; is that correct?
THE WITNESS:
That is correct.
MADAM COURT REPORTER:
We have -- this is the SBA. It's already attached as --
MR. LAMB:
Oh, it is?
MADAM COURT REPORTER:
Yeah.
MR. LAMB:
Oh, it's Exhibit 7, isn't it?
MR. SHELBY:
It's -- yeah.
MR. LAMB:
Yeah. Okay.
MADAM COURT REPORTER:
Yes, sir.
MR. LAMB:

Sorry about that.
BY MR. LAMB:
Q So this is Exhibit 7. This was identified as Annex 20 to the responses to the committee's 2004 document production request. Do you recognize this document, Mr. Shah?
A I have seen many documents. I'm sorry, I don't recognize this particular one.
Q Okay. Let me -- let me scroll down a little bit. This is titled The Loan Authorization and Agreement with the US Small Business Administration.
A Sure.
Q I can repeat. The document I'm showing you on the screen as Exhibit 7 is entitled The Loan Authorization and Agreement with the US Small Business Administration. It is signed 3/1 of 2022. I'm on page 7. Can you see --
A Yes, I see that.
Q You can see this? Is this your signature?
A It is a signature. Yes, that is mine.
Q Okay. Can you describe what the purpose of this loan was for?
A For helping us get through the hard times, and this is an SBA loan that we were reached -- we

reached out to SBA, and they said you can apply for relief through this loan, and that's what we were able to get.
Q Okay. And this loan -- SBA required a guarantor to guarantee the performance of this loan. And I'm -- I'm scrolling through it. Do you recognize this portion of the -- of the agreement? It's entitled US Small Business Administration Security Agreement Borrower Swiftships, LLC, dated 3/1/2022. Do you recognize this document?
A DocuSign. Yeah, I mean, these -- we signed a lot of loan documents. Of course, this is part of that package.
Q Okay. So --
A That is signed by me through DocuSign.
Q That is signed by you. Okay. So this would -- this -- I believe Mr. Shelby had referred to earlier as the guarantee for the Small Business Administration loan.
A Sure.
Q And this is what I'm showing you. Do you agree with that?
A Absolutely, sir.
Q Okay. And -- and your -- your signature is on

this document?
A Through DocuSign. That is correct.
Q Okay.
MR. SHELBY:
Mr. Lamb, this is Rick Shelby. I don't mean to interrupt, but the guarantee is actually at the very end of the document. So if you scroll all the way down.
MR. LAMB:
Did I not go far enough?
Unconditional guarantee. I'm sorry.
BY MR. LAMB:
Q Mr. Shah, I'm going to ask you the same questions. This is on page 2020 -- 22 of Exhibit 7. This portion of the document is entitled "Unconditional Guarantee." Do you recognize this document?
A Like I said, I've reviewed just the DocuSign package that was sent to me for signing. So I'm sure this is part of what the team had already looked through, and that's Ms. Sadia Iqbal, who usually gets into these types of -- as a treasure. But I do see that that's my signature, and I've the approval for it.
Q Okay. You see -- you confirm that this is your

signature on page 25?
A Yes, sir, I do. Absolutely.
MR. LAMB:
Okay. Okay. I -- I don't have any other questions at this time. Mr. Shah, thank you for your time.
THE WITNESS:
Sure.
MR. LAMB:
And --
THE WITNESS:
Thank you for your --
MR. LAMB:
Great. Thank you.
MADAM COURT REPORTER:
Okay. Mr. Shelby, are you ready to move on to your next witness?
MR. SHELBY:
Yeah, I believe so. I think we can keep going.
MADAM COURT REPORTER:
Okay. And --
THE WITNESS:
Thank you, Rich.
MADAM COURT REPORTER:

-- who would you like to move on to -- who would you like for your next witness? You want to go to Michael or --

MR. SHELBY:

I think we can -- yeah. We can go to Michael Poel.

MADAM COURT REPORTER:

Okay. Michael, are you with us and ready to go?

THE WITNESS:

I have to take myself off mute. Yes, I am.

MADAM COURT REPORTER:

Okay. Will you raise your right hand for me, please, sir?

MICHAEL POEL

after having been first duly sworn by the Certified Court Reporter, did testify as follows:

MADAM COURT REPORTER:

Thank you, sir.

Counsel, you may proceed whenever you're ready.

MR. SHELBY:

Thank you.

EXAMINATION BY MR. SHELBY:

Q Good afternoon, Mr. Poel.
A Good afternoon.
Q My name is Rick Shelby. I represent the Creditors Committee. I believe you've been present during the testimony here today; is that correct?
A Yes.
Q So I -- I think we've covered a lot of ground. I'm going to ask you the same question that I asked Mr. Shah. Well, first off, are you an employee of the debtor?
A I am -- I'm a direct employee of Sunrays. I was assigned as the CEO and president of Swiftships based on a requested reorganization of the company through the NAVSEA AIO office, and that happened last February 2025.
Q So you've heard the testimony today. Is there anything that, in your position as president, that you think needs to be clarified from your understanding of the testimony on any of those topics?
A Based on all of the information provided so far, and it's an awful lot at this point, I can't recall anything specific at this moment that I would correct.

Q I only have a few questions. Some of it is related to what Mr. Lamb was just asking about the LCU program.
A Okay.
Q And I believe Mr. Shah suggested that you've been sort of leading up the legal battle or communications with respect to the termination and possible negotiation with the Navy; is that correct?
A I've been involved not in -- in every single way, but largely involved in coordination with the lawyers, and at certain aspects, I may not -- I may not have direct information about every single aspect of the legal case.
Q And -- and who's been handling the legal case for the debtor? What law firm?
A At the time that the filing was made in the federal claims court, it was made by Faisal Gill. I can't think of the exact name of the firm that Faisal owns -- but it was his firm.
Q And as was mentioned earlier, that -- that claim was denied in the Court of Claims, correct?
A Correct.
Q And then Mr. Shah suggested that there was some type of plea bargain, or I believe he -- he used

the term plea bargain, with respect to going back to the navy. Is that your understanding of where this stands right now?
A I wouldn't use -- I wouldn't personally use the term plea bargain. That may have a different definition. I think we've been engaged, as Mr. Shah was representing with NAVSEA representatives, primarily Ryan Ksanznak, who is the LCU -- sub -- current LCU 1700 contracting officer.
And we have -- since the time of the dismissal, through a very slow iterative process, attempted to clarify our next steps with NAVSEA on how we could potentially come to an arrangement or an agreement on some -- some decisions that could be made that could be helpful maybe to both parties.
Q And that has to do with the inventory that's on site; is that correct?
A It has to do with both the inventory on site and prepayment recovery and payments still not made by NAVSEA during the duration of the program. So there's kind of three separate categories. I think this was explained by Mr. Saeed.
Q So there is still some discussion ongoing

regarding the overall claim related to the LCU program; is that correct?

A I guess we would look at it that way. It's kind of a long storyline as a -- since the middle of last year, when the federal claims court dismissal occurred. There was a lot of inactivity in terms of communication, and then there was some iterative, I don't know, communications between us and NAVSEA representatives, namely Ryan Ksanznak.

And then we eventually, after some -- some dialogue in the later part of 2025, sent the letter that has been referenced already on January 23, 2026. We did not hear anything back for quite a long time. It was my role to continue to pursue a response.

Eventually, I did get a phone call. There was some discussion about continuing reviews by NAVSEA based on our Chapter 11 filing. There was another period of time where there was no communication. I had additional follow-up. There was a period where -- there was a point where there was going to be a communication that just didn't come.

And then, as was already described, we

received a communication two days ago from Ryan Ksanznak with this two-paragraph, one-page response. A little bit confusing. I would say that there has to be continuing -- there -- there will be continuing interaction with NAVSEA based on that letter. So I guess you would -- you could make the conclusion that there will be continuing dialogue or interaction between us and NAVSEA.

Q And in your opinion, with the materials that are in the possession of Swiftships on the property in Morgan City, is that value related to that? I'm not trying to pin you to a number, but --

A I think -- I -- I think Omer Saeed has described that value in both his testimony and some of the documentation. Is there something further that you were looking for? I'm sorry, I shouldn't ask you questions. I'm sorry.

Q Yeah -- no. I -- my -- I'll clarify the question. You're right. He -- my understanding is he put a number on it of $0.50 on the dollar but was optimistic, or that was optimistic, is my understanding of his testimony. Do you agree with that?

A Yes. I -- I recall that input, and I think Mr.

Shah commented that it would maybe be much less than that. I think there's been a -- you know, somewhat of a consequential duration from the time that the contract was concluded and the inventory has been sitting in -- in a -- in a certain state of -- of -- of -- you know, in Connexes and in warehouse and so on, along with the hulls that Mr. Shah mentioned.

Yeah, of course, as you would know, material in certain cases, if it's stored in certain ways, can degrade a little bit. It also ages out in terms of parts and models. And so, it's hard for us to know where, you know, the -- the certain amount -- percentage amount might be versus maybe a purchase value of that material. So I couldn't give you a definitive answer other than what you already heard.

Q You'd agree that time is of the essence to do something with this inventory if there will be value?

A I certainly think that time has always been of the essence to do something with the inventory, but it's not under our control. It's strictly under the control of NAVSEA.

Q Moving on to this Hull 649, that is a partially

completed hull sitting on the property in Morgan City; is that -- is that correct?
A That is correct.
Q And there have been some efforts to market that, but there is work to be done to get it in a position where it would be seaworthy; is that accurate?
A Because it's a partially constructed hull and it has certain systems installed, and it -- it is not a seaworthy vessel because it couldn't operate in a normal, fully built condition.
As I think Mr. Shah referenced, you know, we would have to engage with a -- an interested party. There would be some requirements based on the assessment of the current hull -- you know, hull in construction state and the systems, and then there would be an engineering process to determine what they wanted it built to.
And that process would be a production process to bring it up to a fully built state. So, you know, I'm just -- it's a long-winded way of saying it's not seaworthy at the moment because there's a lot to do from where it's at currently today to where it would be to be

seaworthy and operational.
Q So let's say -- well, let me ask this: Would the idea be that you would find a purchaser that would purchase it in its current state and then pay Swiftships to complete the work? Was that one idea, I guess?
A That is possible.
Q And then another idea would be Swiftships would have to come up with some amount of money to complete the vessel itself and then market a completed vessel; is that correct?
A That's also possible if the funding was available. Yes.
Q The Risen Sun -- are you involved in the marketing of the Risen Sun currently with the broker?
A I am not.
Q That's Mrs. -- Ms. Iqbal; is that correct?
A Yes, Mrs. Iqbal and I -- Yes.
Q Okay. And then one further set of questions related to Mr. Jeff Leleux. Do you know who that is?
A I do.
Q Have you been handling some of the back and forth with the legal team related to his

departure from the company?
A Some parts of it.
Q And I believe Mr. Shah wasn't sure, but when I mentioned Kings & Jurgens has been handling that -- or demand; is that correct?
A Yes. There has been some more recent, what I'll call, formal interaction between lawyers representing Mr. Leleux and the firm Kings & Jurgens representing us.
Q And do you know who's representing Mr. Leleux?
A I don't recall the name off the top. We could -- we can look for that information and provide it to Mr. Richmond.
MR. SHELBY:
Okay. That was my next question. I don't think I have any further questions for you, Mr. Poel. Thank you.
THE WITNESS:
Okay. Thank you.
MR. SHELBY:
Okay.
MR. LAMB:
Rick, do you mind if I ask him some questions?
MR. SHELBY:

(No verbal response.)
EXAMINATION BY MR. LAMB:
Q Mr. Poel -- is it Poel?
A Poel like a swimming pool.
Q A swimming pool. You've -- you've been observing the -- the previous conversations.
A Yes.
Q I -- you just mentioned something to -- to Rick, and in his time is of the essence question regarding the sense of urgency to sell inventory or stock as soon as possible.
Were you referring to -- and -- and this was in -- I think, in relation to the LCU 1700 program. Were you referring to what is -- what Mr. Saeed classified as inventory that -- that is owned by the debtor that is debtor's property?
A Okay. So if the inventory was allowed to be sold, this would be a decision that would have to be made by NAVSEA. Then selling it at a level of urgency would be applicable. That decision cannot be made by Swiftships if that answers your question.
Q That -- that -- that's kind of what I'm trying to get at. The -- the estimated value of 16.9

million, that is inventory. That's, I guess, my understanding from -- from Mr. -- Mr. Shah's testimony was that it's not installed on any of the hulls. It's sitting in a warehouse still.
A There are -- the majority of it is sitting in the warehouse. There might be some pieces out in the yard, you know, in an uncovered state because that's the way that inventory is able to be maintained. And I think he also made that point.
Q But -- but it's not attached to any of the 12 hulls?
A As far as I understand it, I don't believe any of that amount that it was referenced is attached to the current hulls that are in a partially built state. And I think that -- yeah.
Q Okay. Okay. That -- that's helpful. You -- you're stating, as I understand it, that Swiftships is unable to market that inventory because NAVSEA has some type of hold on Swiftships' ability to do that?
A As far as we understand it, and in -- in engagements with NAVSEA, they have -- through their office, NAVSEA contracting -- LCU 1700



26-50237 - #147-3 File 10/09/26 Enter 10/09/26 15:30:11 Ex. 2 2004 Exam Transcript Pg 232 of 250

contracting office and the NAVSEA AIO office, they have an interest and have stated this in -- verbally and in writing, and -- and -- and again in most recently, in this letter received two days ago that they are -- they will be sending some representatives, apparently, down to our Morgan City yard to look at the inventory, make some determinations of what they -- you know, maybe they want to have some turned over to them. We don't know. There's been some limited references in a very confusing way. That's all we know at this point.
Q The LCU 1700 program. Was Swiftships provided prebuilt hulls and was -- and -- and contracted to complete those hulls and then -- and make them seaworthy, or did --
A No.
Q -- Swiftships built the hulls themselves?
A I'm sorry to cut you off there. No, we were not provided prebuilt hulls. As Mr. Shah represented, this was a design-build contract. So there was a design phase that preceded any construction of the hulls, and then -- and then -- and -- and he did reference that there was a very, very convoluted, confusing design period.

It's a very, very long story.
That's -- but having said that, once there was a certain state of the design, there was a push by NAVSEA to start constructing the hulls. The design was still not in a completed state, which is not ideal for any construction, whether it's a vessel or a building or anything else.
So -- yeah, we would -- we did not have any pre-built hulls. We were building the hulls on our own based on the design that was created.
Q Okay. Okay. And what you're saying is -- is that 4 of these 12 hulls are completed?
A I'm saying -- well, I think the way to state it would be four of the hulls are structurally hull-completed. That does not mean that those vessels are prepared to be put in the water.
There were certain -- the hull structure itself, which is steel plate and so on, was -- was built, and there were certain components based on the level of design that had been clarified and was still in a confused state at that point were installed.
And so, they're not a completed vessel, but they're a completed structural hull with certain components installed.

MR. LAMB:
Okay. I don't -- I don't have any other questions, Rick.
Mr. Poel, thank you very much for making yourself available and for your time today.
THE WITNESS:
Thank you.
MR. SHELBY:
Can we take ten and then finish up with Ms. Iqbal? Is that okay with everybody?
MADAM COURT REPORTER:
Yes, sir.
MR. LAMB:
Good for me.
MADAM COURT REPORTER:
I'll take --
MR. RICHMOND:
Yeah, that's fine with me.
MADAM COURT REPORTER:
-- I'll take us off the record at 3:12.
(OFF-THE-RECORD)
(WHEREUPON, A BRIEF RECESS WAS TAKEN AT 3:12 P.M.)
MADAM COURT REPORTER:
I'll go ahead and put us back on the

record at 3:26 p.m.

SADIA IQBAL

after having been first duly sworn by the Certified Court Reporter, did testify as follows:

MADAM COURT REPORTER:

Thank you.

Counsel, you may proceed whenever you're ready.

MR. SHELBY:

All right. Thank you.

(ON-THE-RECORD)

(WHEREUPON, THE 2004 EXAMINATION RESUMED AT 3:26 P.M.)

EXAMINATION BY MR. SHELBY:

Q Good afternoon, Ms. -- Ms. Iqbal; is that correct?
A Yes. Good afternoon.
Q Can you just please state your name for the record?
A Yes. That's Sadia Iqbal.
Q And same question I've asked of the other witnesses. Are you an employee of the debtor?
A I am not. I am a direct employee of Sunrays International, LLC.
Q And you're identified as the treasurer?

A Yes, sir.
Q Is that your official title with Sunrays, or do you play that role with the debtor as well?
A Both.
Q Okay. So you would be an officer of the debtor; is that accurate?
A Yes. Yes.
Q You've been present the whole time today, which I appreciate your patience. Is there anything, before I get started with my questions, that you felt like in your role you needed to clarify that you've heard to this point?
A Yes. So I wanted to clarify the -- loan. Some of the questions that you were asking. So I'm not personally a guarantor on the loan, but my house was actually used as collateral for the loan. So -- so it wasn't the boat that we used as collateral. It was my property, which is what helped us get that loan for Swiftships.
Q Understood. And that's helpful. And you just said, "it wasn't the boat." You were referring to the Risen Sun?
A Yes, sir. Because there was some confusion on whether it was the -- you know, the assets of Swiftships that were used to obtain that loan.

But they actually used my property because it's a fully paid-off property to approve that loan for us. So on the loan agreement, you'll see my home address under the collateral.
Q Now, did you pledge your property on any other loans of Swiftships?
A No.
Q And I asked this question of Mr. Shah earlier, and I think he referred to you on the security agreement documentation with the SBA loan. Are you aware of any security interest granted by the debtor to the SBA in the Risen Sun vessel?
A Sorry, I don't understand. Can you clarify the question?
Q Sure. The Risen Sun is a completed vessel, a flagged coast guard vessel, correct?
A Uh-huh. Uh-huh.
Q Did the debtor pledge the completed vessel as collateral for the SBA loan?
A No.
Q And I think you have been the one referred to or appointed to -- to answer questions about the marketing of the Risen --
A Yes, sir. Yes.
Q Can you just briefly tell me your role in that?

A Yes. So I have been engaged with Mark Felterman, Felterman & Associates, back when the vessel had gotten seized to try and sell this vessel. As you know, it was up for short sale with Saint Mary Parish. So we were trying to sell the vessel for, you know, at least the appraised price commercially, as Mr. Shah had mentioned.

So he has been -- he has listed the boat for several months now, and we actually do have an interested party, as Mr. Shah mentioned with this Nigerian company. Currently, we haven't been able to move forward with them because we are waiting on a renewed certificate of documentation on the vessel.

So because of the government shutdown, there's been delay in processing from the Naval Coast Guard on that certificate. Once we get that, which hopefully should be very soon, I'm going to work with the broker to see if we can -- you know, if they're hopefully still interested, we can move along in the process because we're doing everything we can, and we would really like to sell this vessel as soon as possible so that we can pay PSB and we can pay,

you know, the vendors off as well.
Q And it wasn't clear to me from Mr. Shah's testimony earlier, the -- the circumstances related to the interested party in Nigeria. I think at one point he suggested that it was going to be a very long process to complete; is that --
A So from -- from my communication with Mark Felterman, they -- it was a long process. They've been interested for quite some time now. They were working at their end to get their bank to approve a loan to them for the full eight million, which is what they had agreed upon with us. And I have an offer in an email from them for $8 million.

So I believe in April or May they got the approval, but they will not move forward or work with us until they see that renewed certificate of documentation for Risen Sun since it was expired.
Q Okay. And I think you just testified that hopefully that will occur in the near future.
A Yes. We were -- we've been working directly with the Coast Guard, and, you know, they had some questions back and forth. So we've moved

along in the queue for them -- for their processing. So hopefully it will be maybe within the next week. I'm hoping that we can have the renewed certificate.
Q I'm assuming any interested party would want the same certificate, right?
A Absolutely. Yeah.
Q Has there been any deadline discussed with Felterman on completion of a vessel sale?
A Yes. We've -- we've given many deadlines, but unfortunately the offers that we've received from interested parties have been well below even, you know, the five million that Saint Mary was going to start off at auctioning.

So just recently he told me that an interested party was offering 1.5 million. So that would not even cover the mortgage that we owe to Patterson State Bank. So he was like, "I know that this is just not -- it's too low."

So, you know, I gave him a deadline of a few weeks before we entered this Chapter 11. We were trying our best to sell the vessel so that we could pay the vendors before the March sale date of the vessel.

So I had given him a deadline before March

to try and get the vessel sold. Unfortunately, we just ran into a little bit of a hiccup with the certificate of documentation. So I'm hoping, and I'm -- I'm -- we're doing all the follow-up that we can. You know, there's -- we -- we tried to get it expedited, you know, we're -- we're trying our best.
Q Okay. Is there -- I guess, following up on the deadline question, is there a universe in which Felterman would decide to do an auction of the vessel, or do you know?
A Well -- no. Not that I know of.
Q But in your discussions with the broker, anything less than maybe five million at this point in time is non-negotiable; is that his position?
A Yes.
Q The only truly interested party that you're having discussions with is this Nigerian group; is that correct?
A Yes. Yes, sir. There was one more party where the boat is housed in Seacraft Shipyard. I've also been working with the owner, Glenn, who also has been helping market the boat and try to look for interested parties.

So there was one other interested party at 7.5 million or something, but even that did not pan out. So right -- as of now, it's just the Nigerian company.
Q Okay. And you -- just to clarify, you're not sure of the timing even once the certification is complete on when the Nigerian company will be able to act, or do you know?
A No, sir. They won't speak with us until we are able to provide the certificate of documentation.
MR. SHELBY:
I don't think I have any other questions for you, Ms. Iqbal.
THE WITNESS:
Okay.
MR. SHELBY:
Thank you.
THE WITNESS:
Thank you.
EXAMINATION BY MR. LAMB:
Q Hi, Ms. Iqbal. I just have a couple of -- of questions for you. This is Ryan Lamb from Department of Justice.
On the Risen Sun -- my understanding from

the -- the previous conversations we've had today with your associates is that the Risen Sun was -- was built for an entity that -- that later dissolved or was unable to complete the purchase, and Swiftship -- Swiftships took control of the vessel and has been holding it for sale; is -- is that correct?
A Yes, sir.
Q What other uses, if any, has Swiftships -- has this vessel been used for by Swiftships?
A I would defer that to either Mr. Shah or Mr. Omer.
Q Okay. On the certificate of title, when -- is it currently expired?
A Yes.
Q When did that expire?
A It's been some time. I'd have to look up the exact date. I can send that over to you -- I can send it over to Ryan Richmond, the expired certificate.
Q That would be helpful. Do you know when, approximately, it expired?
A No, I do not.
Q Was it this year or was it last year?
A I -- I can look it up.

Q Okay.
A Unless you prefer me to send it over to Mr. Richmond.
Q It would be helpful if -- if you could send it to -- to Mr. Richmond.
A Okay.

MR. LAMB:
I think that's it. I think that's the only questions I had. Again, thank you for your time this afternoon and all day today. Thank you.

THE WITNESS:
Thank you. Thank you.

MR. LAMB:
Back to you, Rick.

MR. SHELBY:
Thanks, everyone:
Ryan, Richmond, for having all your witnesses available. I think we're done for the day.

MS. HAUGEN:
Yeah. Ryan -- I'm sorry, Rick.

MR. SHELBY:
Yes.

MS. HAUGEN:

I just wanted to say something on the record that the UST had a number of questions about the transfers between the affiliates pre and post-petition. But based upon Mr. Saeed's testimony, which was very helpful, there appears to be a paper trail, and there is some kind of in the form of master service agreements, invoices, time sheets, and corporate ledgers.

So what I -- what the UST is going to do is I will make a formal Rule 2004 request for production of documents. I'll send it to Mr. Richmond, and if necessary, I'll do my own oral examination, but it may not be necessary, and I don't have any questions at this time.

MR. SHELBY:

Yeah, I was going to follow up. I think there's sort of a list that I'll put together for Mr. Richmond based upon Mr. Saeed's testimony as to what we would like to see as follow-up and make sure I copy everyone. And if Ryan has any issue on producing that under the current notice, we can -- we can discuss that offline.

MR. RICHMOND:

No. I -- I have no -- no issue with

that. I think just while we're here, Rick, you wanted the -- the MSAs, the general ledgers, the letter -- the communications going back with NAVSEA. The --

MR. SHELBY:

Yeah.

MR. RICHMOND:

-- either we sent back in, I think, January, and then their response the other day, and then there was a -- an -- a company value analysis. I've got like a preliminary list. We'll get started on those preliminary matters.

But if you want to supplement that by sending me something this weekend or on Monday with all the documents we want -- you want, we can do a supplementary production because I think we're still under the Rule 2004 exam notice.

MR. SHELBY:

Yeah, I think that -- that sounds good and acceptable to us. I appreciate it, Ryan.

MR. RICHMOND:

Yeah. No problem.

(WHEREUPON, THE 2004 EXAMINATION WAS CONCLUDED AT 3:40 P.M.)

(OFF-THE-RECORD)

(WITNESSES EXCUSED)

REPORTER'S PAGE

I, Alisha Patrice Armes, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn proceeding was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript.

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

Alisha Patrice Armes
Certified Court Reporter
License No. 2025001

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Alisha Patrice Armes, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was administered, do hereby certify that OMER SAEED, SHEHRAZE SHAH, MICHAEL POEL, and SADIA IQBAL after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 248 pages;

That this testimony was reported by me in the stenomask reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the foregoing transcript has been prepared in compliance with transcript format guidelines required by statute or by the Rules of the Louisiana Certified Shorthand Reporter Board; and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by the Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter;

That I am not of counsel, not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

Alisha Patrice Armes

Alisha Patrice Armes
Certified Court Reporter
License Number 2025001