UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:

SWIFTSHIPS, LLC — CASE NO. 26-50237

Debtor — CHAPTER 11

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTOR'S SECOND EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING AND GRANTING RELATED RELIEF**

COMES NOW Kevin M. Epstein, United States Trustee for Region 5 (the "U.S. Trustee"), and submits the objection to Debtor Swiftships, LLC's Second Expedited Motion for Interim and Final Orders Authorizing the Debtor to Obtain Postpetition Financing and Granting Related Relief ("Second DIP Motion") ECF No. 154, and states as follows:

## I. Preliminary Statement

1. While the Motion asserts that the proposed financing is in the best interest of the estate it is conclusory and unsupported. The Debtor's Monthly Operating Reports ("MORs") demonstrate the estate's condition has materially deteriorated during this case. Affiliate liabilities increased from approximately $16,469,668 million in March 2026 to $18,012,431 in September 2026, an increase of more than $1.5 million (ECF No. 96 at 16; ECF No. 153 at 17). Simultaneously, the Debtor's equity deficit worsened from negative $3,124,000 to negative $6,756,750, reflecting a further decline in estate value of approximately $3,632,750. (ECF No. 96 at 16; ECF No. 153 at 17). The Debtor also reported cumulative net losses of $4,047,270 through September averaging roughly $578,000 per month. At that rate, the proposed $600,000 Second DIP Facility would fund only about one month of operations.

2. Although the Debtor asserts that it needs the Second DIP Facility "to operate through the chapter 11 plan process" and "to quickly emerge from this Chapter 11 case," the

Motion provides no budget no cash flow forecast, no payroll analysis, no burn-rate calculation, or other evidence demonstrating that he proposed 600,000 facility is sufficient to carry the Debtor through confirmation or emergence from chapter 11. (ECF No. 154 ¶¶ 10, 26). The Motion does not even explain how long the funds are expected to last, or why the proposed financing is likely to achieve different result. Instead, the Debtor offers only conclusory assertions that the additional financing is necessary and beneficial.

**Background**

3. On March 18, 2026, the Debtor commenced this chapter 11 case. On July 14, 2026, the Debtor filed its first DIP motion seeking approval of a $600,000.00 post-petition loan from its affiliate, ICS Nett Inc., and requested that the insider lender be granted an administrative expense claim under 11 U.S.C. § 503(b)(1). (ECF No. 117).

4. Although ICS Nett Inc. had historically provided unsecured operating loans to the Debtor without priority status, repayment schedules, or restrictive covenants, the Debtor represented at the hearing on the First DIP Motion that the affiliate would not provide additional funding absent a subordinated administrative expense claim under § 503(b)(1). The Court entered an interim order approving the financing on September 14, 2026. (ECF No. 141).

5. On September 26, 2026, the Debtor filed the Second DIP Motion seeking approval of a new $600,000 unsecured DIP facility from its affiliate, ICS Nett, Inc., to "backstop payroll, fund ongoing operations, . . . and allow the company to continue through the Chapter 11 process." (ECF No. 154 at 4, 5, 10, 11-12). Unlike the First DIP Facility, the affiliate lender seeks only a subordinated general unsecured claim and also agrees to convert the First DIP Facility into a subordinated general unsecured claim. (ECF No. 154 at 2, 4-5, 8, 10-12).

6. During the pendency of this bankruptcy case, the Debtor filed eight monthly

operating reports which show the following:

| MONTH | GROSS INCOME | COST OF GOODS | GROSS PROFIT | OPERATING EXPENSES/OTHER | INTEREST | NET |
|---|---|---|---|---|---|---|
| March 18-31, 2026 | $316,136 | $311,813 | $4,323 | $106,726 | $30,090 | -$136,141 |
| April, 2026 | $280,029 | $272,024 | $8,005 | $252,147 | $74,901 | -$327,742 |
| May, 2026 | $131,369 | $446,540 | -$315,171 | $243,896 | $75,311 | -$643,077 |
| June, 2026 | $1,131,233 | $1,859,410 | -$728,177 | $73,194 | $79,281 | -$889,351 |
| July, 2026 | $254,875 | $814,063 | -$559,188 | $212,458 | $77,061 | -$857,406 |
| August, 2026 | $0 | $210,700 | -$210,700 | $223,468 | $132,698 | -$575,565 |
| September, 2026 | $0 | $337,066 | -$337,066 | $185,816 | $86,407 | -$617,988 |
| TOTAL | $2,113,642 | $4,251,616 | -$2,137,974 | $1,297,705 | $555,749 | -$4,047,270 |

(ECF No. 96, 97, 107, 144, 145, 152, 153). As shown above, the Debtor's cumulative net losses reached $4,047,270 with average monthly losses of $578,181 per month. At this rate, the U.S. Trustee calculates the Debtor's cumulative net losses will reach approximately $6,938,177 by year-end.

7. Although this case has been pending since March 2026, the Debtor has not filed a plan or disclosure statement, and its path to emergence from the Chapter 11 remains unclear.

8. Prior to filing of this Objection, the U.S. Trustee reached out to counsel for the Debtor seeking information that would clarify the necessity and effectiveness of the proposed financing and potentially narrow issues for the hearing. Specifically, the U.S. Trustee requested a budget and supporting financial information, including whether the DIP lender would receive any indirect benefits not disclosed in the motion; whether the estate was providing any consideration or benefit in exchange for the lender's agreement to convert the First DIP Facility from a priority claim to a subordinated unsecured claim; the circumstances that created the need for additional financing and why those circumstances were not identified during the First DIP

process; details regarding the payroll obligations the financing would support, including payroll amounts, dates, and employee counts; and the controls that would prevent DIP proceeds from being transferred to affiliates.

9. The U.S. Trustee also sought clarification regarding the Debtor's deteriorating financial condition, including how an additional $600,000 in financing would improve operational viability given cumulative losses exceeding $4 million and average monthly losses of approximately $578,000, and whether the Debtor anticipated requiring additional financing beyond the proposed Second DIP Facility. The U.S. Trustee never heard back from counsel for the Debtor.

## II. Legal Standard

### A. Insider DIP Financing Transactions are Subject to Heightened Judicial Scrutiny and Entire Fairness Rather than Deferential Business Judgment Review.

10. The Debtor's statutory theory is somewhat unclear because it expressly acknowledges that the proposed financing does not fit neatly within § 364(a)-(d). (ECF No. 154 ¶12). Nevertheless, the Debtor appears to rely principally on § 364(b). (ECF No. 154 ¶14). The Debtor then spends the remainder of its argument discussing the business-judgment standard and cites cases interpreting § 364 financing motions. However, as outlined by the U.S. Trustee in its objection to the First DIP Financing Motion, courts apply heightened scrutiny to insider transactions to ensure they are fair, reasonable, and necessary. The U.S. Trustee adopts legal standard outlined in his Objection to the First DIP Financing by reference. (ECF No. 130 ¶¶3-7). Here, because the arrangement involves an insider and it is subject to rigorous judicial scrutiny rather than a deferential "business judgment" standard.

## III. Argument

### A. The Debtor Failed to Provide Basic Financial Information Necessary to Evaluate the Proposed Financing

11. Although the Motion asserts that "the proceeds of the Second DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code," (ECF No. 154 ¶23), the Debtor has provided no evidence demonstrating how those funds will be safeguarded. As set forth in the U.S. Trustee's pending Motion to Dismiss or Convert, during the case, the Debtor has engaged in a pattern of nondisclosure and unauthorized transactions, including the concealment of affiliate management agreements, transfers to insiders, and the payment of professional fees without prior court approval. Despite these concerns, and despite the U.S. Trustee's pre-objection inquiry regarding what controls would be implemented to prevent DIP proceeds from being transferred to affiliates, the Debtor provided no response and identified no safeguards. Under these circumstances, the Debtor's assurances regarding the use of DIP proceeds are unsupported. (*See generally* ECF No. 154; Motion to Dismiss or Convert, hearing set January 20, 2027).

12. The Debtor asserts that "the terms of the Second DIP Facility are fair, appropriate, reasonable, adequate under the circumstances, and in the best interests of the Debtor, its estate, and its creditors." (ECF No. 154 ¶ 21). Prior to filing this objection, the U.S. Trustee requested information regarding whether the DIP lender would receive any indirect benefits not disclosed in the Motion and what consideration, if any, the estate would provide in exchange for the lender's agreement to convert the First DIP Facility from a subordinated administrative expense claim to a subordinated general unsecured claim. From a market standpoint, a lender's voluntary relinquishment of administrative priority in favor of a subordinated unsecured claim —without any stated consideration—is an unusual transaction, which defies commercial logic and warrants explanation. If there is a commercial or restructuring-related rationale for the proposed

conversion, the Debtor should disclose it to the Court and creditors. The Debtor did not respond to the U.S. Trustee's request for this information.

13. The Debtor asserts that it "requires access to additional liquidity provided under the Second DIP Facility to stabilize its operations, meet working capital and business operating needs, fund the administration of this Chapter 11 case . . . and quickly emerge from this Chapter 11 case." ECF No. 154 ¶26. Yet the Motion does not identify the circumstances that created the need for additional financing, explain why those circumstances were not addressed during the First DIP process, or provide basic information regarding the payroll obligations the financing is intended to support.

14. Before filing this objection, the U.S. Trustee sought information that would permit a meaningful evaluation of the proposed financing, including a budget, cash-flow projections, payroll information, and other supporting financial data. The Debtor did not provide the requested information.

15. The Debtor likewise failed to explain how an additional $600,000 in financing will improve operational viability despite reporting cumulative losses exceeding $4 million and average monthly losses of approximately $578,000, or whether additional financing requests are anticipated. Absent that information, the Court cannot determine whether the proposed financing is reasonably likely to achieve its stated objectives.

16. Because the Motion is unsupported by competent evidence, it consists largely of counsel's assertions. As a result, the Court lacks an evidentiary basis to determine whether the proposed financing is necessary, reasonable, or likely to achieve its stated objectives.

Kevin M. Epstein

United States Trustee
Region 5, Judicial Districts
of Louisiana and Mississippi

By: /s/ *Anna Haugen*
Anna Haugen

Anna Haugen, FL Bar No. 89555
Trial Attorney, Office of the U.S. Trustee
300 Fannin Street, Suite 3196
Shreveport, LA 71101
Anna.Haugen@usdoj.gov
Telephone No. (318) 676-3456
Direct Telephone No. (318) 676-3554

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:

| | |
|---|---|
| SWIFTSHIPS, LLC<br>Debtor | CASE NO. 26-50237<br>CHAPTER 11 |

**CERTIFICATE OF SERVICE**

I certify that a copy of the above and foregoing ORDER has been either mailed by first class mail, postage prepaid, or transmitted by CM/ECF to the following:

Swiftships, LLC
1105 Levee Road
Morgan City, LA 70380-1001

Ryan James Richmond
Sternberg, Naccari & White, LLC
450 Laurel Street,Suite 1450
Baton Rouge, LA 70801

Emile Joseph, Jr.
Allen & Gooch, A Law Corporation
P.O. Box 81129
Lafayette, Louisiana 70598

Benjamin W. Janke
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170

Carli M. Worsham
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170

Duris L. Holmes
DEUTSCH KERRIGAN, L.L.P.
755 Magazine Street
New Orleans, Louisiana 70130

Ryan W. Lamb
U.S. Department of Justice
P.O. Box 875-Ben Franklin Station
Washington, DC 20044

Joseph E. "Josh" Lee III
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

Claire A. Campbell (Bar #41181)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130

PATRICK K. RESO
HENRI S. THERIOT
CHEHARDY, SHERMAN, WILLIAMS,
RECILE & HAYES, L.L.P.
111 North Oak Street, Suite 200
Hammond, Louisiana 70401

Seth B. Shapiro
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875

Rick M. Shelby
KELLY HART PITRE
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Amelia L. Hurt
KELLY HART PITRE
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Louis M. Phillips
KELLY HART PITRE
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

KREBS FARLEY, PLLC
Laura F. Ashley
400 Poydras Street, Suite 2500
New Orleans, LA 70130

KREBS FARLEY, PLLC
Elliot Scharfenberg
400 Poydras Street, Suite 2500
New Orleans, LA 70130

Charels M. Rush, APLC
202 Magnate Drive
Lafayette, LA 70508

Mark. A Mintz
Jones Walker, LLP
201 St. Charles Ave., Ste. 5100
New Orleans, LA 70170-5100

Date: November 5, 2026

By: *__/s/ Jennifer J. Moore__*
Jennifer J. Moore
Paralegal Specialist
Office of the United States Trustee
300 Fannin Street, Suite 3196
Shreveport, LA 71101
Telephone No. (318) 676-3456